1
Richard R. Spirra (SBN: 106361)
2
rspirra@gordonrees.com
Paul A. Henreid (SBN: 214527)
3
phenreid@gordonrees.com
GORDON & REES LLP
4
101 W. Broadway, Suite 1600
San Diego, CA 92101
5
Telephone: (619) 696-6700
Facsimile: (619) 696-7124
6

7
Attorneys for Plaintiff
Jenny Craig Franchising, LLC

8

**FILED**

**FEB 2 2 2008**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
9

SOUTHERN DISTRICT OF CALIFORNIA
10

11

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA 92101

JENNY CRAIG FRANCHISING, LLC,
12
a Delaware limited liability company,

13
Plaintiff,

14
vs.

15
DMJ, INC. a Delaware corporation,

16
Defendant.

17

) Civil Case No. **'08 CV 0554 JM BLM**
)
) **COMPLAINT FOR BREACH OF**
) **CONTRACT AND INJUNCTIVE**
) **RELIEF**
)
)
)
)
)
)
)

18
    Plaintiff Jenny Craig Franchising, LLC ("Jenny Craig") alleges:

19
                                **Parties**

20
    1.    Jenny Craig is a limited liability company organized under the laws of the state of

21
Delaware. Its sole member is Jenny Craig NA Franchising, Inc., a California corporation whose

22
principal place of business is in San Diego County, California.

23
    2.    Defendant DMJ, Inc. ("DMJ") is a corporation organized under the laws of the

24
State of Delaware. Jenny Craig is informed and believes, and on that basis alleges, that DMJ's

25
principal place of business is in the state of Tennessee.

26

**ORIGINAL**

27
                        **Jurisdiction and Venue**

28
    3.    This Court has original subject matter jurisdiction of the claims set forth herein

- 1 -

COMPLAINT FOR BREACH OF CONTRACT AND INJUNCTIVE RELIEF

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA 92101

1   pursuant to 28 U.S.C. § 1332 because the value of the injunctive relief Jenny Craig seeks

2   exceeds $75,000, and the claims set forth herein are based on disputes between citizens of

3   different states. Specifically, Jenny Craig is a limited liability company organized under the laws

4   of the state of Delaware. Its principal place of business is in San Diego County, California. Its

5   sole member is Jenny Craig NA Franchising, Inc., a California corporation whose principal place

6   of business is in San Diego County, California. For purposes of determining whether there is

7   diversity of citizenship pursuant to 28 U.S.C. § 1332, Jenny Craig's state of citizenship is

8   California, the state in which its sole member is incorporated and has its principal place of

9   business. *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).

10  DMJ is a corporation incorporated under the laws of the State of Delaware, and Jenny Craig is

11  informed and believes, and on that basis alleges, that DMJ's principal place of business is in

12  Tennessee.

13      4.      This Court has personal jurisdiction over DMJ because, in section 22.3 of the

14  franchise agreements that this Complaint alleges DMJ breached, copies of which are attached

15  hereto as Exhibits 1 and 3, DMJ expressly agreed that "Any arbitration or litigation relating in

16  any way to this Agreement shall be conducted in San Diego, California." Personal jurisdiction

17  also exists by virtue of the fact that the agreements that are the subject of this action were entered

18  into in this district, and some of the obligations were to be performed by DMJ in this district.

19      5.      Venue for this matter is proper in this district because, in section 22.3 of the

20  franchise agreements that this Complaint alleges DMJ breached, copies of which are attached

21  hereto as Exhibits 1 and 3, DMJ expressly agreed that "Any arbitration or litigation relating in

22  any way to this Agreement shall be conducted in San Diego, California." Venue in this district is

23  also proper because the agreements that are the subject of this action were entered into in this

24  district, and some of the obligations were to be performed by DMJ in this district.

25

26                          **General Allegations**

27      6.      On or about April 23, 2001, Jenny Craig International, Inc. and  DMJ entered into

28  a franchise agreement.  The agreement provided, *inter alia,* that DMJ would operate a Jenny

- 2 -

1    Craig Weight Loss Centre in Memphis, Tennessee. A true and correct copy of that franchise

2    agreement (hereinafter referred to as the "Memphis Franchise Agreement") is attached hereto as

3    Exhibit "1" and incorporated herein by reference. The Memphis Franchise Agreement also

4    provided that, upon termination of that agreement, DMJ would have certain specific post-

5    termination obligations, including, but not limited to, transferring DMJ's interest in any lease of

6    the premises and/or equipment to Jenny Craig International, Inc., delivering possession of the

7    premises and certain equipment to Jenny Craig International, Inc., delivering all documents

8    relating to the franchise to Jenny Craig International, Inc., and paying for any food products

9    previously supplied to DMJ.

10         7.      On or about April 23, 2001, Jenny Craig International, Inc. and DMJ entered into

11   an Area Development Agreement for Memphis, Tennessee.  That agreement provided, *inter alia,*

12   that DMJ could, subject to certain terms and conditions, be granted the right to operate additional

13   Jenny Craig Weight Loss Centres in the Memphis area. A true and correct copy of that Area

14   Development Agreement  (hereinafter referred to as the "Memphis Area Development

15   Agreement")  is attached hereto as Exhibit "2" and incorporated herein by reference.

16         8.      On or about April 23, 2001, Jenny Craig International, Inc. and  DMJ entered into

17   a second franchise agreement.  The agreement provided, *inter alia,* that DMJ would operate a

18   Jenny Craig Weight Loss Centre in Jackson, Mississippi. A true and correct copy of that

19   franchise agreement (hereinafter referred to as the "Jackson Franchise Agreement") is attached

20   hereto as Exhibit "3" and incorporated herein by reference. The Jackson Franchise Agreement

21   also provided that, upon termination of that agreement, DMJ would have certain specific post–

22   termination obligations, including, but not limited to, transferring DMJ's interest in any lease of

23   the premises and/or equipment to Jenny Craig International, Inc., delivering possession of the

24   premises and certain equipment to Jenny Craig International, Inc., delivering all documents

25   relating to the franchise to Jenny Craig International, Inc., and paying for any food products

26   previously supplied to DMJ.

27         9.      On or about April 23, 2001, Jenny Craig International, Inc. and DMJ entered into

28   an Area Development Agreement for Jackson, Mississippi.  That agreement provided, *inter alia,*

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA 92101

- 3 -

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA 92101

1   that DMJ could, subject to certain terms and conditions, be granted the right to operate additional

2   Jenny Craig Weight Loss Centres in the Jackson area. A true and correct copy of that Area

3   Development Agreement  (hereinafter referred to as the "Jackson Area Development

4   Agreement") is attached hereto as Exhibit "4" and incorporated herein by reference.

5         10.    In 2003, Jenny Craig International, Inc. assigned to Jenny Craig all of Jenny

6   Craig International Inc.'s rights and obligations under the four agreements referred to in

7   Paragraphs 6-9 above.

8         11.    On November 16, 2007, Jenny Craig provided written notice to DMJ that DMJ

9   had defaulted on various obligations under all four of the agreements referred to in paragraphs

10   6-9 above. Jenny Craig gave DMJ 90 days, until February 14, 2008, to either cure the defaults or

11   transfer DMJ's rights and obligations under the four agreements to another franchisee.

12         12.    DMJ did not cure the defaults or transfer its rights and obligations under the four

13   agreements by February 14, 2008.

14         13.    On February 15, 2008, Jenny Craig  sent a letter to DMJ in which it confirmed

15   that: (1) the franchise agreements and area development agreements for both the Memphis and

16   Jackson franchises had been terminated as of February 14, 2008, pursuant to the express terms of

17   those agreements because DMJ had failed to cure the defaults or transfer its rights and

18   obligations under the agreements to another franchisee; and (2) that Jenny Craig would be

19   exercising its post-termination rights under the franchise agreements, including, but not limited

20   to, the right to take over the leases for the centres, the right to enter and inspect the premises and

21   equipment,  the right to purchase fittings and equipment in the centres at fair market value.

22         14.    Between February 15 and February 20, 2008, Jenny Craig demanded that DMJ

23   fulfill DMJ's post-termination obligations as set forth in section 15 of the franchise agreements,

24   including, but not limited to: transferring the leases for the Memphis and Jackson centres to

25   Jenny Craig; transferring the equipment and fittings in the Memphis and Jackson  centres to

26   Jenny Craig; surrendering possession of the centres' premises to Jenny Craig; permitting Jenny

27   Craig onto the premises to inspect the equipment and fittings; delivering all documents related to

28   the Memphis and Jackson franchises; turning operation of the centres over to Jenny Craig;

COMPLAINT FOR BREACH OF CONTRACT AND INJUNCTIVE RELIEF

1  paying all sums previously owed to Jenny Craig; and paying for any food products previously

2  supplied to DMJ.

### COUNT I

#### (Breach of Contract/Injunctive Relief – Memphis Centre)

6      15.    Jenny Craig repeats, realleges and incorporates by this reference paragraphs

7  1-14 of this Complaint as though fully set forth herein.

8      16.    Jenny Craig has fully performed all of its obligations under the Memphis

9  Franchise Agreement and the Memphis Area Development Agreement.

10      17.    DMJ has breached the Memphis Franchise Agreement by continuing to operate

11  the Memphis centre and representing that it is a Jenny Craig Weight Loss Centre after the

12  Memphis Franchise agreement was terminated,  and by failing to fulfill its post-termination

13  obligations set forth in section 15 of the Memphis Franchise Agreement, including, but not

14  limited to: transferring the lease for the Memphis centre to Jenny Craig;  permitting Jenny Craig

15  onto the Memphis centre's premises to inspect the equipment and fittings;  delivering equipment

16  and fittings on the Memphis centre's premises to Jenny Craig; delivering all documents and

17  materials related to the Memphis franchise to Jenny Craig; turning operation of the centre over to

18  Jenny Craig; terminating its use of Jenny Craig's trademarks and any materials bearing Jenny

19  Craig's trademarks after authorization to use such marks was terminated; paying all sums

20  previously owed to Jenny Craig; and paying for any food products previously supplied to DMJ.

21      18.    As a result of DMJ's failure to comply with its post-termination obligations,

22  Jenny Craig is suffering irreparable harm, and will continue to suffer such harm unless and until

23  DMJ is compelled to fulfill its obligations. More specifically, Jenny Craig's ability to continue

24  the existing relationships with the Memphis centre's landlords, employees, vendors and

25  customers is being significantly impeded by DMJ's failure to comply with its post-termination

26  obligations.  It is imperative that, once the franchise is terminated, the landlord, employees,

27  vendors and customers know that Jenny Craig is taking over operations immediately, and will

28  continue the relationships. If the franchise is being operated by "lame duck" owners, the landlord

- 5 -

1   may seek out new tenants, the employees may look for new jobs, vendors may find new

2   customers, and existing customers who learn that the franchise has been terminated may look for

3   another weight loss program because of uncertainty as to whether the Jenny Craig centre will

4   continue to function and serve their needs as it has in the past. Moreover, it is unlikely that a

5   franchisee whose franchises have been terminated will be motivated to provide the same level of

6   services to the franchises' customers. The disruption and uncertainty resulting from DMJ's

7   failure to fulfill its post-termination obligations is causing, and will continue to cause, damage to

8   Jenny Craig, including harm to Jenny Craig's goodwill and reputation, that is difficult to

9   quantify.  Furthermore, Jenny Craig and its franchisees are subject to various orders and

10  regulations of the Federal  Trade Commission and the Food and Drug Administration, and Jenny

11  Craig is not able to monitor DMJ's compliance with these orders and regulations.  In addition,

12  DMJ is continuing to use Jenny Craig's trademarks and other proprietary materials. Therefore,

13  money damages alone will not be adequate to fully compensate Jenny Craig for the harm caused

14  by DMJ's breaches of its post-termination obligations.

15          19.     Jenny Craig will continue to suffer this irreparable harm unless DMJ is enjoined

16  and ordered to cease using Jenny Craig's trademarks and to perform all of its post-termination

17  obligations and, as set forth in the Memphis Franchise Agreement.

18

19                                  **COUNT II**

20          **(Breach of Contract/Injunctive Relief – Jackson Centre)**

21          20.     Jenny Craig repeats, realleges and incorporates by this reference paragraphs 1-14

22  and 16-19 as though fully set forth herein.

23          21.     Jenny Craig has fully performed all of its obligations under the Jackson Franchise

24  Agreement and the Jackson Area Development Agreement.

25          22.     DMJ has breached the Jackson Franchise Agreement by continuing to operate the

26  Jackson centre and representing that it is a Jenny Craig Weight Loss Centre after the Jackson

27  Franchise agreement was terminated,  and by failing to fulfill its post-termination obligations set

28  forth in section 15 of the Jackson Franchise Agreement, including, but not limited to: transferring

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA  92101

- 6 -

1  the lease for the Jackson centre to Jenny Craig;  permitting Jenny Craig onto the Jackson centre's

2  premises to inspect the equipment and fittings;  delivering equipment and fittings on the Jackson

3  centre's premises to Jenny Craig; delivering all documents and materials related to the Jackson

4  franchise to Jenny Craig; turning operation of the centre over to Jenny Craig; terminating its use

5  of Jenny Craig's trademarks and any materials bearing Jenny Craig's trademarks after

6  authorization to use such marks was terminated; paying all sums previously owed to Jenny

7  Craig; and paying for any food products previously supplied to DMJ.

8       23.    As a result of DMJ's failure to comply with its post-termination obligations,

9  Jenny Craig is suffering irreparable harm, and will continue to suffer such harm unless and until

10  DMJ is compelled to fulfill its obligations. More specifically, Jenny Craig's ability to continue

11  the existing relationships with the Jackson centre's landlords, employees, vendors and customers

12  is being significantly impeded by DMJ's failure to comply with its post-termination obligations.

13  It is imperative that, once the franchise is terminated, the landlord, employees, vendors and

14  customers know that Jenny Craig is taking over operations immediately, and will continue the

15  relationships. If the franchise is being operated by "lame duck" owners, the landlord may seek

16  out new tenants, the employees may look for new jobs, vendors may find new customers, and

17  existing customers who learn that the franchise has been terminated may look for another weight

18  loss program  because of uncertainty as to whether the Jenny Craig centre will continue to

19  function and serve their needs as it has in the past. Moreover, it is unlikely that a franchisee

20  whose franchises have been terminated will be motivated to provide the same level of services to

21  the franchises' customers. The disruption and uncertainty resulting from DMJ's failure to fulfill

22  its post-termination obligations is causing, and will continue to cause, damage to Jenny Craig,

23  including harm to Jenny Craig's goodwill and reputation, that is difficult to quantify. Moreover,

24  Jenny Craig and its franchisees are subject to various orders and regulations of the Federal  Trade

25  Commission and the Food and Drug Administration, and Jenny Craig is not able to monitor

26  DMJ's compliance with these orders and regulations.   In addition, DMJ is continuing to use

27  Jenny Craig's trademarks and other proprietary materials.  Therefore, money damages alone will

28  not be adequate to fully compensate Jenny Craig for the harm caused by DMJ's breaches of its

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA 92101

- 7 -

1   post-termination obligations.

2       24.    Jenny Craig will continue to suffer this irreparable harm unless DMJ is enjoined

3   and ordered to cease using Jenny Craig's trademarks and to  perform all of its post-termination

4   obligations as set forth in the Jackson Franchise Agreement.

5

6                              **PRAYER FOR RELIEF**

7       WHEREFORE, Jenny Craig prays for the following relief against DMJ:

8       1.  An injunction requiring DMJ to specifically and fully perform all post-

9           termination obligations set forth in section 15 of the Memphis Franchise

10          Agreement and the Jackson Franchise Agreement, including, but not limited to:

11          immediately transferring the leases for the Memphis and Jackson centres to Jenny

12          Craig; immediately delivering possession of the Memphis and Jackson centres'

13          premises to Jenny Craig; immediately permitting Jenny Craig onto the Memphis

14          and Jackson centres' premises to inspect the equipment and fittings; immediately

15          delivering all equipment and fittings to Jenny Craig; immediately delivering all

16          documents related to the Memphis and Jackson franchises to Jenny Craig;

17          immediately turning operation of the Memphis and Jackson centres over to Jenny

18          Craig; immediately ceasing use of Jenny Craig's trademarks and/or representing

19          that it is operating a Jenny Craig Weight Loss Centre; and immediately paying for

20          any food products previously supplied to DMJ by any third party; and

21      2.  Such further and other injunctive relief that this Court deems proper.

22

23

24  Dated:  2-22-08                          GORDON & REES LLP

25

26                                          By:
                                                Richard R. Spirra
27                                              Attorneys for Plaintiff
                                                Jenny Craig Franchising, LLC

28

Gordon & Rees LLP
101 West Broadway, Suite 2000
San Diego, CA 92101

COMPLAINT FOR BREACH OF CONTRACT AND INJUNCTIVE RELIEF

**EXHIBIT 1**

# EXHIBIT 1

FRANCHISE AGREEMENT


BY AND BETWEEN


JENNY CRAIG INTERNATIONAL, INC.
(Franchisor)


AND


DMJ, INC.
(Franchisee)


Centre # 8072
Park Place
1233 Park Place Center, #1233
Memphis, TN 38119


K:\Legal\Franchise\UFOC\FA 2-01 Fran.doc

TABLE OF CONTENTS

Section                                                                                                    Page

1       GRANT OF FRANCHISE. ................................................................................... 1
        1.1 Grant. ............................................................................................................ 1
        1.2 Acceptance. ................................................................................................... 1

2       TERRITORY. ...................................................................................................... 2
        2.1 Grant. ............................................................................................................ 2
        2.2 Reservation of Rights. ................................................................................... 2

3       SITE SELECTION. ............................................................................................. 2
        3.1 Location. ........................................................................................................ 2
        3.2 Selection. ....................................................................................................... 2
        3.3 Government Approval. ................................................................................... 4
        3.4 Relocation. ..................................................................................................... 4
        3.5 Leasehold Improvements. ............................................................................. 4
        3.6 Opening. ......................................................................................................... 4
        3.7 Grand Opening. .............................................................................................. 4
        3.8 Indemnification. ............................................................................................ 4

4       TERM AND RENEWAL. ..................................................................................... 4
        4.1 Term. .............................................................................................................. 4
        4.2 Renewal Rights and Conditions. .................................................................... 5
        4.3 Form of Renewal Franchise Agreement. ........................................................ 5
        4.4 Exercising Right To Renew. ........................................................................... 6

5       FEES. .................................................................................................................... 6
        5.1 Initial Franchise Fee. ..................................................................................... 6
        5.2 Continuing Fees. ............................................................................................ 6
        5.3 Gross Receipts. .............................................................................................. 6
        5.4 Payment of Continuing Fees. ......................................................................... 7
        5.5 Late Payment; NSF Checks. ........................................................................... 7
        5.6 Electronic Funds Transfers. ........................................................................... 7

6       DUTIES AND RESPONSIBILITIES OF FRANCHISOR. ................................. 7
        6.1 Location Information. ..................................................................................... 7
        6.2 General. .......................................................................................................... 7
        6.3 Advertising and Promotional Materials. ........................................................ 7
        6.4 Equipment. ..................................................................................................... 8
        6.5 Training. ......................................................................................................... 8
        6.6 Layout and Color Scheme. ............................................................................. 8
        6.7 Franchise Manual. .......................................................................................... 8

7       TRADEMARKS. ................................................................................................... 9
        7.1 General. .......................................................................................................... 9
        7.2 Product Quality. ............................................................................................. 9
        7.3 Title and Protection. ...................................................................................... 9

i

7.4 Display of Trademarks...................................................................... 9
7.5 Tradename....................................................................................... 10
7.6 Defense by Franchisor. ................................................................... 10

8     ADDITIONAL TRADEMARK PROVISIONS.......................................... 10
8.1 Third Party Infringers, ................................................................... 10
8.2 Stopping Use of Trademarks. ........................................................ 10
8.3 Use of Trademarks. ........................................................................ 11
8.4 Best Efforts. ................................................................................... 11

9     ADDITIONAL OBLIGATIONS OF FRANCHISEE. .............................. 11
9.1 Promote Business............................................................................ 11
9.2 Staff................................................................................................. 11
9.3 Conform to Programs...................................................................... 12
9.4 Hours............................................................................................... 12
9.5 Minimum Business Requirements. ................................................. 12
9.6 Competitive Merchandise. .............................................................. 13
9.7 Independent Contractor Relationship. ............................................ 13
9.8 Independent Ownership Notice....................................................... 13
9.9 Fictitious Business Name................................................................ 14
9.10 Telephone Lines............................................................................ 14
9.11 Compliance with Franchise Manual. ............................................ 14
9.12 Records and Accounting............................................................... 14
9.13 Audit. ........................................................................................... 14
9.14 Audit Result. ................................................................................ 15
9.15 Attendance at Meetings................................................................ 15
9.16 Notification of Ownership. ........................................................... 15
9.17 Insurance. ..................................................................................... 15
9.18 Standard of Conduct for Franchisee. ........................................... 16
9.19 Maintain Reasonable Access To Inspect. ..................................... 16
9.20 Secrecy and Confidential Information. .......................................... 16
9.21 Initial Training. ............................................................................ 17
9.22 Indemnification by Franchisee to Franchisor. .............................. 17
9.23 Law and Licenses.......................................................................... 17
9.24 Franchisor's Right To Make Changes. ......................................... 18

10    REQUIREMENT TO PURCHASE FOOD AND EQUIPMENT. ....................... 18
10.1 Food Products Purchase Agreement. ............................................ 18
10.2 Purchase from Others.................................................................... 18
10.3 Specifications................................................................................ 19
10.4 Computer System.......................................................................... 19
10.5 Year 2000 Compliance. ................................................................ 19

11    ADVERTISING.................................................................................... 19
11.1 Advertising and Promotion............................................................ 19
11.2 Amount of Advertising. ................................................................ 20
11.3 National Advertising. .................................................................... 20
11.4 Sales Outside of Centre................................................................. 20

12    RESTRICTIVE COVENANTS........................................................................20
       12.1 Restriction..........................................................................................20
       12.2 Employment of Personnel...................................................................21
       12.3 Owners...............................................................................................21
       12.4 Other Skills........................................................................................21
       12.5 Presumption.......................................................................................21

13    TRANSFER AND ASSIGNMENT...................................................................21
       13.1 Transfer and Assignment by Franchisee...............................................21
       13.2 Franchisor's Approval of Transfer.......................................................22
       13.3 Right of First Refusal..........................................................................23
       13.4 Death or Incapacity of Franchisee or Controlling Owner or Shareholder....24
       13.5 Assignment by Franchisor....................................................................24

14    TERMINATION BY FRANCHISOR.................................................................24
       14.1 Termination by Franchisor With Notice and Opportunity to Cure..............25
       14.2 Termination by Franchisor with Twenty Four Hours' Notice and Opportunity
              to Cure...............................................................................................25
       14.3 Termination by Franchisor without Notice or Opportunity to Cure............25

15    ACTION ON TERMINATION.........................................................................27
       15.1 Deliver Up Documents and Stop Using Intellectual Property....................27
       15.2 Remove or Obliterate Signs and Features..............................................27
       15.3 Divest Intellectual Property Rights.......................................................27
       15.4 Sale of Selected Fittings and Equipment...............................................27
       15.5 Lease of Premises or Equipment..........................................................28
       15.6 Telephone Numbers............................................................................28
       15.7 No Rebate..........................................................................................28
       15.8 Obligation To Pay...............................................................................28
       15.9 Payment for Food................................................................................28
       15.10 Uncompleted Obligations....................................................................28
       15.11 Survival of Obligations.......................................................................28

16    INJUNCTIVE RELIEF...................................................................................28

17    NOTICES....................................................................................................29

18    WAIVER......................................................................................................29

19    THIRD PARTIES..........................................................................................29

20    ENTIRE AGREEMENT...................................................................................29

21    OWNERS GUARANTEE.................................................................................30

22    ARBITRATION/DISPUTE RESOLUTION.........................................................30
       22.1 Arbitration.........................................................................................30
       22.2 Franchisor Actions.............................................................................31
       22.3 Consent to Jurisdiction.......................................................................31

23    SEVERABILITY, COMPETENT JURISDICTION, ETC........................................31

24    GOVERNING LAW.......................................................................................32

25    LIMITATION OF LIABILITY. ........................................................... 32
26    APPROVALS AND REQUESTS. ....................................................... 32
27    LEGAL FEES AND COSTS. ............................................................. 32
28    FORCE MAJEURE. .......................................................................... 33
29    NO OFFSET. ................................................................................... 33
30    TIME OF ESSENCE. ........................................................................ 33
31    INTERPRETATION. ......................................................................... 33
32    EFFECTIVENESS. ........................................................................... 34
33    RESERVATION OF RIGHTS. ........................................................... 34
34    ACKNOWLEDGMENT AND DISCLAIMER. ...................................... 34

EXHIBIT A        FRANCHISE LOCATION

EXHIBIT B        FOOD PRODUCTS PURCHASE AGREEMENT

EXHIBIT C        GUARANTEE AND ASSUMPTION OF OBLIGATIONS

EXHIBIT D        DECISION AND ORDER

JENNY CRAIG INTERNATIONAL, INC.

FRANCHISE AGREEMENT

This Franchise Agreement (this "Agreement"), effective as of the 1st day of April, 2001 (the "Effective Date"), is made and entered into by and between **Jenny Craig International, Inc.**, a California corporation ("**Franchisor**"), and DMJ, Inc., a ~~Tennessee~~ corporation ("**Franchisee**"), with reference to the following facts:

*Delaware*

RECITALS

A.    Franchisor owns a proprietary system for developing, opening and operating weight management centres providing products and services to customers to help them manage their body weight (the "System").

B.    Franchisor is the owner or licensee of trade secrets, trademarks, trade names, service marks, copyrights and logos, including but not limited to the marks "Jenny Craig" and "Jenny Craig Personal Weight Management" (the "Marks"), all of which are part of the System.

C.    Franchisor continues to expend time, skill and money seeking to improve the System and to integrate into it new or substitute programs, procedures, systems, services, activities and products.

D.    Franchisee desires to obtain a franchise to operate one Jenny Craig Weight Loss Centre using the System, and Franchisor is willing to grant to Franchisee a franchise on the terms and conditions in this Agreement.

Accordingly, the parties agree as follows:

AGREEMENT

1    GRANT OF FRANCHISE.

1.1    Grant.  Franchisor grants to Franchisee the right, subject to all the terms and conditions of this Agreement, to use the System to operate one Jenny Craig Weight Loss Centre (the "Centre") at the Franchise Location (as defined in Section 3.1).  The rights granted include the right to sell approved food and other products that: (a) bear the Marks and are purchased from Franchisor or an affiliate of Franchisor or from suppliers who obtained from Franchisor or an affiliate of Franchisor a license to affix the Marks on the products; or (b) are obtained from Approved Suppliers (as defined in Section 10).  No right is implied in Franchisee or in any supplier to use any of the Marks in any other manner than is set forth in this Agreement.  The rights granted in this Section 1.1 are referred to herein as the "Franchise."

1.2    Acceptance.  Franchisee accepts the Franchise and agrees to operate the Centre according to the terms of this Agreement.  Franchisee shall use its best efforts to develop and expand the market for the products and services offered by the Centre.

1



2    TERRITORY.

2.1    Grant. Franchisee's right to establish, own and operate the Centre is restricted to the Centre address identified in Exhibit A to this Agreement (the "Location"). No other territory rights with respect to the Centre are granted hereunder.

2.2    Reservation of Rights. Franchisee acknowledges that the rights granted in this Agreement do not include any exclusivity except as expressly set forth in this Section 2, and that Franchisor and its affiliates, licensees or other authorized third parties may advertise, solicit and service clients, and conduct business in any manner not expressly restricted in this Section 2. By way of example of the foregoing, Franchisor, its affiliates, licensees or other authorized third parties may engage in activities that include, but are not limited to, the following: (i) broadcast, print or other advertising, whether by radio, television, cable, satellite, print, Internet or other media, (ii) direct sale to persons or entities, whether through telemarketing, direct mail, Internet or otherwise, of goods or services, including without limitation, food and other products bearing the Marks; and (iii) sale at retail locations of food and other products, including without limitation, those bearing the Marks.

3    SITE SELECTION.

3.1    Location. The term "Franchise Location" shall mean the location within the Development Area described in the parties' Area Development Agreement selected by Franchisee and approved by Franchisor where Franchisee shall operate the Centre pursuant to this Agreement.

3.2    Selection. Franchisee shall submit to Franchisor for Franchisor's review a proposed location and proposed lease for the Centre at the Franchise Location. Franchisee shall submit information regarding Franchisee's proposed location for a Centre, as set forth in Franchisor's then–current site selection criteria. Franchisee shall not sign a lease for the location until after Franchisee receives Franchisor's written approval of both the proposed location and the proposed lease. In approving or disapproving any proposed location, Franchisor shall have the right to consider any factors Franchisor deems material including, without limitation, demographic characteristics, traffic patterns, parking, character of the neighborhood, proximity to other similar businesses, size and appearance of premises, and other physical and commercial characteristics.

3.2.1    On request by Franchisor, Franchisee shall submit to Franchisor site analyses, maps, photos, diagrams of the premises and other information that Franchisor requests to review the proposed location and proposed lease.

3.2.2    Before Franchisee executes any lease for a proposed location, Franchisee shall deliver the proposed lease to Franchisor for Franchisor's approval. Franchisee shall not execute a lease that Franchisor disapproves. After receiving the proposed lease and other information requested by Franchisor for review of the proposed location, Franchisor shall communicate its approval or disapproval. Absence of any one

2

or more of the following provisions from the proposed lease may be among the grounds for Franchisor to disapprove:

      3.2.2.1    "This lease is immediately assignable by Franchisee to Jenny Craig International, Inc. or its affiliates, successors-in-interest or related entities (as may be designated by Jenny Craig International, Inc.) at any time during its term without further authorization and consent of Landlord";

      3.2.2.2    "Landlord shall furnish to Jenny Craig International, Inc. written notice specifying any default and the method of curing the default under the lease and shall allow Jenny Craig International, Inc. thirty (30) days after receipt thereof to cure the default";

      3.2.2.3    "Landlord acknowledges that only Franchisee is responsible for any and all debts, payments and performance due under this lease before the time, if any, that Jenny Craig International, Inc. or its affiliates, successors-in-interest or related entities take actual possession of the premises";

      3.2.2.4    "The lease may not be amended without Jenny Craig International, Inc.'s prior written consent, which consent shall not be unreasonably withheld. Jenny Craig International, Inc. shall be promptly provided with copies of all proposed amendments and all signed amendments hereto"; and

      3.2.2.5    "The foregoing provisions are expressly for the benefit of Jenny Craig International, Inc. and its affiliates, successors-in-interest and related entities. The foregoing provisions are rights, but not obligations, of Jenny Craig International, Inc., its affiliates, successors-in-interest and related entities to assume the rights and obligations of Franchisee under this lease."

    3.2.3   Within forty-five (45) days after the Effective Date of this Agreement, Franchisee shall:

      3.2.3.1    obtain Franchisor's written approval of the Franchise Location; and

      3.2.3.2    cause to be delivered to Franchisor a copy of the lease for the Franchise Location executed by Franchisee and the landlord or its authorized representative.

    3.2.4   Site selection assistance, if any, provided by Franchisor and the exercise of Franchisor's approval rights shall not be construed as an express or implied warranty, nor give rise to any liability of Franchisor, with respect to actual viability or profitability of the Centre or the Franchise Location.

    3.2.5   Franchisee shall operate the Centre only at the Franchise Location. The Franchise Location shall be used for no purpose other than operating the Centre pursuant to this Agreement.

3.2.6 Except as otherwise provided in this Agreement, Franchisee shall not assign the lease or sublet the premises of the Centre or any portion of the premises containing the Centre without Franchisor's prior written consent.

3.3 <u>Government Approval</u>. Franchisee shall be solely responsible to seek and obtain all licenses, consents, use permits, zoning variances and other approvals of any federal, state or local government or other authority required for Franchisee to lawfully open and operate the Centre.

3.4 <u>Relocation</u>. Franchisee shall not relocate the Centre from the Franchise Location without Franchisor's prior written consent. Franchisor shall have the right to require that any relocation occur in compliance with the provisions in this Section 3 relating to the lease and all other provisions of this Agreement relating to the Franchise Location. Franchisor shall have the right to condition any relocation on the requirement that Franchisee not be in breach of this Agreement. Any relocation of the Centre occurring with the prior approval of and in compliance with this Agreement shall be deemed to be the Franchise Location as such term is used in this Agreement.

3.5 <u>Leasehold Improvements</u>. Franchisee shall, at Franchisee's sole expense, effect leasehold improvements and obtain and install fixtures, furniture and equipment at the Centre as required to comply with Franchisor's then-current requirements and specifications for Centre design and image.

3.6 <u>Opening</u>. Franchisee shall open the Centre for business within one hundred twenty (120) days after the Effective Date of this Agreement.

3.7 <u>Grand Opening</u>. No later than ninety (90) days from the date the Centre commences operations, Franchisee shall expend a sum acceptable to Franchisor as is reasonably necessary to implement a grand opening promotional advertising program approved by Franchisor for the Centre; provided, however, that such a sum shall be not less than Three Thousand Dollars ($3,000.00).

3.8 <u>Indemnification</u>. Franchisor shall not be liable for any loss or damage arising from the design, plans or specifications of the Centre, regardless of whether Franchisor provided, reviewed or approved them or for any other reason. Franchisee shall indemnify, defend and hold harmless Franchisor for any loss, damage, cost or expense, including attorneys' and experts' fees, that may potentially be sustained by Franchisor due to acts or omissions of Franchisor, Franchisee, Franchisee's contractors, subcontractors or other vendors arising from or relating to the design or construction of the Centre.

4    <u>TERM AND RENEWAL</u>.

4.1 <u>Term</u>. The term of this Agreement (the "<u>Agreement Term</u>") shall commence on the Effective Date hereof and shall expire ten (10) years after the Effective Date, unless earlier terminated as provided in Section 14. If this Agreement is renewed pursuant to Section 4.2.1, such renewal term shall be referred to herein as a "<u>Renewal Term</u>."

4



4.2    Renewal Rights and Conditions.

4.2.1    Franchisee shall have the right to renew this Agreement and enter into one (1) Renewal Franchise Agreement (as defined in Section 4.3), for an additional ten (10) year term, subject to Franchisee's timely satisfaction for each renewal of all the provisions in Sections 4.2 through 4.4, each of which is a condition precedent to renewal.

4.2.2    At the time Franchisee exercises the right to enter into a Renewal Franchise Agreement, and when the Renewal Term starts, Franchisee shall have fully performed all terms and provisions in this Agreement, shall not be in default of any term or provision of this Agreement, shall be in compliance with the Franchise Manual and with all other agreements with Franchisor or any affiliate of Franchisor, and shall be current with respect to all amounts owed to Franchisor or any affiliate of Franchisor.

4.2.3    Before signing a Renewal Franchise Agreement, Franchisee shall demonstrate to Franchisor's satisfaction the ability to either (i) retain lawful possession of the Franchise Location for the duration of the Renewal Term on terms acceptable to Franchisor or (ii) within one hundred twenty (120) days after expiration of the then-existing lease, lease a new Franchise Location, acceptable to Franchisor, for the duration of the Renewal Term.

4.2.4    Before signing a Renewal Franchise Agreement, Franchisee shall sign a general release satisfactory to Franchisor of any and all claims against (i) Franchisor, (ii) all affiliates of Franchisor, (iii) all other persons or entities who could assert against Franchisor or against an affiliate of Franchisor a claim for indemnity or similar claim as a result of a claim being brought against any of them by Franchisee, and (iv) the respective shareholders, directors, officers, partners, agents, attorneys, contractors and employees of all of the foregoing, in both their corporate and individual capacities, whether arising out of or in any way related to this Agreement, the Franchise Manual, or any other agreement between Franchisor or an affiliate of Franchisor and Franchisee ("General Release").

4.2.5    Not later than the time of signing the applicable Renewal Franchise Agreement, Franchisee shall have satisfied or arranged to satisfy Franchisor's then-current qualification and training requirements for a renewing Jenny Craig Weight Loss Centre Franchisee.

4.2.6    Franchisee shall upgrade, remodel and refurbish the Centre, both exterior and interior, to comply with Franchisor's then-current standards and specifications including, without limitation, upgrades to Franchisee's computer and technology equipment and systems.

4.3    Form of Renewal Franchise Agreement.  Upon renewal, Franchisee shall sign Franchisor's then-current form of Franchise Agreement and any and all ancillary agreements that Franchisor then requires ("Renewal Franchise Agreement"). The terms of the Renewal Franchise Agreement may provide for different or additional fees, or both, and may otherwise materially differ from the provisions in this Agreement, except

5

that the Franchise Location shall be the same, the duration shall be the applicable period of time provided in Section 4.2.1, and there shall be no initial franchise fee.

4.4 <u>Exercising Right To Renew</u>. Franchisee's option to renew this Agreement shall be exercised as follows:

4.4.1 At least one hundred twenty (120) days, but not more than one hundred eighty (180) days, before the end of the Agreement Term, Franchisee shall in writing notify Franchisor of its intent to renew and request from Franchisor a copy of Franchisor's then-current Uniform Franchise Offering Circular or equivalent disclosure document, the Renewal Franchise Agreement and applicable ancillary agreements; and

4.4.2 No sooner than fifteen (15) days after receipt and no later than the expiration of this Agreement, Franchisee shall sign the Renewal Franchise Agreement and all applicable ancillary agreements that Franchisor then requires Franchisee to sign and shall deliver these documents to Franchisor with payment of a renewal fee of One Thousand Dollars ($1,000) ("<u>Renewal Fee</u>").

4.4.3 Franchisee's failure to perform fully and timely any acts required in Sections 4.2 through 4.4 shall be deemed an election by Franchisee not to exercise the right to enter into a Renewal Franchise Agreement.

4.4.4 Franchisor's delivery of any documents to Franchisee pursuant to this Section 4.4 shall not constitute a waiver of any of Franchisee's obligations or of any conditions precedent in Sections 4.2 through 4.4. If Franchisee has exercised the right to enter into a Renewal Franchise Agreement as provided in this Agreement and, through and including the date this Agreement expires, Franchisee has satisfied all obligations and conditions precedent in Sections 4.2 through 4.4, then on (or as of) the date this Agreement expires, Franchisor shall sign the Renewal Franchise Agreement previously signed and returned by Franchisee pursuant to Section 4.4 and shall provide Franchisee with a copy of the signed Renewal Franchise Agreement.

5 FEES.

5.1 <u>Initial Franchise Fee</u>. On signing this Agreement, Franchisee shall pay to Franchisor a non-refundable initial franchise fee of Twenty-Five Thousand Dollars ($25,000) ("<u>Initial Franchise Fee</u>"). This amount shall be deemed to be fully earned when paid and is non-refundable, except as provided in Section 14.3.8.

5.2 <u>Continuing Fees</u>. Franchisee shall pay to Franchisor a weekly continuing fee (the "<u>Continuing Fee</u>") of seven percent (7%) of Franchisee's total Gross Receipts.

5.3 <u>Gross Receipts</u>. The term "<u>Gross Receipts</u>" shall mean the amount of all receipts Franchisee receives from operation of the Centre including, but not limited to, all receipts from customers or others for the use of the facilities and services provided by Franchisee, from the sale of food products, and from any other services, sales or other activities conducted by Franchisee; provided, however, that actual customer refunds and rebates, and any sales, use or similar taxes separately itemized and collected by

Franchisee and timely paid to the proper taxing authority in connection with such receipts, shall be excluded from Gross Receipts.

5.4    Payment of Continuing Fees. Franchisee shall deliver to Franchisor weekly, on a form approved by Franchisor, a report of the amount of Franchisee's Gross Receipts for the prior week ending Friday and shall deliver with that report the Continuing Fee due with respect to the Gross Receipts for that week. Franchisee shall also deliver to Franchisor monthly, on a form approved by Franchisor, an income and expense report for the preceding month. The weekly report and Continuing Fee shall be due within seven (7) days after the end of the reporting week, and the monthly report shall be due within thirty (30) days after the close of the previous month.

5.5    Late Payment; NSF Checks. Any Continuing Fee, or any other amount, not paid when due and/or not received by Franchisor within seven (7) days following the end of the reporting week shall be deemed past due and shall bear interest at two (2) percentage points above the prime rate published from time to time by Bank of America (or its successor), or at the maximum rate allowed by applicable law, whichever is less. If Franchisee submits more than one (1) check which is returned for insufficient funds during any calendar year, Franchisor shall have the right to require Franchisee to pay Continuing Fees by certified or cashier's checks. This provision does not authorize or excuse a late payment or dishonored check or otherwise waive any right of Franchisor to collect any Continuing Fee.

5.6    Electronic Funds Transfers. In the event that Franchisor commences an electronic funds transfer payment program, Franchisor shall give Franchisee one hundred twenty (120) days' written notice thereof, and commencing the following calendar month, Franchisor may electronically debit from Franchisee's bank account any and all fees provided for herein including, but not limited to, Continuing Fees.

6    DUTIES AND RESPONSIBILITIES OF FRANCHISOR.

6.1    Location Information. If requested by Franchisee, Franchisor shall provide information to assist Franchisee (a) in the selection of a location of premises for the Centre and (b) in the negotiation of a premises lease.

6.2    General. Franchisor shall provide management, sales and administrative information from time to time and allow Franchisee to consult with personnel of Franchisor at usual times of business with respect to the efficient operation of the Franchise.

6.3    Advertising and Promotional Materials. Franchisor shall provide information to Franchisee from time to time about advertising and promoting the Centre and the food and services offered to the public. Franchisor may, in its sole discretion, develop concepts and materials for advertising campaigns and other promotional activities for food and services offered to the public. The cost of placing any such advertising or promotional materials shall be borne by Franchisee.

6.4    Equipment. Franchisor shall provide Franchisee with information from time to time with respect to equipment and fittings necessary for the Centre and shall make available or identify sources of such equipment and fittings for purchase.

6.5    Training. If this is Franchisee's first Centre, prior to commencing operations (or taking possession in the case of a Transfer), Franchisor shall provide, and Franchisee shall attend, a training program at a location to be chosen at Franchisor's discretion as described in Section 9.21 for all principals of Franchisee with management responsibility and one additional person designated by Franchisee. At Franchisee's request, Franchisor will provide training for additional personnel of Franchisee at Franchisor's then-current training fees. All travel, lodging, meals and other expenses and compensation of Franchisee's employees with respect to such training shall be fully paid by Franchisee and shall be at no cost or expense whatsoever to Franchisor. Franchisor shall provide its standard training materials that shall be loaned to Franchisee and updated as changes occur. Such materials shall remain the property of Franchisor and all copyrights and all other proprietary rights in such materials are reserved to Franchisor and shall not in any manner whatsoever pass to Franchisee.

6.6    Layout and Color Scheme. Franchisor shall provide Franchisee with information and details as to the layout and color scheme requirements for the Centre.

6.7    Franchise Manual. Franchisor shall loan to Franchisee one (1) copy of its franchise manual ("Franchise Manual") to assist Franchisee in the operation of the Centre. The Franchise Manual means all manuals developed and produced by Franchisor and loaned to Franchisee during the term of this Agreement, including, without limitation, Centre operations manuals, policy manuals, training manuals, and marketing manuals. The manuals, or some of them, may be made available to Franchisee electronically. Franchisee shall comply with the Franchise Manual as provided in this Agreement including, without limitation, Sections 9.11 and 9.18. The Franchise Manual may include:

6.7.1    Prescribed policies, standards, requirements, practices, methods and procedures with respect to the System and the operation and management of the Centre and maintenance of the Centre's image;

6.7.2    Programs for training and supervising managerial and operating personnel;

6.7.3    A system of Centre management controls;

6.7.4    Formats for bookkeeping, recordkeeping and making reports to Franchisor;

6.7.5    Advertising policies and procedures; and

8

6.7.6   Such other matters as Franchisor deems appropriate.

Franchisor shall periodically review the Franchise Manual and, if Franchisor deems appropriate, make modifications to the Franchise Manual and promptly distribute a copy of such modifications to Franchisee, who shall promptly implement the changes in the Centre.

7      TRADEMARKS.

7.1   General.  Franchisee agrees to commence use of the Marks and the operation of the Centre within one hundred twenty (120) days after the Effective Date of this Agreement.  Franchisee shall not cause or permit any use of the Marks or the System other than in the operation of the Centre.  Franchisee shall not manufacture, sell or otherwise deal with or distribute any goods, articles or services bearing any words or symbols associated with or confusingly similar to the Marks.

7.2   Product Quality.  Franchisee agrees that any products manufactured, sold, distributed or otherwise disposed under this Agreement shall bear the Marks only in the manner designated by Franchisor, shall meet the standards of quality, workmanship, material, design, size, color and style established by Franchisor and, if so required by Franchisor, shall bear a legend satisfactory to Franchisor stating that the Marks are the sole property of Franchisor.  Franchisee shall not cause or permit any goods, articles or services to be available for sale that may adversely affect the good name, reputation or goodwill of Franchisor.  Franchisee shall cause all goods, articles and services to conform to and comply with, in all respects, all federal, state and local laws, rules and regulations. Franchisee shall not cause or permit (a) the use of any substandard or offensive material in goods, articles or services bearing the Marks; (b) violation of any federal, state or local law or regulation, including but not limited to, regulations imposing advertising standards or requiring trade or content descriptions of goods, articles or services; or (c) the use of the Marks or any other word, design or symbol associated in any way with Franchisor in connection with any product or activity that is not the subject of this Agreement.

7.3   Title and Protection.  Franchisee acknowledges that there is great value to the goodwill associated with the Marks, the System and the worldwide recognition of the same.  Franchisee acknowledges that the proprietary rights therein, and goodwill attached thereto, are owned solely by Franchisor and that the Marks have a secondary meaning that is firmly associated in the minds of the general public with Franchisor's goods and services, and any additional goodwill attached to the Marks and the System created through the use of the Marks and the System by Franchisee shall inure to the benefit of Franchisor alone.

7.4   Display of Trademarks.  Franchisee shall use and continue to use the Marks, logos, signs and plans in the Centre as prescribed from time to time by Franchisor in the Franchise Manual, and Franchisee shall not make any alterations to any Marks, logos, signs or plans without the prior written consent of Franchisor.  Further, Franchisee shall not use any sign, logo or plan that Franchisor prohibits in the Franchise Manual or otherwise disapproves from time to time.  Franchisee shall pay all costs relating to the use of the Marks and all logos, signs and plans.

9

7.5    Tradename.  If Franchisee is or shall become a corporation or other business entity, Franchisee shall not use the term or words "JENNY," "CRAIG," "JENNY CRAIG," "JENNY CRAIG WEIGHT LOSS CENTRES," or "JC" in its corporate or entity name.  All rights in and to the name "JENNY CRAIG" and any part thereof, addition thereto and use thereof and the Marks used in connection therewith, shall be and remain the exclusive property of Franchisor, and Franchisee shall not acquire any right, title or interest therein except the limited right temporarily to use the Marks pursuant to the terms of this Agreement.  Any unauthorized use of such names and Marks by Franchisee shall be an infringement of Franchisor's rights.  Franchisee shall neither interfere in any manner nor attempt to prevent the use or registration of the name "JENNY CRAIG" by any other franchisee or by Franchisor or any of its affiliates.

7.6    Defense by Franchisor.

7.6.1    Franchisee shall immediately notify Franchisor in writing on learning or receiving notice of any claim, suit or demand alleging that the use of the Marks by Franchisee infringes upon any third party's trademark.  Subject to the condition that Franchisee has used the Marks in full compliance with this Agreement, Franchisor shall take such action as Franchisor deems appropriate to defend against such claim or suit by a third party not affiliated with Franchisor.  By way of illustration and not limitation, Franchisor shall have no obligation to defend Franchisee if a demand, claim or suit arises from Franchisee's use of the Marks in violation of this Agreement.

7.6.2    Franchisor shall have the right to defend and settle any such claim or suit using counsel selected by Franchisor.  Franchisee shall cooperate fully with Franchisor in such defense.  Franchisee hereby irrevocably appoints Franchisor as its attorney-in-fact to defend or settle all such claims or suits.  Franchisee shall not settle or compromise any such claim or suit without Franchisor's prior written consent.

7.6.3    Franchisee shall have the right to participate at Franchisee's own expense in the defense or settlement of any such claim or suit, provided that Franchisor shall have the right to control the defense and any settlement thereof.

8    ADDITIONAL TRADEMARK PROVISIONS.

8.1    Third Party Infringers.  Franchisee shall notify Franchisor in writing immediately on learning that any third party is or may be using any mark the same as or confusingly similar to the Marks, who Franchisee believes may not be authorized to use the Marks.  Franchisor shall have the sole right to determine what, if any, action to take with respect to such alleged use.  Franchisee shall have no right to make any demand or prosecute any claim against any third party with respect to such use of the Marks, except with prior written consent of Franchisor.

8.2    Stopping Use of Trademarks.  If it becomes advisable at any time, in Franchisor's discretion, to modify or stop use of any Mark or to adopt or use one or more additional or substitute marks, then Franchisee shall take all steps to conform its use of the Marks in the manner requested by Franchisor.  Franchisor's sole obligation in any

10

such event shall be to reimburse Franchisee for documented expenses of changing signs and stationery to comply with Franchisor's instructions. Franchisee waives any other claim arising from or relating to any such change in the Marks. Except as expressly stated in this Section 8.2, Franchisor shall have no obligation for expenses, losses or damages sustained by Franchisee as a result of any such change in the Marks.

8.3   Use of Trademarks.

8.3.1   Franchisee shall use all Marks in compliance with rules that Franchisor prescribes from time to time. Franchisee shall not use any Mark with any prefix, suffix or other modifying word, term, design or symbol except as expressly authorized by Franchisor. Franchisee shall not use any Mark in connection with selling any program, product or service not part of the System or in any manner not expressly authorized in writing by Franchisor. Franchisee shall use the Marks only for the operation of the Centre and only at the Franchise Location and in advertising for the Centre.

8.3.2   Franchisee shall not use the Marks in any manner that may incur any obligation or debt on behalf of Franchisor. Franchisee shall sign any documents that Franchisor deems necessary to obtain protection for the Marks or to maintain their continued validity and enforceability.

8.3.3   Franchisee acknowledges that there will be confusion in the minds of the public if, after expiration or termination of this Agreement, Franchisee continues using any of the telephone or facsimile numbers or Internet web pages or addresses used by or listed for the Centre. Therefore, immediately on expiration or termination of this Agreement, except as provided in Section 4 regarding renewal, Franchisee shall stop using such telephone and facsimile numbers and Internet web pages and addresses. At Franchisor's written request, Franchisee shall cause all telephone companies and Internet providers servicing the Centre to transfer to Franchisor or to Franchisor's nominee, all telephone and facsimile numbers and all Internet web pages and addresses used by or listed for the Centre. In the event that Franchisee fails to do so, then Franchisee hereby irrevocably appoints Franchisor as Franchisee's attorney-in-fact to direct all telephone companies and Internet providers to make such transfers.

8.4   Best Efforts. Franchisee shall continuously use its best efforts in advertising, promoting, selling and distributing, and in any other dealing with or disposal of all goods, articles or services bearing the Marks to protect the good name and goodwill associated with the Marks.

9      ADDITIONAL OBLIGATIONS OF FRANCHISEE.

9.1   Promote Business. Franchisee shall actively and diligently promote the Centre and exercise its best efforts in the operation of the Centre.

9.2   Staff. Franchisee shall employ sufficient qualified staff to operate the Centre effectively. To ensure compliance with this obligation, Franchisee shall employ at least one Centre director who shall devote his or her full time and attention to the Centre

during normal business hours and who shall not carry on any business similar to the Franchise, whether personally or through an agent, representative, employee, shareholder or director in any firm or corporation; provided, however, that this obligation shall not prohibit such employee from acquiring or holding, either beneficially or of record, any issue of stock or securities of a company that has securities listed on a national securities exchange or is quoted on the automated dealer quotation system of the National Association of Securities Dealers, Inc., provided that such employee does not own more than five percent (5%) of the voting securities of any such company.

9.3    Conform to Programs.  Without prior written approval of Franchisor, Franchisee shall not:

9.3.1    depart from the substance or manner of sale and presentation of the System, equipment, food products, diets, or menus that Franchisor issues or authorizes from time to time;

9.3.2    offer or distribute any program, diet, menu, product or service, except as set forth in this Agreement or the Manuals or as Franchisor may supply or make available to Franchisee; or

9.3.3    publish, sell or otherwise distribute the text of the Franchise Manual, any operations manuals or any other Confidential Information.

9.4    Hours.  Franchisee shall remain open for business at least the hours established by Franchisor from time to time as set forth in the Franchise Manual or as adjusted for the Centre with the prior written consent of Franchisor.

9.5    Minimum Business Requirements.

9.5.1    Minimums.  Beginning thirteen (13) months after the opening of the Centre, Franchisee is required to collect from that Centre minimum Gross Receipts (as defined in Section 5.3) of at least Twenty Thousand Dollars ($20,000) per month; provided, however, that the Centre shall not be in violation of this Section 9.5 if the average monthly Gross Receipts for all of Franchisee's Jenny Craig Weight Loss Centres in operation for at least thirteen (13) months (i) exceed Twenty Thousand Dollars ($20,000) per Centre in that month; or (ii) exceed Twenty Five Thousand Dollars ($25,000) per Centre in at least four (4) of the preceding twelve (12) months.

9.5.2    Additional Remedies.  If Gross Receipts collected in any month fall below the minimum requirements specified in Section 9.5.1, above, Franchisor, in its sole discretion, shall have the right, but no obligation, in addition to Franchisor's other rights, to require that the following steps, either separately or together, be taken:

9.5.2.1    A conference at Franchisor's headquarters with Franchisee's Centre director to analyze the operations of the Centre and to discuss possible methods to improve operations of the Centre.

9.5.2.2    Employees from the Centre who are reasonably designated by Franchisor may be required to attend a refresher course designated by Franchisor for the purpose of improving the work techniques and performance of Franchisee and such employees.

9.5.3    Travel and Living Expenses. All travel, lodging, meals and other expenses incurred by Franchisee and employees of Franchisee in attending the conference or course described in Section 9.5.2 shall be borne by Franchisee.

9.6    Competitive Merchandise. Unless otherwise specifically authorized by this Agreement, Franchisee shall not cause or permit the manufacture, sale or distribution of, or other dealing with or disposal of any goods, packaging, wrapping or related materials or services or any advertisement or promotion of the same that are or may in Franchisor's judgment be in any manner competitive with any goods, articles or services bearing or associated with the Marks. Franchisee may sell ancillary products that do not compete with Franchisor's products provided that the sale of such products is consented to in advance by Franchisor in writing. Franchisor shall have no obligation to consent to the sale of any such products.

9.7    Independent Contractor Relationship. Franchisee shall operate the Centre as an independent contractor. Franchisee agrees that the parties hereto are completely separate entities and that this Agreement is not intended to and does not create a fiduciary relationship between them, and that they are not intended to be and are not and shall not be partners, joint venturers or agents of each other, and that neither party has the power to obligate or bind the other party, except as provided in Sections 7.6.2, 8.3.3, 15.3 and 15.6. Franchisee agrees that nothing in this Agreement shall be construed to authorize Franchisee to act as agent for or with Franchisor. Franchisee agrees that it is not and shall not be a representative or employee of Franchisor. Franchisee shall not conduct its operations in the name of or on behalf of Franchisor or make any representation, guarantee or warranty with respect to its facilities or the System except as may be authorized in writing by Franchisor.

9.8    Independent Ownership Notice. At all times and in all advertising, promotion and other display (whether print, broadcast, Internet or otherwise) on Franchisee's letterhead and business forms, and in all business dealings and in all dealings with the public, Franchisee shall identify itself as an independently owned and operated franchised location of Franchisor. Franchisee shall not identify itself as being a subsidiary, division, partner, joint venturer, agent or employee of Franchisor or of any other franchisee of Franchisor. Without limiting the generality of the foregoing, Franchisee shall display signs at the Centre, with such wording, design and dimensions as Franchisor may specify, identifying the business as a Jenny Craig Weight Loss Centre and stating that Franchisee is the independent owner of the business, and with such additional, specific and/or different language as Franchisor from time to time may specify. The signs shall include, but not be limited to, display of a conspicuous placard or decal on or near all entrance doors to the Centre which clearly states: "This Jenny Craig Weight Loss Centre Is Independently Owned and Operated," or any other similar statement designated by Franchisor.

13

9.9   <u>Fictitious Business Name</u>. Franchisee shall comply with any applicable statutes or ordinances requiring Franchisee to publish and file with any government agency a notice of intent to do business or of doing business under the name "Jenny Craig Weight Loss Centres" or equivalent notice. Franchisee shall not otherwise attempt to register any business name, trademark or corporate name or title or any other form of intellectual property owned by Franchisor.

9.10   <u>Telephone Lines</u>. Franchisee shall subscribe for and maintain three (3) or more separate telephone lines for the Centre as designated by Franchisor with a telephone number listed and identified exclusively for the Centre. Franchisee shall advertise and list the Centre in all "White Pages" (alphabetic) directories serving the Franchise Location and in all "Yellow Pages" directories serving the Franchise Location, under headings and in accordance with size, style and content standards that may be designated by Franchisor. Such listings and advertisements shall be procured, placed and paid for by Franchisee.

9.11   <u>Compliance with Franchise Manual</u>. Franchisee shall comply with, adhere to and abide by each rule, procedure, standard, specification and requirement in the Franchise Manual, as amended, modified or supplemented from time to time. Franchisee expressly acknowledges that Franchisor may amend, modify or supplement the Franchise Manual for the purposes of maintaining, improving, modifying, supplementing or enforcing the System. Franchisee shall keep Franchisee's borrowed copy of the Franchise Manual up-to-date. In the event of any dispute as to the contents of the Franchise Manual, the contents of Franchisor's master copy shall be presumed to be controlling. Franchisee acknowledges that the Franchise Manual is and shall remain the sole and exclusive property of Franchisor.

9.12   <u>Records and Accounting</u>. Franchisee shall keep accurate books of account and records covering all transactions relating to this Agreement or arising out of the Franchise or the Centre in accordance with generally accepted accounting principles. Franchisee shall maintain true and accurate accounts and records of all sales of goods and services in the operation of the Centre in a form satisfactory to Franchisor, as Franchisor may designate from time to time. Franchisor may, at its discretion, specify the form of business records to be used and reported by Franchisee, including, without limitation, electronic collection and data transmission to Franchisor. Franchisee agrees to maintain a true and correct record of all transactions upon such business forms or business records as designated by Franchisor. Franchisee shall maintain in good order and condition all such books and records for a period of three (3) years after the expiration of any reporting period or, in the event of a dispute between the parties hereto, such books and records shall be maintained for such additional time as is required until the resolution of the dispute.

9.13   <u>Audit</u>. Franchisor shall have the right, itself or through its designated representatives, at any time, with or without notice, during regular business hours, to enter Franchisee's premises to inspect, audit and copy all books of account and other records including, but not limited to, bank statements, records of receipts, checkbooks, sales and income tax returns, bookkeeping and accounting records, correspondence, the

14

loaned copy of the Franchise Manual and all other files and records of or relating to Franchisee, the Centre or both. At Franchisor's request, Franchisee shall cooperate in making such materials available where they are kept.

9.14   Audit Result. If any audit under Section 9.13, or any arbitration or other legal proceeding, or any other information obtained by Franchisor reveals any understatement of Gross Receipts or underpayment of Continuing Fees or any other understatement or underpayment, then Franchisee shall immediately pay to Franchisor the additional amounts payable plus interest as provided in Section 5.5. If any audit reveals that for any period covered by the audit there is any error of five percent (5%) or more in the Gross Receipts or Continuing Fees previously reported or paid by Franchisee, then, in addition, all expenses involved in conducting the audit shall be borne by Franchisee and Franchisor shall have the right of termination set forth in Section 14.3.1. If no error equals or exceeds five percent (5%), the expenses shall be borne by Franchisor. If any audit discloses an error that resulted in an overpayment, Franchisor shall refund the overpayment to Franchisee without interest.

9.15   Attendance at Meetings. Franchisee or its principal shareholders or other owners and the Centre director shall, at Franchisee's expense, attend all meetings called by Franchisor, which shall not exceed two (2) regular meetings per year; provided, however, that Franchisor shall retain the right to call as many special meetings as it, in its sole discretion, deems necessary.

9.16   Notification of Ownership. If Franchisee is a corporation or other type of business entity, Franchisee shall disclose the names of all of its officers, directors and shareholders (or the equivalent, as applicable) and their respective ownership interests and positions in writing to Franchisor and shall provide all organizational documents (articles of incorporation or equivalent certificate, agreements among owners, publicly filed statements of officers and all other documents that Franchisor requests) on execution of this Agreement. Franchisee shall update the disclosure in writing within ten (10) days after the occurrence of any change. This provision is not intended to imply authorization or consent to any such change.

9.17   Insurance.

9.17.1   Franchisee shall purchase and continuously maintain insurance acceptable to Franchisor covering all perils, including but not limited to, product liability claims, personal injury, property damage and professional liability with Franchisor named as a co-insured. Each insurance policy shall be for at least Two Million Dollars ($2,000,000) combined single limit or higher coverage as Franchisor may specify from time to time in writing. Each policy shall be issued by an insurer approved in writing by Franchisor. Franchisee shall cause each policy of insurance to contain an endorsement that the policy will not be canceled, non-renewed or materially changed by the insurer until the expiration of thirty (30) days' prior written notice from the insurer to Franchisor and that the provision is for the benefit of Franchisor. Franchisee shall at all times observe the conditions of such policies and provide to Franchisor on demand copies of

15

the policies obtained by Franchisee pursuant to this Section 9.17 and receipts for the payment of premiums and for renewals of such policies.

9.17.2   Franchisee shall not do or allow or permit to be done any act or thing which may prejudice or invalidate any insurance or render any policy of insurance obtained pursuant to this Section 9.17 void, voidable or otherwise subject to cancellation unless (i) Franchisee provides suitable substitute insurance coverage which complies with the requirements of this Section 9.17 or (ii) such act is required by the Franchise Manual.

9.18    Standard of Conduct for Franchisee.  Franchisee shall observe and maintain standards of conduct of the Centre equal to those prescribed from time to time by Franchisor and, in particular, Franchisee shall in all respects comply with the regulations, procedures and standards prescribed by Franchisor in the Franchise Manual. Franchisor shall have the right to modify the Franchise Manual and any audio and/or visual recordings provided by Franchisor at any time and from time to time by addition, deletion, variation or other modification to the provisions or content thereof as Franchisor deems appropriate, based on, without limitation, the need to protect the Marks and Franchisor's reputation and goodwill and other intellectual property, the need to comply with any statutes or ordinances or judicial or administrative decisions, the need to maintain administrative efficiency, and the need to improve the quality of facilities, services and products offered by Franchisee to the public.

9.19    Maintain Reasonable Access To Inspect.  On reasonable prior notice, Franchisee shall permit Franchisor during regular business hours to inspect and observe the Centre, including any premises used by Franchisee, for the purpose of verifying Franchisee's compliance with any or all terms of this Agreement, including but not limited to proper use of the Marks, adherence to the System, product and service quality and any and all other purposes that Franchisor deems appropriate.

9.20    Secrecy and Confidential Information.

9.20.1   During the Agreement Term and after expiration or termination without renewal, Franchisee shall treat as confidential information and shall maintain strict secrecy of the Franchise Manual and of Franchisor's methods of business and finances, including without limitation, any and all manuals, audio and/or visual recordings provided or used by Franchisor, trade secrets and unpublished advertising and publicity material (the "Confidential Information").  Franchisee shall take all steps necessary to ensure that its employees or agents also observe such requirements of secrecy and confidentiality and shall, if required by Franchisor, cause such employees and agents to enter into a confidentiality/secrecy agreement with Franchisee in a form approved by Franchisor.

9.20.2   Franchisee shall cause its employees and agents to refrain, during the Agreement Term and after expiration or termination, except in the proper course of their duties, from disclosing any Confidential Information received from Franchisor to any person or entity whatsoever, and shall cause its employees and agents to use their best efforts to prevent the publication or disclosure of any Confidential Information,

16

unless such disclosure is required by law. Franchisee shall inform Franchisor immediately in writing of any such demand for disclosure.

9.21    Initial Training. If this is Franchisee's first Centre, prior to commencing operations (or taking possession in the case of an assignment), principals of Franchisee with management responsibility and up to one additional person designated by Franchisee shall attend training, as required by Franchisor. Except as provided in Section 6.5 with respect to expenses to be borne by Franchisee, the costs of such initial training shall be borne by Franchisor. Initial training shall be at such location and for such duration as Franchisor shall prescribe. Training of other employees of Franchisee shall be in accordance with the training requirements set forth in the Franchise Manual and Sections 6.5 and 9.5.2.2 of this Agreement. Franchisee and Franchisee's personnel shall also attend and complete such additional training programs as Franchisor may require from time to time. If Franchisee requests supplementary training for its employees, it shall pay to Franchisor in advance the fees prescribed by Franchisor from time to time for providing such supplementary training. The costs of any travel, lodging, meals and other expenses of Franchisee and its employees in attending any of the foregoing training shall be borne by Franchisee.

9.22    Indemnification by Franchisee to Franchisor.

9.22.1    Franchisee shall indemnify, defend and hold harmless Franchisor, its affiliates, subsidiaries, successors-in-interest, related entities, shareholders, directors, officers, employees, agents and representatives (collectively, "Indemnitees") from and against any and all costs, claims, suits, losses, damages and expenses (including attorneys' fees) based upon, arising out of, or in any way related to any and all activities of Franchisee relating to the operation of its business, including but not limited to, the activities of the Centre, all obligations of Franchisee incurred pursuant to any and all provisions of this Agreement, the use of goods, articles or services bearing the Marks or any alleged defect in the goods, articles or services bearing the Marks, or nonconformity to or noncompliance with any statute or other regulation pertaining to the design, quality, safety, advertising or marketing of the goods, articles or services bearing the Marks. The Indemnitees are intended to be third party beneficiaries of this Section 9.23.

9.22.2    If any action, suit or proceeding shall be commenced against Franchisor or any other Indemnitee arising out of or relating to the activities of Franchisee or any claim or demand is asserted for which Franchisor or any other Indemnitee demands indemnification under this Section 9.23, Franchisor shall promptly notify Franchisee. Franchisor and each other Indemnitee shall reasonably cooperate with Franchisee in the defense, compromise or settlement of the claim, action or proceeding. Franchisee shall not compromise or settle any such action, suit or proceeding without the prior written consent of Franchisor, which consent shall not be unreasonably withheld.

9.23    Law and Licenses.

9.23.1    Franchisee shall observe and fully comply, at Franchisee's own expense, with any and all federal, state and local laws, regulations, proclamations,

17

directions, orders, requirements or demands of any federal, state or local government or other authority affecting the Centre. Franchisee acknowledges that the foregoing may include, without limitation, laws relating to zoning, construction, retail installment credit, health codes, disclosures to persons buying memberships, notices of a member's right to cancel or rescind a membership and other required provisions in terms of membership.

9.23.2    The parties acknowledge that in connection with an action in the United States Federal Trade Commission entitled, "In the Matter of Jenny Craig, Inc. and Jenny Craig International, Inc." (FTC Docket No. 9260), Franchisor has negotiated with the Federal Trade Commission a Decision and Order (the "Order") that contains certain prohibitions and affirmative requirements. A copy of the Order is attached as Exhibit D. Franchisee shall comply with all prohibitions and affirmative requirements of the Order.

9.24    Franchisor's Right To Make Changes. Franchisor shall have the right to change or modify, at its sole discretion, the manner of delivering the System and to delete and/or add new markets, products or distribution channels. Franchisee shall adhere to and implement these changes on receiving Franchisor's written notification of the changes.

10    REQUIREMENT TO PURCHASE FOOD AND EQUIPMENT.

10.1    Food Products Purchase Agreement. Franchisee may elect to designate Jenny Craig Products, Inc. ("JC Products") or Jenny Craig Operations, Inc. ("JC Operations") depending on Franchisee's geographic area, as Franchisee's exclusive source for the purchase of food products to be sold by Franchisee in the Centre by executing the Food Products Purchase Agreement attached hereto as Exhibit B. A default by Franchisee under the Food Products Purchase Agreement shall be deemed a default by Franchisee under this Agreement. If Franchisee does not elect to designate JC Products or JC Operations as its exclusive source, Franchisee shall purchase food products only from JC Products, JC Operations or alternate suppliers approved by Franchisor in the manner set forth in Section 10.2 ("Approved Suppliers").

10.2    Purchase from Others. If Franchisee desires to purchase required food products from a supplier not yet approved by Franchisor, Franchisee shall so advise Franchisor and thereafter provide Franchisor with all information regarding the supplier that Franchisor requests. Franchisor shall furnish to the supplier, in whole or in part, the then-current standards and specifications applicable to the food products required by Franchisor to be used in the operation of the Centre, provided that Franchisor shall have the right first to require the supplier to sign a confidentiality agreement in form and substance satisfactory to Franchisor acknowledging that the standards and specifications are trade secrets of Franchisor and containing provisions to protect such status. Thereafter, Franchisor may require the supplier to provide Franchisor with samples of the food products that Franchisee desires to purchase. Any tests required by Franchisor to determine whether the food products meet Franchisor's then-current standards and specifications shall be performed by or under the direction or supervision of Franchisor but at the cost of the supplier. On completion of any tests and other procedures required by Franchisor, and on completion of Franchisor's determination whether the supplier

possesses adequate capacity, resources and facilities to supply Franchisee's needs in the quantities, at the times and with the reliability requisite to an efficient operation, Franchisor shall promptly notify Franchisee and the supplier in writing of its decision whether to approve the supplier. In addition, Franchisor may from time to time review the quality of the food products produced or supplied by an Approved Supplier and the Approved Supplier's capacity, resources and facilities and shall have the right to monitor the production, use and disposition of the food products. On the basis of such review and monitoring, Franchisor may at any time remove Franchisee's supplier from its list of Approved Suppliers. In such event, Franchisor shall promptly advise Franchisee in writing of such action.

10.3    Specifications. Franchisor shall specify food products and packaging to be used by Franchisee in the operation of the Centre. Franchisee shall use all food products and packaging required by Franchisor and no other food products or packaging. In the event that Franchisee uses a food product or package that has neither been obtained from Franchisor, JC Products or JC Operations (as exclusive agent or vendor) or from Approved Suppliers, such use shall constitute a material breach of this Agreement. Franchisor may require Franchisee to offer additional food products or to remove any food product from the list of items to be offered to customers. Franchisee shall effect such changes at Franchisee's expense. Franchisor may specify food product formats and formulas and require the offer of food products and formulas that are frozen, freeze dried, packaged in retort pouches or in cans or are prepared using any other format. Only food product formats or formulas approved by Franchisor in writing may be used by Franchisee.

10.4    Computer System. Franchisee shall purchase a computer system for the Centre, comprised of a minimum of two (2) computers, which comply with the current computer specifications of Franchisor or an affiliate of Franchisor. These computers shall be used to run the Jenny Craig Centre systems, currently consisting of the Integrated Centre Automation Network ("ICAN") and the Program Director Computer System ("PD System"). Franchisor shall have the right to require Franchisee to maintain, upgrade, update or replace the ICAN, PD System, hardware, software or any of these as needed from time to time at Franchisee's expense.

10.5    Year 2000 Compliance. Franchisor and Franchisee shall not hold one another liable for Year 2000 information supplied in good faith or for errors and delays caused by the failure of computer programming to properly process data due to failure to recognize dates after December 31, 1999. Franchisee shall use only suppliers of Year 2000 information approved in writing by Franchisor. Nothing set forth in this Section 10.5 shall excuse a failure or delay in any payment as and when due to Franchisor or any of its affiliates.

11    ADVERTISING.

11.1    Advertising and Promotion. All advertising and promotion by Franchisee shall conform to programs developed or furnished by Franchisor. Franchisee shall submit to Franchisor for consent and approval (a) all advertising and promotional

programs and materials proposed by Franchisee and (b) all promotional or novelty items proposed by Franchisee for display or distribution which bear or use the Marks. Franchisee shall not use any proposed program, material or item without Franchisor's prior written consent, which consent shall be at Franchisor's sole discretion. Franchisee shall pay when due all invoices and other liabilities with respect to advertising and advertising media. Franchisor reserves the right to approve all advertising or promotional materials, such as signs, stationery, business forms and supplies that are not provided by Franchisor, but which bear or use the Marks. All advertising (including any Internet advertising), publicity, signs, decorations, furnishings, equipment or other materials using the Marks in any way must be approved in writing by Franchisor prior to publication or use.

11.2    Amount of Advertising. Each calendar month, Franchisee shall spend an amount equal to the greater of One Thousand Dollars ($1,000) or ten percent (10%) of Gross Receipts for the preceding month for advertising and promoting the Centre.

11.3    National Advertising. Franchisee agrees that Franchisor may, from time to time, initiate a national advertising campaign regarding the Marks or the System. Franchisee shall pay an amount designated by Franchisor for such national advertising; provided, however, that in no event shall Franchisee's contribution to the national advertising campaign exceed five percent (5%) of Franchisee's Gross Receipts for such period. Any amounts paid by Franchisee for such national advertising campaign shall be applied toward Franchisee's satisfaction of its obligation under Section 11.2, above. For purposes of this Agreement, "national advertising" means advertising that runs in major designated market areas (as such phrase is used in the advertising industry) containing a majority of the population in the United States. Franchisor agrees to pay its pro rata share of national advertising costs for all Jenny Craig Weight Loss Centres owned by Franchisor and its affiliates, subject to the same five percent (5%) limitation of Gross Receipts per Centre.

11.4    Sales Outside of Centre. Franchisee shall not make or accept any mail order or telephone sales without the prior written consent of Franchisor. Franchisee shall not make any e-commerce sales of products or services or use the Internet or any other electronic means to promote or make any Internet sales of products or services without the prior written consent of Franchisor. Franchisee shall follow and abide by Franchisor's electronic commerce, communications and Internet policies. Any advertising or other presence or promotion by Franchisee on the Internet must comply with Franchisor's Internet policies as communicated by Franchisor from time to time.

12    RESTRICTIVE COVENANTS.

12.1    Restriction. During the Agreement Term and any Renewal Term and for two (2) years after termination or expiration of this Agreement and any Renewal Franchise Agreements, Franchisee shall not, without Franchisor's prior written consent, directly or indirectly, as employee, proprietor, partner, director, shareholder, member, officer or otherwise, engage in the operation of a weight loss or weight management center, whether or not identical or similar to the Jenny Craig Weight Loss Centres

described herein, at any location. Notwithstanding the foregoing, nothing in this Agreement shall prevent Franchisee or a shareholder, partner, member, director or officer thereof from acquiring or holding, either beneficially or of record, any issue of stock or securities of any such company listed on a national securities exchange or quoted on the automated dealer quotation system of the National Association of Securities Dealers, Inc., provided that Franchisee and such other persons or entities do not in the aggregate own more than five percent (5%) of the voting securities of any such company.

12.2    Employment of Personnel. During the Agreement Term and any Renewal Terms, and for a period of one (1) year after termination or expiration of this Agreement or any Renewal Franchise Agreements, Franchisee shall not employ, seek to employ or engage in any capacity, any employee or agent of Franchisor (or any of its affiliates) or any other of Franchisor's franchisees without the prior written consent of Franchisor or such other franchisee.

12.3    Owners. If Franchisee is a corporation or other business entity, Franchisee shall cause all of its shareholders, partners, members or other form of owners to comply with the provisions of this Section 12.

12.4    Other Skills. Franchisee acknowledges that Franchisee has considerable other skills, experience and education that afford Franchisee the opportunity to derive income from other endeavors and that the covenants in this Section 12 will therefore not impose any undue hardship on Franchisee.

12.5    Presumption. Franchisee acknowledges that among the purposes of the covenants in this Section 12 is to reduce the cost and complexity to Franchisor of protecting its trade secrets. Franchisee therefore agrees that it may conclusively be presumed that any violation of the covenants of this Section 12 was accomplished by and through Franchisee's unlawful use of Franchisor's confidential information, know-how, methods, procedures and other trade secrets.

13    TRANSFER AND ASSIGNMENT.

13.1    Transfer and Assignment by Franchisee. Neither Franchisee nor any owner or principal shall pledge, encumber, hypothecate or otherwise grant any third party a security or other interest in this Agreement or the Centre in any manner whatsoever without the prior written consent of Franchisor, which consent may be withheld or conditioned in Franchisor's discretion.

The rights and duties created by this Agreement are "personal" to Franchisee and its owners and principals, and Franchisor has entered into this Agreement in reliance on many factors, including the character, skill, aptitude and business and financial capacity of Franchisee and its owners and principals. Accordingly, neither Franchisee's nor any owner's or principal's interest in this Agreement nor any rights or obligations hereunder shall be sold, conveyed, assigned, transferred, gifted, mortgaged, shared or divided, voluntarily or involuntarily, by operation of law or otherwise in any manner, including the division of any community property interest in connection with any divorce

21

proceeding (a "Transfer"), without Franchisor's prior written consent, which consent may be withheld or conditioned in Franchisor's discretion. Any such purported Transfer, including any Transfer by a trustee in bankruptcy, without Franchisor's prior written consent, shall be null and void and a material default of this Agreement.

13.2    Franchisor's Approval of Transfer. Any Transfer or encumbrance of fifty percent (50%) or more of the outstanding and issued stock, membership interests, partnership rights or other ownership interest of Franchisee by one or more Transfers, by operation of law, or any other event(s) or transaction(s) or which, directly or indirectly, changes management control of Franchisee shall be valid and effective only with Franchisor's prior written consent and only after compliance with this Section 13. Franchisee acknowledges and agrees that there are many objective and subjective factors that comprise the process by which Franchisor selects a suitable franchisee; therefore, Franchisor may impose any reasonable condition to its consent to any such Transfer, including without limitation, the satisfaction of some or all of the following conditions:

13.2.1    The Transfer of Franchisee's rights under this Agreement shall be accompanied by a Transfer of any existing area development agreements and any other franchise agreements with Franchisor and rights to all Centres owned by Franchisee to the same transferee;

13.2.2    Franchisee and the proposed transferee must complete, execute and comply with all requirements of Franchisor's then-current transfer documents and any other materials described in the Manuals, including, without limitation, Franchisor's then-current form of franchise agreement, which may differ from the terms of this Agreement, with a term equal to the term remaining under this Agreement;

13.2.3    The proposed transferee must be a person or business entity that meets Franchisor's then-current standards, specifications, and qualifications for new franchisees;

13.2.4    The proposed Transfer shall be for commercially reasonable terms; the sales price of the interest to be conveyed must not be so high, or the terms of the sale so onerous that, in the reasonable judgment of Franchisor, the transferee will be unlikely to properly operate, maintain, and promote the Centre and meet transferee's financial and other obligations to Franchisor, third party suppliers and creditors. This provision shall not create any liability whatsoever to either Franchisee or any purported assignee on the part of Franchisor in the event that Franchisor approves the Transfer or disapproves the Transfer;

13.2.5    As of the effective date of the proposed Transfer, all obligations of Franchisee hereunder and under all other agreements between Franchisee and Franchisor and any affiliate of Franchisor shall be fully satisfied;

13.2.6    Any transferee must complete training to Franchisor's satisfaction and pay the then-current training fee;



13.2.7    At or prior to the Transfer, Franchisee's Centre shall be upgraded, remodeled and refurbished, both exterior and interior, to comply with Franchisor's then-current standards and specifications including, without limitation, upgrades to the Centre's computer and technology equipment and systems;

13.2.8    Franchisee shall enter into a General Release; and

13.2.9    Payment by Franchisee of a transfer fee equal to One Thousand Dollars ($1,000.00).

13.3    Right of First Refusal.

13.3.1    ·If Franchisee desires to make any Transfer for value, Franchisee shall, at least thirty (30) days prior to the closing for any such proposed Transfer, notify Franchisor in writing.  This notice must set forth the name of the proposed Transfer, all terms and conditions of the proposed Transfer, and must be accompanied by all fully completed then-current transfer documents required by Franchisor, including a fully executed purchase and sale agreement (the "Notice").  The effectiveness of any such purchase and sale agreement must be contingent upon Franchisor's waiver of its right of first refusal as described herein and upon Franchisor's consent to the transaction.

13.3.2    Franchisor shall have a right of first refusal to accept for itself or its nominee the terms of any proposed Transfer of the kind described in Sections 13.1 and 13.2 that is offered or proposed by Franchisee or offered by a bona fide third party and proposed to be accepted by Franchisee, whether voluntarily or by operation of law (the "Right of First Refusal").

13.3.3    If Franchisor exercises the Right of First Refusal, then in addition:  (i) Franchisor shall have the right to substitute cash for any form of payment proposed in the offer; (ii) Franchisor shall have the right to purchase all property that is part of the proposed transaction or to elect to separate the Centre and/or this Agreement from other property, subject to making a reasonable allocation of the price to such property; (iii) Franchisor's creditworthiness shall be deemed to be at least as good as that of any proposed purchaser; (iv) Franchisor shall have at least sixty (60) days after notifying Franchisee of its election to exercise the Right of First Refusal to close the transaction; and (v) Franchisor shall be entitled to receive written representations and warranties from Franchisee that Franchisee owns clear title to all assets being sold, assigned or transferred, free of all liens, claims and encumbrances and that there are no liabilities of Franchisee that have not been disclosed to Franchisor in writing in connection with the Transfer.

13.3.4    Franchisor shall exercise the Right of First Refusal as follows:  Within thirty (30) days after Franchisee delivers the Notice and all additional information requested by Franchisor, Franchisor shall, in writing, consent or withhold consent to the proposed Transfer or, in accordance with this Section 13, accept for itself or its nominee the proposed Transfer on the terms specified in the Notice.

13.3.5    If Franchisor exercises the Right of First Refusal, then Franchisee shall take all action necessary to cause any other agreements designated by Franchisor and relating to the Centre to be assigned to Franchisor.

13.3.6    If Franchisor elects not to exercise the Right of First Refusal and consents to the proposed Transfer, then Franchisee shall be authorized to complete the proposed transaction with the proposed transferee on the terms set forth in the Notice. Any change to any material term of the transaction shall constitute a new proposal that shall again require compliance by Franchisee with the procedures in this Section 13.

13.3.7    If the proposed sale, assignment or transfer is not completed for any reason within one hundred twenty (120) days after Franchisor elects not to exercise the Right of First Refusal with respect to such transaction, a new Right of First Refusal shall commence as to any subsequent proposed Transfer by Franchisee.

13.3.8    An election by Franchisor not to exercise the Right of First Refusal and consent to the proposed transaction shall not affect Franchisor's Right of First Refusal for any other proposed transaction. Franchisor's decision not to exercise the Right of First Refusal shall not constitute consent to the proposed transaction. Franchisee and any proposed transferee shall be required to comply with all provisions relating to Transfer in this Section 13.

13.4    <u>Death or Incapacity of Franchisee or Controlling Owner or Shareholder</u>.

13.4.1    In the event of the death or incapacity of Franchisee (which is not a business entity) or any of its controlling or managing owners or principals (if Franchisee is a business entity), Franchisor shall, upon the written request of the heirs or representatives, allow the heirs or representatives a period of six (6) months from date of death or incapacity to:

13.4.4.1    demonstrate that such heirs or representatives meet Franchisor's standards and specifications for new Centre franchisees and execute and agree to the terms of the Franchisor's then-current form of franchise agreement (except that the term of such agreement shall be the remaining term hereof and no franchise fee shall be payable); or

13.4.4.2    Transfer or assign this agreement to a third party acceptable to Franchisor who meets Franchisor's standards and specifications for new Centre franchisees, subject to the provisions for Transfers set forth in Section 13.2 and Franchisor's Right of First Refusal set forth in Section 13.3.

13.5    <u>Assignment by Franchisor</u>.  Franchisor shall have the right at any time to assign or Transfer this Agreement, and any rights or obligations in this Agreement, in whole or in part, in any manner and for any purpose to any person or entity, including but not limited to, any affiliate, subsidiary or any other entity.

14    <u>TERMINATION BY FRANCHISOR</u>.

14.1    Termination by Franchisor With Notice and Opportunity to Cure.
Franchisor may terminate this Agreement for cause, which is a breach by Franchisee of
this Agreement or any other agreement with Franchisor or an affiliate of Franchisor.
Except for any default under Sections 14.2 and 14.3, below, and as may be expressly
provided elsewhere in this Agreement or by controlling applicable law, Franchisee shall
have fourteen (14) days (seven (7) days in the case of any default in the timely payment
of sums due to Franchisor or any of its affiliates) after Franchisor's written notice of
default within which to remedy any default under this Agreement, and to provide
evidence of such remedy to Franchisor.  If any such default is not cured within that time
period or such longer time period as Franchisor may specify in the notice of default,
Franchisor may terminate this Agreement.

14.2    Termination by Franchisor with Twenty Four Hours' Notice and
Opportunity to Cure.  Subject to any controlling applicable law to the contrary,
Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate
this Agreement and all rights granted hereunder if Franchisee violates any law,
regulation, order, or Franchisor standard relating to health, sanitation or safety and fails to
cure the default within twenty four (24) hours after delivery or attempted delivery of
written notice by Franchisor or fails to provide evidence of such remedy to Franchisor.

14.3    Termination by Franchisor without Notice or Opportunity to Cure.
Subject to any controlling applicable law to the contrary, Franchisee shall be deemed to
be in material default and Franchisor may, at its option, terminate this Agreement and all
rights granted hereunder without affording Franchisee any opportunity to cure the default,
effective immediately upon delivery or attempted delivery to Franchisee of notice by
Franchisor, upon the occurrence of any of the following events:

14.3.1    Understatement of Fees.  Franchisee is found to have understated
Gross Receipts or Continuing Fees by five percent (5%) or more for any period of time.

14.3.2    Violation of Law.  Franchisee's direct or indirect majority
shareholder or, if Franchisee is an entity other than a corporation, its direct or indirect
majority owner, is convicted of any felony or crime of moral turpitude, or if Franchisee
violates the terms of the Order (as defined in Section 9.23.2).

14.3.3    Property Seized.  All or any substantial part of Franchisee's assets
are seized pursuant to levy, execution, distraint or similar process.

14.3.4    Bankruptcy.  (a) Franchisee commences any case, proceeding or
other action under any bankruptcy, reorganization, insolvency or moratorium law, or any
other law for the relief of or relating to debtors, or Franchisee seeks appointment of a
receiver, trustee, custodian, assignee for the benefit of creditors or similar official to take
possession, custody or control of all or any substantial part of Franchisee's assets; (b) an
involuntary case, proceeding or other action under any bankruptcy, reorganization,
insolvency, moratorium or similar law is commenced against Franchisee, or a receiver,
trustee, custodian, assignee for the benefit of creditors or similar official is appointed to
take possession, custody or control of all or any substantial part of Franchisee's assets,

unless such case, proceeding, action or appointment is dismissed, vacated, withdrawn or set aside within sixty (60) days; or (c) Franchisee fails to pay its debts generally as they become due.

      14.3.5   <u>Location Violation</u>. Franchisee operates the Centre or any business from a location that has not been approved in writing by Franchisor, or suffers termination of the Centre lease or other tenancy of the premises where the Centre is located, or otherwise loses or parts with possession of the premises without the prior written consent of Franchisor; provided that, in the case of termination of such lease without fault of Franchisee, other temporary or involuntary loss of possession of the premises without fault of Franchisee, or exercise of eminent domain of the premises by any federal, state or local government or other authority, Franchisee shall have sixty (60) days within which to lease or acquire other premises that are satisfactory to Franchisor.

      14.3.6   <u>Repeated Failure To Comply with Obligations</u>. Franchisee fails to comply with one or more of the obligations contained in this Agreement on three (3) or more occasions within any twelve (12) month period, whether or not such failure is corrected after notice is given by Franchisor to Franchisee.

      14.3.7   <u>Control by Unapproved Shareholders</u>. There has been an actual or attempted Transfer of any direct or indirect ownership interest greater than a cumulative forty-nine percent (49%) equity interest in Franchisee other than in accordance with Section 13 of this Agreement.

      14.3.8   <u>Failure To Complete Training</u>. Franchisee or any personnel fail to complete the initial training required under Section 9.21 to Franchisor's sole subjective satisfaction. In the event of termination pursuant to this Section 14.3.8, Franchisor shall refund to Franchisee the Initial Franchise Fee paid under Section 5.1 of this Agreement, less Five Thousand Dollars ($5,000).

      14.3.9   <u>Unapproved Assignment of Transfer</u>. Franchisee fails to comply with the Transfer requirements of Section 13 of this Agreement.

      14.3.10   <u>Judgment</u>. Franchisee allows or permits any judgment to be entered against Franchisor or any of its affiliates arising out of or relating to the operation of Franchisee's Centre;

      14.3.11   <u>Abandonment</u>. Franchisee abandons the Centre. For purposes of this Agreement, "abandon" shall mean (i) Franchisee's failure, at any time during the term of this Agreement, to keep the Centre open and operating for business for a period of three (3) consecutive days, except as provided for in the Manuals, (ii) Franchisee's failure to keep the Centre open and operating for any period of time after which it is not unreasonable under the facts and circumstances for Franchisor to conclude that Franchisee does not intend to continue to operate the Centre, unless such failure to operate is due to fire, flood, earthquake or other similar causes beyond Franchisee's control, or (iii) any act or statement by Franchisee from which Franchisor reasonably concludes that Franchisee intends to relinquish Franchisee's rights to the Centre;

14.3.12   Unauthorized Use of Marks/Impairment of Goodwill.
Franchisee materially misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein, or takes any action that reflects materially and unfavorably upon the operation and reputation of the Centre at the Franchise Location or the "Jenny Craig" system generally, Franchisee's unauthorized use, disclosure, or duplication of the Confidential Information, excluding independent acts of employees or others if Franchisee shall have exercised its best efforts to prevent such disclosures or use; or

14.3.13   Misrepresentations.  Franchisee makes any material misrepresentations in connection with the execution of this Agreement or the acquisition of the Centre.

## 15   ACTION ON TERMINATION.

On termination or expiration of this Agreement for any reason, and unless Franchisee and Franchisor enter into a Renewal Franchise Agreement as provided in Section 4, Franchisee shall have the following obligations:

15.1   Deliver Up Documents and Stop Using Intellectual Property.  Franchisee shall deliver to Franchisor the Franchise Manual and any and all signs, manuals, instructions, notes, writings and other documents and materials relating to the Franchise or the System, and Franchisee shall cease to exploit in any way whatsoever the System and all intellectual property, including without limitation, any techniques or skills owned or developed by Franchisor or any of its affiliates.

15.2   Remove or Obliterate Signs and Features.  Franchisee shall, if requested by Franchisor in writing, remove, obliterate or destroy (as appropriate) any and all signs, color schemes and other features associated with the Franchise hereby granted.

15.3   Divest Intellectual Property Rights.  Franchisee shall execute all documents and do all things as are necessary in Franchisor's judgment to confirm that Franchisee is divested of all rights of every kind and nature whatsoever relating to the Marks or the System, and Franchisee hereby appoints Franchisor as its attorney-in-fact to execute all documents and do all things as are necessary for the aforesaid purposes.

15.4   Sale of Selected Fittings and Equipment.  If Franchisor so notifies Franchisee in writing within ten (10) days after delivering a notice of termination, Franchisee shall sell and deliver to Franchisor such of Franchisee's fittings and equipment as may be selected by Franchisor.  The purchase price of the fittings and equipment selected by Franchisor shall be their fair market value (as of the date of termination) and shall be paid by Franchisor to Franchisee within sixty (60) days after the date of termination.  Franchisor shall be entitled to set off any amounts payable by it to Franchisee pursuant to this Section against any amounts then due to Franchisor or any of its affiliates by Franchisee.  Franchisee shall permit Franchisor and its authorized agents to have access to the premises within which such fittings and equipment are located to

enable Franchisor to inspect such fittings and equipment and, after payment, to take possession of any items selected by Franchisor.

15.5    Lease of Premises or Equipment.  If Franchisor so requires, within ten (10) days after delivery of a notice of termination, Franchisee shall assign, transfer or surrender (as the case may require) all of Franchisee's right, title and interest in any lease of any premises or leased equipment and, where so required by Franchisor pursuant to this Section, quietly yield and deliver up possession of the premises to Franchisor in the same or better condition as existed immediately prior to the termination or expiration.

15.6    Telephone Numbers.  Franchisee shall comply with the provisions of Section 8.3.3 within three (3) days after the date of termination or expiration.

15.7    No Rebate.  Franchisee shall not be entitled to receive any rebate or refund of any money paid pursuant to this Agreement.

15.8    Obligation To Pay.  Franchisee shall not be relieved of its obligation to pay any monies previously owed to Franchisor pursuant to this Agreement for any reason whatsoever.

15.9    Payment for Food.  Franchisee shall pay the supplier of food for any products supplied to Franchisee by the supplier then remaining unpaid and such payment shall be made no later than ten (10) business days after the date of termination or expiration.

15.10    Uncompleted Obligations.  Franchisor may, at its discretion, directly fulfill all or any of Franchisee's uncompleted obligations to its customers and, in the event that Franchisor elects to complete such obligations, Franchisee shall reimburse Franchisor for any expenses incurred in doing so.

15.11    Survival of Obligations.  In addition to this Section 15, Franchisee's obligations under Sections 9.12, 9.20, 9.22, 12.1 through 12.5, and other provisions which by their nature contemplate performance or obligations after termination shall survive termination or expiration of this Agreement and continue in effect for the applicable period stated or such longer period as needed until by its nature the obligation shall have expired. All other obligations of Franchisor and Franchisee which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied or by their nature expire.

16    INJUNCTIVE RELIEF.

Franchisee acknowledges that any violation of the covenants in Sections 7, 8 or 12 would result in immediate and irreparable injury to Franchisor for which no adequate remedy at law is available. Accordingly, Franchisee hereby consents to the entry of mandatory or prohibitory temporary, preliminary and permanent injunctive relief prohibiting any conduct by Franchisee in violation of the covenants in Sections 7, 8 or 12 or any other breach or act that may irreparably injure Franchisor, or if necessary,



mandating conduct by Franchisee to prevent any such violation or act, without the necessity of posting a bond.

17    NOTICES.

All notices or other communications in connection with this Agreement shall be in writing, and shall be considered given when personally delivered or when delivered to the addressee by registered or certified mail, postage prepaid, return receipt requested, or when delivered to the addressee via commercial courier or telecopier with confirmation of receipt directed as follows (or directed to such other address or telecopier with confirmation of receipt as instructed by the recipient in accordance with this Section 17):

Franchisor:    Jenny Craig International, Inc.
11355 North Torrey Pines Road
La Jolla, California  92038
Attention: President
Telecopier: (858) 812-2734

and

Jenny Craig, Inc.
11355 North Torrey Pines Road
La Jolla, California 92038
Attention:  General Counsel
Telecopier: (858) 812-2799

Franchisee:    DMJ, Inc.
6006 Sweetbrier Cove
Memphis, Tennessee 38120
Attention:  President
Telecopier:  (901) 767-7040

18    WAIVER.

None of the terms of this Agreement can be waived except by an express instrument in writing signed by the party to be bound thereby.  The failure of either party to enforce, or the delay by either party in enforcing, any of its rights under this Agreement shall not constitute a waiver of such rights, and either party may, within the time permitted by applicable law, commence appropriate proceedings to enforce any or all such rights.

19    THIRD PARTIES.

Except as provided in Section 9.22, no person or entity other than Franchisee, Franchisor and affiliates of Franchisor shall be deemed to have acquired any rights by reason of anything contained in this Franchise Agreement.

20    ENTIRE AGREEMENT.

This Agreement sets forth the entire agreement between the parties with respect to its subject matter and supersedes any and all prior understandings and agreements with respect to its subject matter. This Agreement can be amended, supplemented, modified or changed only by a writing signed by each of the parties hereto.

21    OWNERS GUARANTEE.

In the event that Franchisee is a corporation, partnership or other form of business entity, all shareholders or other owners of Franchisee shall sign a guarantee and assumption of obligations in the form designated by the Franchisor, which current form is attached as Exhibit C to this Agreement.

22    ARBITRATION/DISPUTE RESOLUTION.

22.1    Arbitration.

22.1.1    Except for controversies, disputes or claims set forth in Section 22.2 below, for which Franchisor elects to proceed to court, every claim or dispute arising out of or relating to the negotiation, performance or non-performance of this Agreement including, without limitation, any alleged torts, and any claims regarding the validity, scope, and enforceability of this Section shall be determined by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), or as otherwise agreed by the parties. The place of arbitration shall be in San Diego, California.

22.1.2    The parties shall first attempt to resolve any claim or dispute through good faith, informal negotiations, including but not limited to, non-binding mediation. In the event that the matter is not thereby resolved within thirty days, either party may demand arbitration by written notice to the other party and to the AAA in San Diego, California.

22.1.3    The parties shall mutually agree on one arbitrator. If the parties cannot so agree, the single arbitrator shall be selected by the AAA.

22.1.4    The arbitrator shall, within thirty (30) days after the matter has finally been submitted to him or her, render a written decision making specific findings of fact and setting forth the reasons for the decision which shall be consistent with the terms of this Agreement. The arbitrator shall not have any power to alter, modify or change any of the terms of this Agreement or to grant any remedy which is inconsistent with or prohibited by the terms of this Agreement or not available in a court of law. The arbitrator shall have power to award only direct actual damages and shall have no power or authority to award punitive, exemplary, consequential or incidental damages or statutory multiples of damages such as statutory treble damages. The parties intend that this agreement to arbitrate be valid, binding, enforceable and irrevocable. The terms of this Section shall survive the termination or expiration of this Agreement. Judgment on any award of the arbitrator shall be binding and may be entered in any court having jurisdiction thereof.

22.2   Franchisor Actions.  Notwithstanding the provisions of Section 22.1, Franchisor shall have the right to proceed to any court of competent jurisdiction and seek appropriate remedies, including, but not limited to, damages, repossession, foreclosure, specific performance, and injunctive relief, in the following instances:

22.2.1   Conduct or threatened conduct that may cause Franchisor, the System, or the Marks irreparable harm;

22.2.2   Franchisee's infringement, misuse or inappropriate use of the Marks (including but not limited to actions seeking relief under the Trademark Act of 1946, as amended), copyrights, trade dress, trade secrets, or other proprietary or Confidential Information;

22.2.3   Abandonment of the Centre;

22.2.4   Any failure to properly "de-identify" upon expiration, termination, or abandonment;

22.2.5   Any actions by Franchisor as secured creditor under applicable law under any promissory notes, equipment lease, or other secured obligation; and

22.2.6   Any actions by Franchisor under applicable bankruptcy law.

22.3   Consent to Jurisdiction.  Any arbitration or litigation relating in any way to this Agreement shall be conducted in San Diego, California.  By execution and delivery of this Agreement, Franchisee hereby irrevocably waives, to the fullest extent permitted by law, any objection that Franchisee may now or hereafter have to the laying of venue in San Diego, California, and any claim that San Diego, California, is an inconvenient forum.  Notwithstanding the foregoing, nothing herein shall limit the right of Franchisor to commence any action of the kind described in Section 22.2, above, in courts other than those that are located in San Diego, California.

23   SEVERABILITY, COMPETENT JURISDICTION, ETC.

23.1   Except as expressly provided to the contrary, each paragraph, item and provision of this Agreement, and any portion thereof, shall be severable.  Any final, unappealable ruling issued by any court, agency or tribunal of competent jurisdiction in any action or proceeding to which Franchisor is a party that any provision of this Agreement is invalid, contrary to, or in conflict with any applicable law or regulation shall not impair the operation of, or have any other effect on, such other portions of this Agreement as may otherwise remain effective, which shall continue to be given full force and effect and continue to bind the parties hereto.

23.2   To the extent that the terms of Section 12, or the terms of any clause thereof, may be deemed unenforceable because of area, business, breadth of individuals covered, activity prohibited and/or length of time, but could be enforceable by reducing any or all such terms, the parties agree that such section or clause shall be enforced to the

fullest extent permitted under the laws and public policies applied in the jurisdiction in which enforcement is sought.

    23.3    If any applicable law or rule requires greater notice than required by this Agreement or the taking of an action not required hereunder, or if under any applicable law or rule any provision of this Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the greater notice or the action required by such law or rule shall be substituted for the comparable provisions hereunder, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable specification, standard or operating procedure to the extent required to be valid and enforceable.

## 24    GOVERNING LAW.

This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts made and to be performed in that State, without giving effect to the conflict of laws rules of that State; provided, however, that if a provision of this Agreement is unenforceable under California law, such provision shall be governed and construed under the laws of the State in which the Centre is located.

## 25    LIMITATION OF LIABILITY.

Under no circumstances shall either party be liable for any indirect, incidental, punitive, exemplary, special or consequential damages or statutory multiples of damages (such as statutory treble damages) suffered by the other party or any other person arising out of or related to this Agreement or the performance or non-performance of its obligations hereunder, regardless of whether or not such party has been advised of the possibility of such damages. Nothing contained herein or elsewhere in this Agreement shall act to limit liability to Franchisor for the indemnification obligations of Franchisee set forth in Section 9.22.

## 26    APPROVALS AND REQUESTS.

Franchisor has the absolute right to refuse any request by Franchisee or to withhold consent to any action proposed by Franchisee except where this Agreement expressly obligates Franchisor to give or withhold its consent reasonably. All consents by Franchisor must be in writing to be effective, and Franchisor shall not be deemed to have given its consent unless first obtained in writing. Franchisee acknowledges that Franchisor operates a large and diverse business and that Franchisor has no obligation to enforce this Agreement or other agreements in any uniform manner.

## 27    LEGAL FEES AND COSTS.

If, without the commencement of arbitration or litigation, Franchisor incurs any legal expenses, costs or attorneys' fees in connection with either the collection of any sums due under this Agreement, or the enforcement of Franchisee's compliance with this Agreement, or as a result of Franchisee's breach of this Agreement, Franchisee shall pay such legal expenses, costs and attorneys' fees. If either Franchisor or Franchisee

commences arbitration or litigation to enforce compliance with the terms of this Agreement, the prevailing party in such arbitration or litigation and in any appeals from the judgment rendered in such arbitration or litigation shall be entitled to recover the full amount of all of its legal expenses, costs and attorneys' fees incurred in such arbitration or litigation.

28    FORCE MAJEURE.

Franchisee and Franchisor shall not be deemed to be in default of their obligations hereunder, other than any obligation of Franchisee to pay money to Franchisor, if such obligations are delayed or become impossible due to act of God, war, earthquake, fire, accident, civil commotion, act of government, its agencies or officers or any other similar cause beyond the control of the parties hereto.

29    NO OFFSET.

Amounts due to Franchisor under this Agreement shall not be subject to any right of offset by Franchisee.

30    TIME OF ESSENCE.

Franchisee's timely performance of each and all of Franchisee's obligations is of the essence of this Agreement.

31    INTERPRETATION.

Wherever herein appearing, unless clearly contrary to the context:

31.1    Except as otherwise specifically provided herein, words importing the singular shall be deemed to include the plural and vice versa.

31.2    "Franchisor" shall mean Jenny Craig International, Inc., its agents, successors in title and permitted assigns, permitted transferees and those claiming through or under them, respectively.

31.3    "Franchisee" shall mean the entity designated as Franchisee in the first paragraph of this Agreement, its successors in title and permitted assigns, permitted transferees and those claiming through or under them, respectively.

31.4    The masculine, feminine and neuter gender shall include each other.

31.5    A "week" shall be deemed to commence at the time Franchisee commences business on Saturday of each week and to conclude at the close of business on Friday, and a "month" shall mean a calendar month.

31.6    A "business day" shall mean Monday through Friday, excluding national holidays, but not excluding state holidays that are not also national holidays.

31.7    The table of contents and section headings contained in this Agreement are for purposes of convenient reference only and shall not affect the meaning or interpretation of this Agreement.

33


31.8    The provisions of this Agreement shall be interpreted according to their plain meanings and not strictly for or against either party.

32    <u>EFFECTIVENESS.</u>

This Agreement shall be effective as of the Effective Date set forth in the first paragraph of this Agreement; provided however, that this Agreement shall be of no force or effect until accepted and signed by Franchisor.

33    <u>RESERVATION OF RIGHTS.</u>

All rights not expressly and specifically granted herein to Franchisee are reserved to Franchisor.

34    <u>ACKNOWLEDGMENT AND DISCLAIMER.</u>

34.1    Franchisee acknowledges that prior to having executed this Agreement it has carefully read the provisions of this Agreement and understands such provisions and has not received (or, if Franchisee believes it has received, then Franchisee has not relied on) any statement, representation or warranty from Franchisor or its agents other than as set forth herein or in the Offering Circular provided to Franchisee by Franchisor.

34.2    FRANCHISEE ACKNOWLEDGES THAT IT HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF FRANCHISOR'S SYSTEM.  FRANCHISEE ACKNOWLEDGES AND RECOGNIZES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISKS AND THAT SUCCESS OF THE BUSINESS VENTURE WILL LARGELY DEPEND ON THE ABILITY OF FRANCHISEE AS AN INDEPENDENT BUSINESS PERSON. FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RECEIVED, ANY WARRANTY OR GUARANTY, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement in one or more counterparts, each of which shall constitute an original, Franchisee having signed on the day and year first above written, and Franchisor having signed on the date indicated below.

FRANCHISEE:                          FRANCHISOR:

DMJ, INC. ~~DELAWARE~~               JENNY CRAIG INTERNATIONAL, INC.
a ~~Tennessee~~ corporation          a California corporation

By:                                  By:

Jon Fusco                            Maria Weiss
President                            Vice President Franchise Development
Date: 4/23 ,2001                     Date: 6 ,2001

34

EXHIBIT A

FRANCHISE LOCATION

The Franchise Location is the following address:

Centre #8072
Park Place
1233 Park Place Center, #1233
Memphis, Tennessee 38119

EXHIBIT B

FOOD PRODUCTS PURCHASE AGREEMENT

This Food Products Purchase Agreement ("Agreement"), effective as of the 1st day of April, 2001 (the "Effective Date"), is made and entered into by and between **Jenny Craig Operations, Inc.**, a California corporation ("**Company**") and **DMJ, Inc.**, a Tennessee corporation ("**Franchisee**").

## RECITALS

(A)     Company is an affiliate of Jenny Craig International, Inc., a California corporation ("Franchisor").

(B)     Company and Franchisee have entered into a Franchise Agreement effective as of April 1st, 2001 (the "Franchise Agreement"), whereby Franchisee will open or has opened a Jenny Craig Weight Loss Centre (the "Centre").

(C)     Franchisee has requested that Company enter into this Agreement in order to define and establish the terms of Franchisee's purchase of food, food supplements and beverage products ("Food Products") for use in the Centre.

Accordingly, the parties agree as follows:

## AGREEMENT

1.    COMPANY AS EXCLUSIVE SOURCE.

1.1     Appointment. Franchisee appoints Company as exclusive source for the purchase of Food Products offered by Company for use in the Centre, and to be sold by Franchisee in the Centre, and Company agrees to provide such Food Products. Company reserves the exclusive right to determine what Food Products it will offer. Company may designate an affiliate to fulfill some or all of its obligations under this Agreement.

1.2     Term. Franchisee's appointment of Company as exclusive source is irrevocable for ten (10) years from the Effective Date of this Agreement or until expiration or termination of the Franchise Agreement, whichever occurs first (the "Term"). Any action by Franchisee to revoke the appointment of Company before the end of such period on less than six (6) months notice, shall be deemed a material breach of this Agreement.

1.3     Termination.

(a)     Franchisee shall have the right to terminate this Agreement on thirty (30) days written notice if Company at any time during the Term fails to supply Franchisee with sufficient quantities of Food Products to meet the needs of Franchisee's customers. The Company will be deemed to have failed to meet the needs of Franchisee's customers if during any ninety (90) day period Company fails to deliver at least ninety percent (90%) of the Food Products ordered by Franchisee (by number of

1

is received by Company; provided, however, that Company shall not have failed to meet the needs of Franchisee's customers if any failure to deliver Food Products is due to the failure of Franchisee to make timely payments for Food Products as required by this Agreement, or due to any force majeure or other incident or event beyond Company's control.

(b)    Franchisee shall have the right to terminate this Agreement upon fifteen (15) days written notice if Company is in material breach of any term or condition hereof, which breach remains uncured for a period of thirty (30) days after Company's receipt of written notice from Franchisee with respect to any such breach; provided, however, that this right to terminate is conditioned on Franchisee being current with respect to all amounts then due to Company, Franchisor and any of their affiliates.

(c)    This Agreement shall automatically terminate upon termination of the Franchise Agreement.

2.    FOOD PRODUCTS SALE TERMS.

2.1    Basic Price Formula. Company shall purchase Food Products from suppliers and make such Food Products available to Franchisee at prices generally equal to approximately thirty seven percent (37%) of Company's suggested retail charge (excluding discounts) for such Food Products in Jenny Craig Weight Loss Centres owned and operated by Company, Franchisor or any of their affiliates ("Company Centres"). A list of Company's current retail charges for Food Products and the amount that would be charged to Franchisee with respect to such Food Products as of the Effective Date of this Agreement is attached hereto as Schedule A.

2.2    New Product Pricing. For new Food Products that are not substitutes for existing Food Products, Company shall have the right to charge Franchisee the greater of thirty seven percent (37%) of the suggested retail price charged by Company in Company Centres, or one hundred five percent (105%) of Company's net cost from its supplier(s) with respect to such Food Products. Net cost is defined as Company's net cost delivered at Company's warehouse, including charges from the supplier, and all packaging, freight and duties, less any discounts received (other than discounts for prompt payment).

2.3    Price Changes. Nothing in Sections 2.1, 2.2 or elsewhere shall be construed to restrict Company's freedom to increase the retail charges for Food Products in Company Centres, nor shall anything herein be construed to tie the cost of Food Products provided hereunder to Franchisee's retail charges for such Food Products to its customers.

2.4    Payment Terms. Franchisee shall pay for Food Products received (i) within one calendar week seven (7) days from the date of delivery or (ii) prior to shipment of Franchisee's next Food Products order, whichever is earlier. In the event that payment for Food Products is not received within seven (7) days from the date of delivery, payment shall be deemed past due and shall bear interest at two percentage points (2%) above the prime rate published from time to time by Bank of America (or its successor) or at the maximum rate allowed by law, whichever is less. Company may also refuse to ship further Food Products orders placed by Franchisee until past due amounts are paid in full. If Franchisee submits more than one (1) check which is returned for

2

insufficient funds during any calendar year, Company shall have the right on request to require payment for Food Products in the form of certified or cashiers' checks. This provision does not authorize or excuse any late payment or dishonored check or otherwise waive any right of Company to collect full payment for any Food Products.

2.5    Credits. Franchisee shall receive a credit for all damaged or defective Food Products delivered to it by or through Company, Franchisor or any of their affiliates, whether such damage or defect is discovered by Franchisee, its customers or otherwise; provided, however, that such damage or defect does not arise out of, and is not in any way related to, the negligence of Company, Franchisee or any of their affiliates or employees.

3.    FREIGHT AND DELIVERY.

3.1    Delivery and Freight. Company shall ship Food Products to Franchisee. Shipment shall be FOB Company's warehouse selected at Company's sole discretion. Company shall use best efforts to deliver Food Products ordered by Franchisee within ten (10) business days after receipt of each order from Franchisee. Franchisee shall pay all freight and handling charges from Company's warehouse to the point of delivery.

3.2    Payment Failure. If delivery of an order is delayed because of nonpayment, a returned or dishonored check, or any other reason within the control of Franchisee, Franchisee shall prepay all extra freight and handling costs to receive that order.

4.    ARBITRATION/DISPUTE RESOLUTION.

4.1    Arbitration.

(a)    Except for controversies, disputes or claims set forth in Section 4.2 below, for which Company elects to proceed to court, every claim or dispute arising out of or relating to the negotiation, performance or non-performance of this Agreement including, without limitation, any alleged torts, and any claims regarding the validity, scope, and enforceability of this Section shall be determined by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), or as otherwise agreed by the parties. The place of arbitration shall be in San Diego, California.

(b)    The parties shall first attempt to resolve any claim or dispute through good faith, informal negotiations, including but not limited to, non-binding mediation. In the event that the matter is not thereby resolved within thirty days, either party may demand arbitration by written notice to the other party and to the AAA in San Diego, California.

(c)    The parties shall mutually agree on one arbitrator. If the parties cannot so agree, the single arbitrator shall be selected by the AAA.

3

(d)     The arbitrator shall, within thirty (30) days after the matter has finally been submitted to him or her, render a written decision making specific findings of fact and setting forth the reasons for the decision which shall be consistent with the terms of this Agreement. The arbitrator shall not have any power to alter, modify or change any of the terms of this Agreement or to grant any remedy which is inconsistent with or prohibited by the terms of this Agreement or not available in a court of law. The arbitrator shall have power to award only direct actual damages and shall have no power or authority to award punitive, exemplary, consequential or incidental damages or statutory multiples of damages such as treble damages. The parties intend that this agreement to arbitrate be valid, binding, enforceable and irrevocable. The terms of this Section shall survive the termination or expiration of this Agreement. Judgment on any award of the arbitrator shall be binding and may be entered in any court having jurisdiction thereof.

4.2     Company Actions. Notwithstanding the provisions of Section 4.1, Company shall have the right to proceed to any court of competent jurisdiction and seek appropriate remedies, including, but not limited to, damages, repossession, foreclosure, specific performance, and injunctive relief, in the following instances:

(a)     Conduct or threatened conduct which may cause Company or its tradenames or trademarks irreparable harm;

(b)     Franchisee's infringement, misuse or inappropriate use of Company's tradenames or trademarks (including but not limited to actions seeking relief under the Trademark Act of 1946, as amended), copyrights, trade dress, trade secrets, or other proprietary or confidential information;

(c)     Any actions by Company as secured creditor under applicable law under any promissory notes, equipment lease, or other secured obligation; and

(d)     Any actions by Company under applicable bankruptcy law.

4.3     Consent to Jurisdiction. Any arbitration or litigation relating in any way to this Agreement shall be conducted in San Diego, California. By execution and delivery of this Agreement, Franchisee hereby irrevocably waives, to the fullest extent permitted by law, any objection that Franchisee may now or hereafter have to the laying of venue in San Diego, California, and any claim that San Diego, California, is an inconvenient forum. Notwithstanding the foregoing, nothing herein shall limit the right of Company to commence any action of the kind described in Section 4.2, above, in courts other than those that are located in San Diego, California.

5.     GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts made, and to be performed in that State without giving effect to the conflict of laws rules of that State; provided, however, that if a provision of this Agreement is unenforceable under

California law, such provision shall be governed by and construed under the laws of the State in which the Centre is located.

6.     LEGAL FEES AND COSTS.  If without the commencement of arbitration or litigation, Company incurs any legal expenses, costs or attorneys' fees in connection with either the collection of any sums due under this Agreement or the enforcement of Franchisee's compliance with this Agreement, or as a result of Franchisee's breach of this Agreement, Franchisee shall pay such legal expenses, costs and attorneys' fees.  If Company commences arbitration or litigation to collect any sums due under this Agreement, or to enforce Franchisee's compliance with this Agreement, or as a result of Franchisee's breach of this Agreement, the prevailing party in such arbitration or litigation and in any appeals from the judgment rendered in such arbitration or litigation shall be entitled to recover the full amount of all of its legal expenses, costs and attorneys' fees incurred in such arbitration or litigation.

7.     ASSIGNMENT.  Neither this Agreement nor the rights, duties or obligations arising hereunder shall be assignable or delegable by Franchisee without the express prior written consent of Company.  Company shall have the right at any time to assign this Agreement, and any rights and obligations in this Agreement, in whole or in part, in any manner and for any purpose to any person, firm, corporation or other entity, including but not limited to any affiliate, subsidiary or other entity related to Company.

8.     FORCE MAJEURE.  Franchisee and Company shall not be deemed to be in default of their obligations hereunder, other than any obligation of Franchisee to pay money to Company, if such obligations are delayed or become impossible due to act of God, war, earthquake, fire, accident, civil commotion, act of government, its agencies or officers or any other similar cause beyond the control of the parties hereto.

9.     NO OFFSET.  Amounts due to Company under this Agreement shall not be subject to any right of offset by Franchisee.

10.     TIME OF ESSENCE.  Franchisee's timely performance of each and all of Franchisee's obligations is of the essence of this Agreement.

11.     ENTIRE AGREEMENT.  This Agreement is the entire agreement among the parties concerning its subject matter and supersedes all other agreements, understandings, negotiations and discussions pertaining to such subject matter.

12.     AMENDMENT.  No amendment of any provision in this Agreement shall be effective unless an instrument stating the amendment has been signed by both parties. No provision of this Agreement can be waived except by an express instrument in writing signed by the party to be bound thereby.

13.     SEVERABILITY.  If any provision of this Agreement is unenforceable, the remainder of this Agreement shall continue in effect.

14.     INTERPRETATION.  Wherever herein appearing, unless repugnant to the context:

(i)     Except as otherwise specifically provided herein, words importing the singular shall be deemed to include the plural and vice versa.

5

(ii)    "Company" shall mean Jenny Craig Products, Inc., its agents, successors in title and permitted assigns, permitted transferees and those claiming through or under them, respectively.

(iii)   "Franchisee" shall mean the entity designated as Franchisee in the first paragraph of this Agreement, its successors in title and permitted assigns, permitted transferees and those claiming through or under them, respectively.

(iv)    The masculine, feminine and neuter gender shall include each other.

(v)     The section headings contained in this Agreement are for purposes of convenient reference only and shall not affect the meaning or interpretation of this Agreement.

(vi)    The provisions of this Agreement shall be interpreted according to their fair meanings and not strictly for or against either party.

15.     LIMITATION OF LIABILITY.  Under no circumstances shall either party be liable for any indirect, incidental, punitive, exemplary, special or consequential damages or statutory multiples of damages (such as statutory treble damages) suffered by the other party or any other person arising out of or related to this Agreement or the performance or non-performance of its obligations hereunder, regardless of whether or not such party has been advised of the possibility of such damages. Nothing contained herein or elsewhere in this Agreement shall act to limit liability to Franchisor for the indemnification obligations of Franchisee set forth in any franchise agreement between the parties.

16.     NOTICES.

All notices or other communications in connection with this Agreement shall be in writing, and shall be considered given when personally delivered or when delivered to the addressee by registered or certified mail, postage prepaid, return receipt requested, or when delivered to the addressee via commercial courier or telecopier directed as follows (or directed to such other address or telecopier as instructed by the recipient in accordance with this Section 15):

|             |                                      |
|-------------|--------------------------------------|
| Company:    | Jenny Craig Operations, Inc.         |
|             | 11355 North Torrey Pines Road        |
|             | La Jolla, California  92038          |
|             | Attention: President                 |
|             | Telecopier: (858) 812-2734           |

and

Jenny Craig, Inc.
11355 North Torrey Pines Road
La Jolla, California 92038
Attention:  General Counsel
Telecopier: (858) 812-2799

Franchisee:          DMJ, Inc.
6006 Sweetbrier Cove
Memphis, Tennessee 38120
Attention: President
Telecopier: (901) 767-7040

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

"Company"                                "Franchisee"

JENNY CRAIG OPERATIONS, INC.              DMJ, INC.

By:_____              By:_____

Maria Weiss                               Jon Fusco
Vice President Franchise Development       President

7

EXHIBIT C

GUARANTEE AND ASSUMPTION OF OBLIGATIONS

THIS GUARANTEE AND ASSUMPTION OF OBLIGATIONS (this "Guarantee") is given to JENNY CRAIG INTERNATIONAL, INC., this 1st day of April, 2001, by Jon and JoAnne Fusco.

In consideration of and as an inducement to the execution of that certain Franchise Agreement of even date herewith (the "Franchise Agreement") by and between JENNY CRAIG INTERNATIONAL, INC. ("Franchisor") and DMJ, Inc. ("Franchisee"), each of the undersigned hereby personally and unconditionally:

(a)    Guarantees to Franchisor and its successors, affiliates and assigns to the terms of the Franchise Agreement and any renewals thereof that Franchisee shall punctually pay and perform each and every undertaking, obligation, agreement and covenant set forth in the Franchise Agreement.

(b)    Agrees to be personally bound by each and every provision of the Franchise Agreement and any renewals thereof, including but not limited to, all monetary obligations and obligations to take or refrain from taking specific action or to engage or refrain from engaging in specific activities; and further agrees to be personally liable for the breach thereof.

(c)    Each of the undersigned consents and agrees that:  (1) his or her liability under this Guarantee shall be joint and several singely and with each and every combination of the other guarantors; (2) he or she shall render any payment or performance required under the Franchise Agreement and any renewals thereof on demand if Franchisee fails or refuses to do so punctually; (3) such liability shall not be contingent or conditioned on pursuit by Franchisor of any remedies against Franchisee or any other person; and (4) such liability shall not be diminished, relieved or otherwise affected by an extension of time, credit or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this Guarantee, which shall be continuing and irrevocable during the term of the Franchise Agreement and any renewals thereof.

This Guarantee shall continue in full force and effect until one (1) year after the nonrenewal or termination of the Centre operated by Franchisee pursuant to the Franchise Agreement, such time period to begin running on the date the Centre permanently closes its doors to the public; provided, however, that none of the undersigned shall be discharged from any liabilities hereunder so long as any claim for fees by Franchisor (or any of its subsidiaries or affiliates) against Franchisee or claim for any other payment or performance remains outstanding.

This Guarantee shall be governed and construed in accordance with the laws of the State of California applicable to contracts made and to be performed in that State, without giving effect to the conflict of laws rules of that State; provided, however, that if a provision of this Guarantee is unenforceable under California law, such provision shall be governed by and construed under the laws of the State in which Franchisee's Centre is located. Any arbitration or litigation arising out or relating in any way to this Guarantee shall be conducted in San Diego, California.

Every claim or dispute arising out of or relating to this Guarantee shall be determined by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), or as otherwise agreed by the parties. The place of arbitration shall be in San Diego, California. The parties shall first attempt to resolve any claim or dispute through good faith, informal negotiations, including but not limited to, non-binding mediation. In the event that the matter is not thereby resolved within thirty days, any party may demand arbitration by written notice to the other party and to the AAA in San Diego, California. In any arbitration, the parties shall mutually agree on one arbitrator. If the parties cannot so agree, the single arbitrator shall be selected by the AAA. The arbitrator shall, within thirty (30) days after the matter has finally been submitted to him or her, render a written decision making specific findings of fact and setting forth the reasons for the decision which shall be consistent with the terms of this Guarantee. The arbitrator shall not have any power to alter, modify or change any of the terms of this Guarantee or to grant any remedy which is inconsistent with or prohibited by the terms of this Guarantee or not available in a court of law. The arbitrator shall have power to award only direct actual damages and shall have no power or authority to award punitive, exemplary, consequential or incidental damages or statutory multiples of damages such as treble damages. Judgment on any award of the arbitrator shall be binding and may be entered in any court having jurisdiction thereof.

The obligations of each of the undersigned to honor this Guarantee shall not be adversely affected by any other agreement entered into by Franchisor and Franchisee or any modification, alteration or amendment of the Franchise Agreement or any renewals thereof.

Intending to be bound thereby, each of the undersigned has executed this Guarantee on the year and day above written.

Jon Fusco

JoAnne Fusco

2

EXHIBIT D
DECISION AND ORDER

JENNY CRAIG, INC. - D                                                    Page 1

B234118

UNITED STATES OF AMERICA
BEFORE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**
Robert Pitofsky, Chairman
Mary L. Azcuenaga
Sheila F. Anthony
Mozelle W. Thompson
Orson Swindle

*In the Matter of*

JENNY CRAIG, INC., a corporation, and JENNY CRAIG INTERNATIONAL, INC., a
corporation.

DOCKET NO. 9260

**DECISION AND ORDER**

The Commission having heretofore issued its complaint charging the respondents named
in the caption hereof with violation of Sections 5 and 12 of the Federal Trade
Commission Act, as amended, and the respondents having been served with a copy of
that complaint, together with a notice of contemplated relief; and

The respondents, their attorneys, and counsel for the Commission having thereafter
executed an agreement containing a consent order, an admission by the respondents of all
the jurisdictional facts set forth in the complaint, a statement that the signing of said
agreement is for settlement purposes only and does not constitute an admission by
respondents that the law has been violated as alleged in such complaint, or that the facts
as alleged in such complaint, other than jurisdictional facts, are true, and waivers and
other provisions as required by the Commission's Rules; and

The Secretary of the Commission having thereafter withdrawn this matter from
adjudication in accordance with § 3.25(c) of its Rules; and

The Commission having considered the matter and having thereupon accepted the
executed consent agreement and placed such agreement on the public record for a period
of sixty (60) days, and having duly considered the comments filed thereafter by interested
persons pursuant to § 3.25(f) of its Rules, and having modified the order in several
respects, now in further conformity with the procedure prescribed in § 3.25(f) of its
Rules, the Commission hereby makes the following jurisdictional findings and enters the
following order:

    1. Respondent Jenny Craig, Inc. is a corporation organized, existing, and
    doing business under and by virtue of the laws of the State of Delaware, with
    its office and principal place of business located at 445 Marine View
    Avenue, #300, Del Mar, California 92014.

    Respondent Jenny Craig International, Inc. is a corporation organized,
    existing, and doing business under and by virtue of the laws of the State of
    California, with its office and principal place of business located at 445
    Marine View Avenue, #300, Del Mar, California 92014.

JENNY CRAIG, INC. - D&

2. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of the respondents, and the proceeding is in the public interest.

## ORDER

## DEFINITIONS

For the purposes of this order, the following definitions shall apply:

A. "Competent and reliable scientific evidence" shall mean those tests, analyses, research, studies, surveys or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

B. "Weight loss program" shall mean any program designed to aid consumers in weight loss or weight maintenance.

C. "Broadcast medium" shall mean any radio or television broadcast, cablecast, home video, or theatrical release.

D. For any order-required disclosure in a print medium to be made "clearly and prominently" or in a "clear and prominent manner," it must be given both in the same type style and in: (1) twelve point type where the representation that triggers the disclosure is given in twelve point or larger type; or (2) the same type size as the representation that triggers the disclosure where that representation is given in a type size that is smaller than twelve point type.

E. For any order-required disclosure given orally in a broadcast medium to be made "clearly and prominently" or in a "clear and prominent manner," the disclosure must be given at the same volume and in the same cadence as the representation that triggers the disclosure.

F. For any order-required disclosure given in the video portion of a television or video advertisement to be made "clearly and prominently" or in a "clear and prominent manner," the disclosure must be of a size and shade and must appear on the screen for a duration sufficient for an ordinary consumer to read and comprehend it.

G. "Short broadcast advertisement" shall mean any advertisement of thirty seconds or less duration made in a broadcast medium.

## I.

IT IS ORDERED that Jenny Craig, Inc., a corporation, and Jenny Craig International, Inc., a corporation ("respondents"), their successors and assigns, and respondents' officers, representatives, agents, and employees, directly or through any corporation, subsidiary, division, or other device, including franchisees or licensees, in connection with the advertising, promotion, offering for sale, or sale of any weight loss program, in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

A. Making any representation, directly or by implication, about the success of

 
.participants on any weight loss program in achieving or maintaining weight loss or weight control unless, at the time of making any such representation, respondents possess and rely upon competent and reliable evidence, which when appropriate must be competent and reliable scientific evidence, that substantiates the representation;

provided, further, that for any representation that:

(1) any weight loss achieved or maintained through the weight loss program is typical or representative of all or any subset of participants of respondents' program, said evidence shall, at a minimum, be based on a representative sample of:

(a) all participants who have entered the program, where the representation relates to such persons; provided, however, that the required sample may exclude those participants who dropped out of the program within two weeks of their entrance or who were unable to complete the program due to change of residence or medical reasons, such as pregnancy; or

(b) all participants who have completed a particular phase of the program or the entire program, where the representation only relates to such persons;

(2) any weight loss is maintained long-term, said evidence shall, at a minimum, be based upon the experience of participants who were followed for a period of at least two years from their completion of the active maintenance phase of respondents' program, or earlier termination, as applicable; and

(3) any weight loss is maintained permanently, said evidence shall, at a minimum, be based upon the experience of participants who were followed for a period of time after completing the program that is either:

(a) generally recognized by experts in the field of treating obesity as being of sufficient length for predicting that weight loss will be permanent, or

(b) demonstrated by competent and reliable survey evidence as being of sufficient duration to permit such a prediction.

B. Representing, directly or by implication, except through endorsements or testimonials referred to in paragraph I.E. herein, that participants of any weight loss program have successfully maintained weight loss, unless respondents disclose, clearly and prominently, and in close proximity to such representation, the statement: "For many dieters, weight loss is temporary.";

provided, further, that respondents shall not represent, directly or by implication, that the above-quoted statement does not apply to dieters in respondents' weight loss program;

provided, however, that a truthful statement that merely describes the existence, design or content of a weight maintenance or weight management program or notes that the program teaches clients about how to manage their weight will not, without more, be considered for purposes of this order a



representation regarding weight loss maintenance success;

C. Representing, directly or by implication, except through short broadcast advertisements referred to in paragraph I.D. herein, and except through endorsements or testimonials referred to in paragraph I.E. herein, that participants of any weight loss program have successfully maintained weight loss, unless respondents disclose, clearly and prominently, and in close proximity to such representation, the following information:

(1) the average percentage of weight loss maintained by those participants,

(2) the duration over which the weight loss was maintained, measured from the date that participants ended the active weight loss phase of the program, provided, further, that if any portion of the time period covered includes participation in a maintenance program(s) that follows active weight loss, such fact must also be disclosed, and

(3) if the participant population referred to is not representative of the general participant population for respondents' programs:

(a) the proportion of the total participant population in respondents' programs that those participants represent, expressed in terms of a percentage or actual numbers of participants, or

(b) the statement: "Jenny Craig makes no claim that this [these] result[s] is [are] representative of all participants in the Jenny Craig program.";

provided, however, that for representations about weight loss maintenance success that do not use a number or percentage, or descriptive terms that convey a quantitative measure such as "most of our customers maintain their weight loss long-term", respondents may, in lieu of the disclosures required in C.(1)-(3) above,

(i) include, clearly and prominently, and in immediate conjunction with such representation, the statement: "Check at our centers for details about our maintenance record."; and

(ii) for a period of time beginning with the date of the first dissemination or broadcast of any such advertisement and ending no sooner than thirty (30) days after the last dissemination or broadcast of such advertisement, give to each potential client, upon the first presentation of any form asking for information from the potential client, but in any event before such person has entered into any agreement with respondents, a separate document entitled "Maintenance Information," which shall include all the information required by paragraph I.B. and subparagraphs I.C.(1)- (3) of this order, formatted in the exact type size and style as the example form described in paragraph I.D.(2)(a) and set out below;

provided, further, that compliance with the obligations of this paragraph I.C. in no way relieves respondents of the requirement under paragraph I.A. of this order to substantiate any representation about the success of participants on any weight loss program in maintaining weight loss.

D. Representing, directly or by implication, in short broadcast advertisements, that participants of any weight loss program have successfully maintained weight loss, unless respondents:

(1) include, clearly and prominently, and in immediate conjunction with such representation, the statement: "Check at our centers for details about our maintenance record.";

(2) for a period of time beginning with the date of the first broadcast of any such advertisement and ending no sooner than thirty days after the last broadcast of such advertisement, comply with the following procedures upon the first presentation of any form asking for information from a potential client, but in any event before such person has entered into any agreement with respondents:

(a) give to each potential client a separate document entitled "Maintenance Information," which shall include all the information required by paragraph I.B. and subparagraphs I.C. (1)-(3) of this order and shall be formatted in the exact type size and style as the example form below, and shall include the heading (Helvetica 14 pt. bold), lead-in (Times Roman 12 pt.), disclosures (Helvetica 14 pt. bold), acknowledgment language (Times Roman 12 pt.) and signature block therein; provided, further, that no information in addition to that required to be included in the document required by this subparagraph I.D.(2) shall be included therein;

## MAINTENANCE INFORMATION

You may have seen our recent ad about maintenance success. Here's some additional information about our maintenance record.

[Disclosure of maintenance statistics goes hereXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]
**For many dieters, weight loss is temporary.**

I have read this notice. _____
(Client Signature) (Date)

(b) require each potential client to sign such document; and

(c) give each client a copy of such document; and

(3) retain in each client file a copy of the signed maintenance notice required by this paragraph;



provided, further, that: (1) compliance with the obligations of this paragraph I.D. in no way relieves respondents of the requirement under paragraph I.A. of this order to substantiate any representation about the success of participants on any weight loss program in maintaining weight loss; and (2) respondents must comply with both paragraph I.D. and paragraph I.C. of this order if respondents include in any such short broadcast advertisement a representation about maintenance success that states a number or percentage, or uses descriptive terms that convey a quantitative measure such as "most of our customers maintain their weight loss long-term";

provided, however, that the provisions of paragraph I.D. shall not apply to endorsements or testimonials referred to in paragraph I.E. herein.

E. Using any advertisement containing an endorsement or testimonial about weight loss success or weight loss maintenance success by a participant or participants of respondents' weight loss program if the weight loss success or weight loss maintenance success depicted in the advertisement is not representative of what participants of respondents' weight loss programs generally achieve, unless respondents disclose, clearly and prominently, and in close proximity to the endorser's statement of his or her weight loss success or weight loss maintenance success:

(1) What the generally expected success would be for Jenny Craig customers in losing weight or maintaining achieved weight loss; provided, however, that in determining the generally expected success for Jenny Craig customers, respondents may exclude those customers who dropped out of the program within two weeks of their entrance or who were unable to complete the program due to change of residence or medical reasons, such as pregnancy; and that for endorsements or testimonials about weight loss success, respondents can satisfy the requirements of this subparagraph by accurately disclosing:

(a) the generally expected success for Jenny Craig customers in the following phrase: "Weight loss averages (number) lbs. over ___ weeks"; or

(b) the average number of pounds lost by Jenny Craig customers, using the following phrase: "Average weight loss (number) lbs. More details at centers"; and, for a period of time beginning with the date of the first dissemination of any such advertisement and ending no sooner than thirty days after the last dissemination of such advertisement, making in any on-site video promotion the preceding disclosure orally and complying with the following procedures upon the first presentation of any form asking for information from a potential client, but in any event before such person has entered into any agreement with respondents:

(i) give to each potential client a separate one-page document with an appropriate title that alerts customers that important information follows, which shall disclose, clearly and prominently, what the generally expected success would be for Jenny Craig customers in losing weight, expressed in terms of both average number of pounds lost and average duration of participation in the Jenny Craig



program; such document shall be formatted in the
following type size and style: heading (Helvetica 14
pt. bold), disclosures (Helvetica 14 pt. bold),
signature block (Times Roman 12 pt.), and any
other language (no larger than 14 pt.); provided,
further, that no information that contradicts this
information shall be included in the document
required by this subparagraph;

(ii) ask each potential client to sign such document;

(iii) give each client a copy of such document; and

(iv) retain in each client file a copy of the notice
provided to clients under the requirements of this
subparagraph; or

(2) the limited applicability of the endorser's experience to what consumers
may generally expect to achieve; i.e., that consumers should not expect to
experience similar results; respondents can satisfy the requirements of this
subparagraph by clearly and prominently disclosing in close proximity to the
representation one of the following statements:

(a) "You should not expect to experience these results."

(b) "This result is not typical. You may not do as well."

(c) "This result is not typical. You may be less successful."

(d) "_____'s success is not typical. You may not
do as well."

(e) "_____'s experience is not typical. You may
achieve less."

(f) "Results not typical."

(g) "Results not typical of program participants."

provided, however, that a truthful statement that merely describes the
existence, design or content of a weight maintenance or weight management
program or notes that the program teaches clients how to manage their
weight, or which states either through the endorser or in nearby copy that
under the program "weight loss maintenance is possible," or words to that
effect, will not, without more, be considered for purposes of this paragraph a
representation regarding weight loss maintenance success or trigger the need
for separate or additional maintenance disclosures required by other
paragraphs of the order;

provided, further, that:

(i) a representation about maintenance by an
endorser that states a number or percentage, or uses
descriptive terms that convey a quantitative

JENNY CRAIG, INC. - D.                                     Page 8

measure, such as "I have kept off most of my weight loss for 2 years," shall be considered a representation regarding weight loss maintenance success;

(ii) if endorsements or testimonials covered by this paragraph are made in a broadcast medium, any disclosure required by this paragraph must be communicated in a clear and prominent manner and in immediate conjunction with the representation that triggers the disclosure.

F. Representing, directly or by implication, that the price at which any weight loss program can be purchased is the only cost associated with losing weight on that program, unless such is the case.

G. Representing, directly or by implication, the price at which any weight loss program can be purchased, unless respondents disclose, clearly and prominently, either (1) in close proximity to such representation, the existence and amount of all mandatory costs and fees associated with the program offered; or (2) in immediate conjunction with such representation, the following statement: "Plus the cost of [list of products or services that participants must purchase at additional cost].";

provided, further, that in a broadcast medium, if the representation that triggers the disclosure is oral, the required disclosure must also be made orally.

H. Failing to disclose over the telephone, for a period of time beginning with the date of any advertisement of the price at which any weight loss program can be purchased and ending no sooner than 180 days after the last dissemination of any such advertisement, to consumers who inquire about the cost of any weight loss program, or are told about the cost of any weight loss program, the existence and amount of any mandatory costs or fees associated with participation in the program.

I. Representing, directly or by implication, that prospective participants in respondents' weight loss program will reach a specified weight within a specified time period, unless at the time of making such representation, respondents possess and rely upon competent and reliable scientific evidence substantiating the representation.

J. Misrepresenting, directly or by implication, the rate or speed at which any participant in any weight loss program has experienced or will experience weight loss.

K. Failing to disclose, clearly and prominently, in writing either:

1) to all participants when they enter the program; or

2) to each participant whose average weekly weight loss exceeds two percent (2%) of his or her initial body weight, or three pounds, whichever is less, for at least two consecutive weeks;

that failure to follow the program protocol and eat all of the food recommended may involve the risk of developing serious health complications.

L. Misrepresenting, directly or by implication, the performance, efficacy, price, or safety



of any weight loss program or weight loss product.

M. Representing, directly or by implication, that participants on any weight loss program recommend or endorse the program unless, at the time of making any such representation, respondents possess and rely upon competent and reliable evidence, which when appropriate must be competent and reliable scientific evidence, that substantiates such representation.

N. Misrepresenting, directly or by implication, the existence, contents, validity, results, conclusions, or interpretations of any test, study, or survey.

## II.

IT IS FURTHER ORDERED that respondents shall notify the Commission at least thirty (30) days prior to the effective date of any proposed change such as dissolution, assignment, or sale resulting in the emergence of a successor corporation(s), the creation or dissolution of subsidiaries, or any other change in the corporation(s) that may affect compliance obligations arising out of this order.

## III.

IT IS FURTHER ORDERED that for three (3) years after the last date of dissemination of any representation covered by this order, respondents, or their successors and assigns, shall maintain and upon request make available to the Federal Trade Commission for inspection and copying:

   A. All materials that were relied upon in disseminating such representation; and

   B. All tests, reports, studies, surveys, demonstrations or other evidence in their possession or control that contradict, qualify, or call into question such representation, or the basis relied upon for such representation, including complaints from consumers.

## IV.

IT IS FURTHER ORDERED that respondents shall distribute a copy of this order to each of their officers, agents, representatives, independent contractors and employees who are involved in the preparation and placement of advertisements or promotional materials or in communication with customers or prospective customers or who have any responsibilities with respect to the subject matter of this order; and, for a period of ten (10) years from the date of entry of this order, distribute same to all future such officers, agents, representatives, independent contractors and employees.

## V.

IT IS FURTHER ORDERED that:

   A. Respondents shall distribute a copy of this order to each of their franchisees and licensees and shall contractually bind them to comply with the prohibitions and affirmative requirements of this order; respondents may satisfy this contractual requirement by incorporating such order requirements into their current Operations Manual; and

ᵀENNY CRAIG, INC. - D&                                    Page 10

B. Respondents shall further make reasonable efforts to monitor their franchisees' and licensees' compliance with the order provisions; respondents may satisfy this requirement by: (1) taking reasonable steps to notify promptly any franchisee or licensee that respondents determine is failing materially or repeatedly to comply with any order provision that such franchisee or licensee is not in compliance with the order provisions and that disciplinary action may result from such noncompliance; and (2) providing the Federal Trade Commission with the name and address of the franchisee or licensee and the nature of the noncompliance if the franchisee or licensee fails to comply promptly with the relevant order provision after being so notified; provided, however, that the requirements of this Part V will not, by themselves, increase the liability of respondents for any acts and practices of their franchisees or licensees that violate this order.

### VI.

IT IS FURTHER ORDERED that this order will terminate on February 19, 2018, or twenty (20) years from the most recent date that the United States or the Federal Trade

Commission files a complaint (with or without an accompanying consent decree) in federal court alleging any violation of the order, whichever comes later; provided, however, that the filing of such a complaint will not affect the duration of:

A. Any paragraph in this order that terminates in less than twenty (20) years;

B. This order's application to any respondent that is not named as a defendant in such complaint; and

C. This order if such complaint is filed after the order has terminated pursuant to this paragraph.

Provided further, that if such complaint is dismissed or a federal court rules that the respondent did not violate any provision of the order, and the dismissal or ruling is either not appealed or upheld on appeal, then the order will terminate according to this paragraph as though the complaint was never filed, except that the order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

### VII.

IT IS FURTHER ORDERED that respondents shall, within sixty (60) days after the date of service of this order, and one year thereafter, file with the Commission a report, in writing, setting forth in detail the manner and form in which they have complied with this order.

By the Commission, Chairman Pitofsky recused and Commissioner Azcuenaga not participating.

Donald S. Clark
Secretary

ISSUED: February 19, 1998

http://www.ftc.gov/os/1998/9802/d09260.d&o.htm

.................................. DataSite Printout ...........................

Project Name:Slender
Index No: K.1.2.36
Title: DMJ, Inc. - Memphis, TN - ADA & Materials
User: Krakus, Beata
Date: Tue Sep 11 11:53:50 CDT 2007
Document Total Page Count: 21