California law, such provision shall be governed by and construed under the laws of the State in which the Centre is located.

6.     LEGAL FEES AND COSTS. If without the commencement of arbitration or litigation, Company incurs any legal expenses, costs or attorneys' fees in connection with either the collection of any sums due under this Agreement or the enforcement of Franchisee's compliance with this Agreement, or as a result of Franchisee's breach of this Agreement, Franchisee shall pay such legal expenses, costs and attorneys' fees. If Company commences arbitration or litigation to collect any sums due under this Agreement, or to enforce Franchisee's compliance with this Agreement, or as a result of Franchisee's breach of this Agreement, the prevailing party in such arbitration or litigation and in any appeals from the judgment rendered in such arbitration or litigation shall be entitled to recover the full amount of all of its legal expenses, costs and attorneys' fees incurred in such arbitration or litigation.

7.     ASSIGNMENT. Neither this Agreement nor the rights, duties or obligations arising hereunder shall be assignable or delegable by Franchisee without the express prior written consent of Company. Company shall have the right at any time to assign this Agreement, and any rights and obligations in this Agreement, in whole or in part, in any manner and for any purpose to any person, firm, corporation or other entity, including but not limited to any affiliate, subsidiary or other entity related to Company.

8.     FORCE MAJEURE. Franchisee and Company shall not be deemed to be in default of their obligations hereunder, other than any obligation of Franchisee to pay money to Company, if such obligations are delayed or become impossible due to act of God, war, earthquake, fire, accident, civil commotion, act of government, its agencies or officers or any other similar cause beyond the control of the parties hereto.

9.     NO OFFSET. Amounts due to Company under this Agreement shall not be subject to any right of offset by Franchisee.

10.    TIME OF ESSENCE. Franchisee's timely performance of each and all of Franchisee's obligations is of the essence of this Agreement.

11.    ENTIRE AGREEMENT. This Agreement is the entire agreement among the parties concerning its subject matter and supersedes all other agreements, understandings, negotiations and discussions pertaining to such subject matter.

12.    AMENDMENT. No amendment of any provision in this Agreement shall be effective unless an instrument stating the amendment has been signed by both parties. No provision of this Agreement can be waived except by an express instrument in writing signed by the party to be bound thereby.

13.    SEVERABILITY. If any provision of this Agreement is unenforceable, the remainder of this Agreement shall continue in effect.

14.    INTERPRETATION. Wherever herein appearing, unless repugnant to the context:

        (i)     Except as otherwise specifically provided herein, words importing the singular shall be deemed to include the plural and vice versa.

(ii) "Company" shall mean Jenny Craig Products, Inc., its agents, successors in title and permitted assigns, permitted transferees and those claiming through or under them, respectively.

(iii) "Franchisee" shall mean the entity designated as Franchisee in the first paragraph of this Agreement, its successors in title and permitted assigns, permitted transferees and those claiming through or under them, respectively.

(iv) The masculine, feminine and neuter gender shall include each other.

(v) The section headings contained in this Agreement are for purposes of convenient reference only and shall not affect the meaning or interpretation of this Agreement.

(vi) The provisions of this Agreement shall be interpreted according to their fair meanings and not strictly for or against either party.

15. LIMITATION OF LIABILITY. Under no circumstances shall either party be liable for any indirect, incidental, punitive, exemplary, special or consequential damages or statutory multiples of damages (such as statutory treble damages) suffered by the other party or any other person arising out of or related to this Agreement or the performance or non-performance of its obligations hereunder, regardless of whether or not such party has been advised of the possibility of such damages. Nothing contained herein or elsewhere in this Agreement shall act to limit liability to Franchisor for the indemnification obligations of Franchisee set forth in any franchise agreement between the parties.

16. NOTICES.

All notices or other communications in connection with this Agreement shall be in writing, and shall be considered given when personally delivered or when delivered to the addressee by registered or certified mail, postage prepaid, return receipt requested, or when delivered to the addressee via commercial courier or telecopier directed as follows (or directed to such other address or telecopier as instructed by the recipient in accordance with this Section 15):

Company:          Jenny Craig Operations, Inc.
                  11355 North Torrey Pines Road
                  La Jolla, California 92038
                  Attention: President
                  Telecopier: (858) 812-2734

                  and

                  Jenny Craig, Inc.
                  11355 North Torrey Pines Road
                  La Jolla, California 92038
                  Attention: General Counsel
                  Telecopier: (858) 812-2799

Franchisee:          DMJ, Inc.
                     6006 Sweetbrier Cove
                     Memphis, Tennessee 38120
                     Attention: President
                     Telecopier: (901) 767-7040

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

"Company"                          "Franchisee"

JENNY CRAIG OPERATIONS, INC.        DMJ, INC.

By: _____         By: _____

Maria Weiss                         Jon Fusco
Vice President Franchise Development President



EXHIBIT C

GUARANTEE AND ASSUMPTION OF OBLIGATIONS

THIS GUARANTEE AND ASSUMPTION OF OBLIGATIONS (this "Guarantee") is given to JENNY CRAIG INTERNATIONAL, INC., this 1st day of April, 2001, by Jon and JoAnne Fusco.

In consideration of and as an inducement to the execution of that certain Franchise Agreement of even date herewith (the "Franchise Agreement") by and between JENNY CRAIG INTERNATIONAL, INC. ("Franchisor") and DMJ, Inc. ("Franchisee"), each of the undersigned hereby personally and unconditionally:

(a)     Guarantees to Franchisor and its successors, affiliates and assigns to the terms of the Franchise Agreement and any renewals thereof that Franchisee shall punctually pay and perform each and every undertaking, obligation, agreement and covenant set forth in the Franchise Agreement.

(b)     Agrees to be personally bound by each and every provision of the Franchise Agreement and any renewals thereof, including but not limited to, all monetary obligations and obligations to take or refrain from taking specific action or to engage or refrain from engaging in specific activities; and further agrees to be personally liable for the breach thereof.

(c)     Each of the undersigned consents and agrees that:  (1) his or her liability under this Guarantee shall be joint and several singlely and with each and every combination of the other guarantors; (2) he or she shall render any payment or performance required under the Franchise Agreement and any renewals thereof on demand if Franchisee fails or refuses to do so punctually; (3) such liability shall not be contingent or conditioned on pursuit by Franchisor of any remedies against Franchisee or any other person; and (4) such liability shall not be diminished, relieved or otherwise affected by an extension of time, credit or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this Guarantee, which shall be continuing and irrevocable during the term of the Franchise Agreement and any renewals thereof.

This Guarantee shall continue in full force and effect until one (1) year after the nonrenewal or termination of the Centre operated by Franchisee pursuant to the Franchise Agreement, such time period to begin running on the date the Centre permanently closes its doors to the public; provided, however, that none of the undersigned shall be discharged from any liabilities hereunder so long as any claim for fees by Franchisor (or any of its subsidiaries or affiliates) against Franchisee or claim for any other payment or performance remains outstanding.

1

This Guarantee shall be governed and construed in accordance with the laws of the State of California applicable to contracts made and to be performed in that State, without giving effect to the conflict of laws rules of that State; provided, however, that if a provision of this Guarantee is unenforceable under California law, such provision shall be governed by and construed under the laws of the State in which Franchisee's Centre is located. Any arbitration or litigation arising out or relating in any way to this Guarantee shall be conducted in San Diego, California.

Every claim or dispute arising out of or relating to this Guarantee shall be determined by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), or as otherwise agreed by the parties. The place of arbitration shall be in San Diego, California. The parties shall first attempt to resolve any claim or dispute through good faith, informal negotiations, including but not limited to, non-binding mediation. In the event that the matter is not thereby resolved within thirty days, any party may demand arbitration by written notice to the other party and to the AAA in San Diego, California. In any arbitration, the parties shall mutually agree on one arbitrator. If the parties cannot so agree, the single arbitrator shall be selected by the AAA. The arbitrator shall, within thirty (30) days after the matter has finally been submitted to him or her, render a written decision making specific findings of fact and setting forth the reasons for the decision which shall be consistent with the terms of this Guarantee. The arbitrator shall not have any power to alter, modify or change any of the terms of this Guarantee or to grant any remedy which is inconsistent with or prohibited by the terms of this Guarantee or not available in a court of law. The arbitrator shall have power to award only direct actual damages and shall have no power or authority to award punitive, exemplary, consequential or incidental damages or statutory multiples of damages such as treble damages. Judgment on any award of the arbitrator shall be binding and may be entered in any court having jurisdiction thereof.

The obligations of each of the undersigned to honor this Guarantee shall not be adversely affected by any other agreement entered into by Franchisor and Franchisee or any modification, alteration or amendment of the Franchise Agreement or any renewals thereof.

Intending to be bound thereby, each of the undersigned has executed this Guarantee on the year and day above written.



Jon Fusco

JoAnne Fusco

2

EXHIBIT D
DECISION AND ORDER

JENNY CRAIG, INC. - DA    Page 1

B234118

UNITED STATES OF AMERICA
BEFORE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**
    Robert Pitofsky, Chairman
    Mary L. Azcuenaga
    Sheila F. Anthony
    Mozelle W. Thompson
    Orson Swindle

*In the Matter of*

JENNY CRAIG, INC., a corporation, and JENNY CRAIG INTERNATIONAL, INC., a corporation.

DOCKET NO. 9260

**DECISION AND ORDER**

The Commission having heretofore issued its complaint charging the respondents named in the caption hereof with violation of Sections 5 and 12 of the Federal Trade Commission Act, as amended, and the respondents having been served with a copy of that complaint, together with a notice of contemplated relief; and

The respondents, their attorneys, and counsel for the Commission having thereafter executed an agreement containing a consent order, an admission by the respondents of all the jurisdictional facts set forth in the complaint, a statement that the signing of said agreement is for settlement purposes only and does not constitute an admission by respondents that the law has been violated as alleged in such complaint, or that the facts as alleged in such complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Secretary of the Commission having thereafter withdrawn this matter from adjudication in accordance with § 3.25(c) of its Rules; and

The Commission having considered the matter and having thereupon accepted the executed consent agreement and placed such agreement on the public record for a period of sixty (60) days, and having duly considered the comments filed thereafter by interested persons pursuant to § 3.25(f) of its Rules, and having modified the order in several respects, now in further conformity with the procedure prescribed in § 3.25(f) of its Rules, the Commission hereby makes the following jurisdictional findings and enters the following order:

    1. Respondent Jenny Craig, Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 445 Marine View Avenue, #300, Del Mar, California 92014.

    Respondent Jenny Craig International, Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the State of California, with its office and principal place of business located at 445 Marine View Avenue, #300, Del Mar, California 92014.



2. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of the respondents, and the proceeding is in the public interest.

## ORDER

## DEFINITIONS

For the purposes of this order, the following definitions shall apply:

A. "Competent and reliable scientific evidence" shall mean those tests, analyses, research, studies, surveys or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

B. "Weight loss program" shall mean any program designed to aid consumers in weight loss or weight maintenance.

C. "Broadcast medium" shall mean any radio or television broadcast, cablecast, home video, or theatrical release.

D. For any order-required disclosure in a print medium to be made "clearly and prominently" or in a "clear and prominent manner," it must be given both in the same type style and in: (1) twelve point type where the representation that triggers the disclosure is given in twelve point or larger type; or (2) the same type size as the representation that triggers the disclosure where that representation is given in a type size that is smaller than twelve point type.

E. For any order-required disclosure given orally in a broadcast medium to be made "clearly and prominently" or in a "clear and prominent manner," the disclosure must be given at the same volume and in the same cadence as the representation that triggers the disclosure.

F. For any order-required disclosure given in the video portion of a television or video advertisement to be made "clearly and prominently" or in a "clear and prominent manner," the disclosure must be of a size and shade and must appear on the screen for a duration sufficient for an ordinary consumer to read and comprehend it.

G. "Short broadcast advertisement" shall mean any advertisement of thirty seconds or less duration made in a broadcast medium.

## I.

IT IS ORDERED that Jenny Craig, Inc., a corporation, and Jenny Craig International, Inc., a corporation ("respondents"), their successors and assigns, and respondents' officers, representatives, agents, and employees, directly or through any corporation, subsidiary, division, or other device, including franchisees or licensees, in connection with the advertising, promotion, offering for sale, or sale of any weight loss program, in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

A. Making any representation, directly or by implication, about the success of

JENNY CRAIG, INC. - D&O                                               Page 3

participants on any weight loss program in achieving or maintaining weight loss or
weight control unless, at the time of making any such representation, respondents possess
and rely upon competent and reliable evidence, which when appropriate must be
competent and reliable scientific evidence, that substantiates the representation;

provided, further, that for any representation that:

(1) any weight loss achieved or maintained through the weight loss program
is typical or representative of all or any subset of participants of respondents'
program, said evidence shall, at a minimum, be based on a representative
sample of:

(a) all participants who have entered the program, where the
representation relates to such persons; provided, however, that
the required sample may exclude those participants who dropped
out of the program within two weeks of their entrance or who
were unable to complete the program due to change of residence
or medical reasons, such as pregnancy; or

(b) all participants who have completed a particular phase of the
program or the entire program, where the representation only
relates to such persons;

(2) any weight loss is maintained long-term, said evidence shall, at a
minimum, be based upon the experience of participants who were followed
for a period of at least two years from their completion of the active
maintenance phase of respondents' program, or earlier termination, as
applicable; and

(3) any weight loss is maintained permanently, said evidence shall, at a
minimum, be based upon the experience of participants who were followed
for a period of time after completing the program that is either:

(a) generally recognized by experts in the field of treating
obesity as being of sufficient length for predicting that weight
loss will be permanent, or

(b) demonstrated by competent and reliable survey evidence as
being of sufficient duration to permit such a prediction.

B. Representing, directly or by implication, except through endorsements or testimonials
referred to in paragraph I.E. herein, that participants of any weight loss program have
successfully maintained weight loss, unless respondents disclose, clearly and
prominently, and in close proximity to such representation, the statement: "For many
dieters, weight loss is temporary.";

provided, further, that respondents shall not represent, directly or by
implication, that the above-quoted statement does not apply to dieters in
respondents' weight loss program;

provided, however, that a truthful statement that merely describes the
existence, design or content of a weight maintenance or weight management
program or notes that the program teaches clients about how to manage their
weight will not, without more, be considered for purposes of this order a

JENNY CRAIG, INC. - D&                                    Page 4

representation regarding weight loss maintenance success;

C. Representing, directly or by implication, except through short broadcast advertisements referred to in paragraph I.D. herein, and except through endorsements or testimonials referred to in paragraph I.E. herein, that participants of any weight loss program have successfully maintained weight loss, unless respondents disclose, clearly and prominently, and in close proximity to such representation, the following information:

(1) the average percentage of weight loss maintained by those participants,

(2) the duration over which the weight loss was maintained, measured from the date that participants ended the active weight loss phase of the program, provided, further, that if any portion of the time period covered includes participation in a maintenance program(s) that follows active weight loss, such fact must also be disclosed, and

(3) if the participant population referred to is not representative of the general participant population for respondents' programs:

(a) the proportion of the total participant population in respondents' programs that those participants represent, expressed in terms of a percentage or actual numbers of participants, or

(b) the statement: "Jenny Craig makes no claim that this [these] result[s] is [are] representative of all participants in the Jenny Craig program.";

provided, however, that for representations about weight loss maintenance success that do not use a number or percentage, or descriptive terms that convey a quantitative measure such as "most of our customers maintain their weight loss long-term", respondents may, in lieu of the disclosures required in C.(1)-(3) above,

(i) include, clearly and prominently, and in immediate conjunction with such representation, the statement: "Check at our centers for details about our maintenance record."; and

(ii) for a period of time beginning with the date of the first dissemination or broadcast of any such advertisement and ending no sooner than thirty (30) days after the last dissemination or broadcast of such advertisement, give to each potential client, upon the first presentation of any form asking for information from the potential client, but in any event before such person has entered into any agreement with respondents, a separate document entitled "Maintenance Information," which shall include all the information required by paragraph I.B. and subparagraphs I.C.(1)- (3) of this order, formatted in the exact type size and style as the example form described in paragraph I.D.(2)(a) and set out below;

JENNY CRAIG, INC. - D&                                     Page 5

provided, further, that compliance with the obligations of this paragraph I.C. in no way relieves respondents of the requirement under paragraph I.A. of this order to substantiate any representation about the success of participants on any weight loss program in maintaining weight loss.

D. Representing, directly or by implication, in short broadcast advertisements, that participants of any weight loss program have successfully maintained weight loss, unless respondents:

(1) include, clearly and prominently, and in immediate conjunction with such representation, the statement: "Check at our centers for details about our maintenance record.";

(2) for a period of time beginning with the date of the first broadcast of any such advertisement and ending no sooner than thirty days after the last broadcast of such advertisement, comply with the following procedures upon the first presentation of any form asking for information from a potential client, but in any event before such person has entered into any agreement with respondents:

(a) give to each potential client a separate document entitled "Maintenance Information," which shall include all the information required by paragraph I.B. and subparagraphs I.C. (1)-(3) of this order and shall be formatted in the exact type size and style as the example form below, and shall include the heading (Helvetica 14 pt. bold), lead-in (Times Roman 12 pt.), disclosures (Helvetica 14 pt. bold), acknowledgment language (Times Roman 12 pt.) and signature block therein; provided, further, that no information in addition to that required to be included in the document required by this subparagraph I.D.(2) shall be included therein;

### MAINTENANCE INFORMATION

You may have seen our recent ad about maintenance success. Here's some additional information about our maintenance record.

[Disclosure of maintenance statistics goes
hereXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]
For many dieters, weight loss is temporary.

I have read this notice. _____
(Client Signature) (Date)

(b) require each potential client to sign such document; and

(c) give each client a copy of such document; and

(3) retain in each client file a copy of the signed maintenance notice required by this paragraph;

JENNY CRAIG, INC. - D9                                                          Page 6

provided, further, that: (1) compliance with the obligations of this paragraph I.D. in no
way relieves respondents of the requirement under paragraph I.A. of this order to
substantiate any representation about the success of participants on any weight loss
program in maintaining weight loss; and (2) respondents must comply with both
paragraph I.D. and paragraph I.C. of this order if respondents include in any such short
broadcast advertisement a representation about maintenance success that states a number
or percentage, or uses descriptive terms that convey a quantitative measure such as "most
of our customers maintain their weight loss long-term";

provided, however, that the provisions of paragraph I.D. shall not apply to endorsements
or testimonials referred to in paragraph I.E. herein.

E. Using any advertisement containing an endorsement or testimonial about weight loss
success or weight loss maintenance success by a participant or participants of
respondents' weight loss program if the weight loss success or weight loss maintenance
success depicted in the advertisement is not representative of what participants of
respondents' weight loss programs generally achieve, unless respondents disclose, clearly
and prominently, and in close proximity to the endorser's statement of his or her weight
loss success or weight loss maintenance success:

    (1) What the generally expected success would be for Jenny Craig customers
in losing weight or maintaining achieved weight loss; provided, however,
that in determining the generally expected success for Jenny Craig
customers, respondents may exclude those customers who dropped out of the
program within two weeks of their entrance or who were unable to complete
the program due to change of residence or medical reasons, such as
pregnancy; and that for endorsements or testimonials about weight loss
success, respondents can satisfy the requirements of this subparagraph by
accurately disclosing:

        (a) the generally expected success for Jenny Craig customers in
the following phrase: "Weight loss averages (number) lbs. over
__ weeks"; or

        (b) the average number of pounds lost by Jenny Craig
customers, using the following phrase: "Average weight loss
(number) lbs. More details at centers"; and, for a period of time
beginning with the date of the first dissemination of any such
advertisement and ending no sooner than thirty days after the
last dissemination of such advertisement, making in any on-site
video promotion the preceding disclosure orally and complying
with the following procedures upon the first presentation of any
form asking for information from a potential client, but in any
event before such person has entered into any agreement with
respondents:

            (i) give to each potential client a separate one-page
document with an appropriate title that alerts
customers that important information follows,
which shall disclose, clearly and prominently, what
the generally expected success would be for Jenny
Craig customers in losing weight, expressed in
terms of both average number of pounds lost and
average duration of participation in the Jenny Craig

JENNY CRAIG, INC. - D&                                       Page 8

measure, such as "I have kept off most of my weight loss for 2 years," shall be considered a representation regarding weight loss maintenance success;

(ii) if endorsements or testimonials covered by this paragraph are made in a broadcast medium, any disclosure required by this paragraph must be communicated in a clear and prominent manner and in immediate conjunction with the representation that triggers the disclosure.

F. Representing, directly or by implication, that the price at which any weight loss program can be purchased is the only cost associated with losing weight on that program, unless such is the case.

G. Representing, directly or by implication, the price at which any weight loss program can be purchased, unless respondents disclose, clearly and prominently, either (1) in close proximity to such representation, the existence and amount of all mandatory costs and fees associated with the program offered; or (2) in immediate conjunction with such representation, the following statement: "Plus the cost of [list of products or services that participants must purchase at additional cost].";

provided, further, that in a broadcast medium, if the representation that triggers the disclosure is oral, the required disclosure must also be made orally.

H. Failing to disclose over the telephone, for a period of time beginning with the date of any advertisement of the price at which any weight loss program can be purchased and ending no sooner than 180 days after the last dissemination of any such advertisement, to consumers who inquire about the cost of any weight loss program, or are told about the cost of any weight loss program, the existence and amount of any mandatory costs or fees associated with participation in the program.

I. Representing, directly or by implication, that prospective participants in respondents' weight loss program will reach a specified weight within a specified time period, unless at the time of making such representation, respondents possess and rely upon competent and reliable scientific evidence substantiating the representation.

J. Misrepresenting, directly or by implication, the rate or speed at which any participant in any weight loss program has experienced or will experience weight loss.

K. Failing to disclose, clearly and prominently, in writing either:

1) to all participants when they enter the program; or

2) to each participant whose average weekly weight loss exceeds two percent (2%) of his or her initial body weight, or three pounds, whichever is less, for at least two consecutive weeks;

that failure to follow the program protocol and eat all of the food recommended may involve the risk of developing serious health complications.

L. Misrepresenting, directly or by implication, the performance, efficacy, price, or safety

JENNY CRAIG, INC. - D&O                                    Page 9

of any weight loss program or weight loss product.

M. Representing, directly or by implication, that participants on any weight loss program recommend or endorse the program unless, at the time of making any such representation, respondents possess and rely upon competent and reliable evidence, which when appropriate must be competent and reliable scientific evidence, that substantiates such representation.

N. Misrepresenting, directly or by implication, the existence, contents, validity, results, conclusions, or interpretations of any test, study, or survey.

## II.

IT IS FURTHER ORDERED that respondents shall notify the Commission at least thirty (30) days prior to the effective date of any proposed change such as dissolution, assignment, or sale resulting in the emergence of a successor corporation(s), the creation or dissolution of subsidiaries, or any other change in the corporation(s) that may affect compliance obligations arising out of this order.

## III.

IT IS FURTHER ORDERED that for three (3) years after the last date of dissemination of any representation covered by this order, respondents, or their successors and assigns, shall maintain and upon request make available to the Federal Trade Commission for inspection and copying:

A. All materials that were relied upon in disseminating such representation; and

B. All tests, reports, studies, surveys, demonstrations or other evidence in their possession or control that contradict, qualify, or call into question such representation, or the basis relied upon for such representation, including complaints from consumers.

## IV.

IT IS FURTHER ORDERED that respondents shall distribute a copy of this order to each of their officers, agents, representatives, independent contractors and employees who are involved in the preparation and placement of advertisements or promotional materials or in communication with customers or prospective customers or who have any responsibilities with respect to the subject matter of this order; and, for a period of ten (10) years from the date of entry of this order, distribute same to all future such officers, agents, representatives, independent contractors and employees.

## V.

IT IS FURTHER ORDERED that:

A. Respondents shall distribute a copy of this order to each of their franchisees and licensees and shall contractually bind them to comply with the prohibitions and affirmative requirements of this order; respondents may satisfy this contractual requirement by incorporating such order requirements into their current Operations Manual; and

JENNY CRAIG, INC. - D&                                     Page 10

B. Respondents shall further make reasonable efforts to monitor their            -
franchisees' and licensees' compliance with the order provisions; respondents
may satisfy this requirement by: (1) taking reasonable steps to notify
promptly any franchisee or licensee that respondents determine is failing
materially or repeatedly to comply with any order provision that such
franchisee or licensee is not in compliance with the order provisions and that
disciplinary action may result from such noncompliance; and (2) providing
the Federal Trade Commission with the name and address of the franchisee
or licensee and the nature of the noncompliance if the franchisee or licensee
fails to comply promptly with the relevant order provision after being so
notified; provided, however, that the requirements of this Part V will not, by
themselves, increase the liability of respondents for any acts and practices of
their franchisees or licensees that violate this order.

## VI.

IT IS FURTHER ORDERED that this order will terminate on February 19, 2018, or
twenty (20) years from the most recent date that the United States or the Federal Trade

Commission files a complaint (with or without an accompanying consent decree) in
federal court alleging any violation of the order, whichever comes later; provided,
however, that the filing of such a complaint will not affect the duration of:

   A. Any paragraph in this order that terminates in less than twenty (20) years;

   B. This order's application to any respondent that is not named as a defendant
   in such complaint; and

   C. This order if such complaint is filed after the order has terminated
   pursuant to this paragraph.

Provided further, that if such complaint is dismissed or a federal court rules that the
respondent did not violate any provision of the order, and the dismissal or ruling is either
not appealed or upheld on appeal, then the order will terminate according to this
paragraph as though the complaint was never filed, except that the order will not
terminate between the date such complaint is filed and the later of the deadline for
appealing such dismissal or ruling and the date such dismissal or ruling is upheld on
appeal.

## VII.

IT IS FURTHER ORDERED that respondents shall, within sixty (60) days after the date
of service of this order, and one year thereafter, file with the Commission a report, in
writing, setting forth in detail the manner and form in which they have complied with this
order.

By the Commission, Chairman Pitofsky recused and Commissioner Azcuenaga not
participating.

Donald S. Clark
Secretary

ISSUED: February 19, 1998

# EXHIBIT 4

AREA DEVELOPMENT AGREEMENT

BY AND BETWEEN

JENNY CRAIG INTERNATIONAL, INC.

(Company)

AND

DMJ, INC.

(Developer)


Jackson, Mississippi

## TABLE OF CONTENTS

SECTION                                                                                                    PAGE

1.   DEFINITIONS..................................................................................................1
     A.   Franchise Agreement ............................................................... 1
     B.   Development Area ..................................................................... 1

2.   DEVELOPMENT AREA ..............................................................................2
     A.   Grant ......................................................................................... 2
     B.   Reservation of Rights................................................................ 2
     C.   Company Limitations................................................................. 2
     D.   Payments by Company to Developer......................................... 2

3.   TERM ...........................................................................................................4
     A.   Initial Term ............................................................................... 4
     B.   Renewal Rights and Conditions................................................ 4
     C.   Form of Renewal Area Development Agreement ...................... 5
     D.   Exercising Right To Renew ...................................................... 5

4.   DEVELOPMENT AND FRANCHISE FEES..............................................5
     A.   Development Fee ....................................................................... 5
     B.   Initial Franchise Fee.................................................................. 5

5.   SELECTION OF CENTRE LOCATIONS ..................................................6

6.   DEVELOPMENT OBLIGATIONS ..............................................................6
     A.   Operating Restrictions .............................................................. 6
     B.   Failure To Satisfy Minimum Quota.......................................... 6
     C.   Closures...................................................................................... 6

7.   TERMINATION............................................................................................6
     A.   Termination by Company With Notice and Opportunity to Cure ............................... 6
     B.   Termination by Company with Twenty Four Hours' Notice and Opportunity to Cure
          6
     C.   Termination by Company without Notice or Opportunity to Cure............................. 7

8.   EFFECT OF TERMINATION .....................................................................8

9.   TRANSFER AND ASSIGNMENT...............................................................8
     A.   Transfer and Assignment by Developer .................................... 8
     B.   Company's Approval of Transfer .............................................. 9
     C.   Right of First Refusal.............................................................. 10
     D.   Death or Incapacity of Developer or Controlling Owner or Shareholder................. 11
     E.   Assignment by Company.......................................................... 11

10.  INDEMNITY BY DEVELOPER .................................................................11

11.     ARBITRATION/DISPUTE RESOLUTION.................................................................12
        A.    Arbitration...................................................................................................... 12
        B.    Company Actions............................................................................................ 13
        C.    Consent to Jurisdiction................................................................................... 13

12.     MISCELLANEOUS .........................................................................................................13
        A.    Entire Agreement............................................................................................ 13
        B.    Amendment...................................................................................................... 13
        C.    Waiver.............................................................................................................. 14
        D.    Third Parties.................................................................................................... 14
        E.    Interpretation.................................................................................................. 14
        F.    Notices ............................................................................................................ 14
        G.    Relation of the Parties .................................................................................... 15
        H.    Governing Law ............................................................................................... 15
        I.    Legal Fees and Costs ...................................................................................... 15
        J.    Limitation of Liability.................................................................................... 15
        K.    Severability ..................................................................................................... 15
        L.    Interest............................................................................................................. 15
        M.    Further Assurances.......................................................................................... 16
        N.    Time................................................................................................................. 16

EXHIBIT 1    DEVELOPMENT AREA

## JENNY CRAIG INTERNATIONAL, INC.
## AREA DEVELOPMENT AGREEMENT

This Area Development Agreement (this "Agreement") is made and entered into effective as of the 1st day of April, 2001 (the "Effective Date"), by and between **Jenny Craig International, Inc.**, a California corporation with its principal office at 11355 North Torrey ~~Delaware~~ Pines Road, La Jolla, California 92038 ("**Company**"), and **DM.I, Inc.**, a ~~Tennessee~~ corporation, whose principal address is 6006 Sweetbrier Cove, Memphis, Tennessee, 38120 ("**Developer**"), with reference to the following facts:

### RECITALS

A.    Company owns a proprietary system for developing, opening and operating weight management centres providing products and services to customers to help them manage their body weight (the "System").

B.    Company is the owner or licensee of trade secrets, trademarks, trade names, service marks, copyrights and logos, including but not limited to the marks "Jenny Craig" and "Jenny Craig Personal Weight Management" (the "Marks") all of which are part of the System.

C.    Company continues to expend time, skill and money seeking to improve the System and to integrate into it new or substitute programs, procedures, systems, services, activities and products.

D.    Developer desires to obtain the right to enter into a number of franchise agreements, each granting Developer the right to operate one Jenny Craig Weight Loss Centre in a defined geographic area using the System. Company is willing to grant such right to Developer on the terms and conditions in this Agreement.

Accordingly, the parties agree as follows:

### AGREEMENT

1.    DEFINITIONS.

A.    Franchise Agreement. "Franchise Agreement" means the standard form of agreement then used by Company to grant a franchise to own and operate a single Jenny Craig Weight Loss Centre (a "Centre") and all exhibits, riders, guarantees or other related instruments, the form and content of which may be amended from time to time. Such amendments may include, without limitation, changes to fees, duration and any other provisions.

B.    Development Area. "Development Area" means the geographic area described in Exhibit "1" attached to this Agreement.

2.    DEVELOPMENT AREA.

A.    Grant.  Provided that Developer fully complies with this Agreement and all other agreements with Company or any of its affiliates, Company shall, according to the procedures in Section 5, grant Developer franchises to own and operate Centres located in the Development Area.  During the Agreement Term (as defined in Section 3(A)), and subject to the condition that Developer is in compliance with this Agreement including, but not limited to, Sections 4, 5 and 6, neither Company nor any affiliate of Company shall establish, own or operate or grant any other person or entity a license or franchise to establish, own or operate a Jenny Craig Weight Loss Centre within the Development Area.  Company or any affiliate of Company shall have the right to establish, own or operate, or grant any number of franchises or licenses to others to establish, own or operate, Jenny Craig Weight Loss Centres anywhere at the edge of or elsewhere outside the Development Area.

B.    Reservation of Rights.  Developer acknowledges that the rights granted in this Agreement do not include any exclusivity except as expressly set forth in this Section 2, and that Company and its affiliates, licensees or other authorized third parties may advertise in the Development Area, may solicit and service clients in the Development Area, and may conduct business in the Development Area in any manner not expressly restricted in this Section 2.  By way of example of the foregoing, Company, its affiliates, licensees or other authorized third parties may engage in activities that include, but are not limited to, the following:  (i) broadcast, print or other advertising in the Development Area, whether by radio, television, cable, satellite, print, Internet or other media, (ii) direct sale to persons or entities in the Development Area, whether through telemarketing, direct mail, Internet or otherwise, of goods or services, including without limitation, food and other products bearing the Marks; and (iii) sale at retail outlets in the Development Area of food and other products, including without limitation, those bearing the Marks, except as provided in Section 2(C).

C.    Company Limitations  Company agrees not to sell or distribute, or to authorize its affiliates, licensees or third parties, to sell or distribute, any "Current Menu Products" in retail outlets in the Development Area.  For purposes of this Agreement, "Current Menu Products" means food products included in then-current Centre client menus and conforming to the published list of ingredients accompanying the products and provided to clients.  Notwithstanding the foregoing, the following food products, even if they are Current Menu Products, may be sold or distributed by Company or its affiliates, licensees or other authorized third parties without restriction:  (i) nutrition bars; (ii) ready to drink beverages; (iii) powdered drink mixes; (iv) nutritional cookies; (v) nutritional crackers; and (vi) mayonnaise and other condiments.

D.    Payments by Company to Developer  If Company or any affiliate sells products or services under the Marks outside of Jenny Craig Weight Loss Centres pursuant to Section 2(B), or if Company or any affiliate licenses the sale of products bearing the Marks outside of Jenny Craig Weight Loss Centres pursuant to Section 2(B), Company shall make payments to Developer pursuant to the terms and conditions set forth in this Section 2(D).

2

(1)    Jenny Craig Sales. For purposes of this Agreement, "Jenny Craig Sales" means sales by Company or any affiliate outside of Jenny Craig Weight Loss Centres and within the United States of America (excluding United States territories and Puerto Rico) of the following products and services: (a) products bearing the Marks, (b) other products that are, at the time of sale, authorized by Company or any affiliate for sale through Centres; and (c) Jenny Craig weight loss program membership fees.

(a)    Jenny Craig Sales Where Customers Are Traced. Company shall pay to Developer an amount equal to twenty percent (20%) of revenues received by Company or any affiliate from Jenny Craig Sales that are Traced to retail customers with delivery addresses within the Development Area. For purposes of this Section 2(D)(1), "Traced" means and refers to Jenny Craig Sales to retail customers where such sales are tracked and accounted for by Company or any affiliate by each such retail customer's delivery address.

(b)    Other Jenny Craig Sales. Company shall pay to Developer an amount equal to: (i) twenty percent (20%) of the revenues received by Company or any affiliate from Jenny Craig Sales other than those described in Section 2(D)(1)(a); divided by (ii) the total number of Jenny Craig Weight Loss Centres (including Jenny Craig Weight Loss Centres owned by Company or an affiliate) in the United States of America (excluding United States territories and Puerto Rico) at the time of payment by Company pursuant to Section 2(D)(4); and multiplied by (iii) the number of Centres then owned by Developer.

(2)    Trademark Licenses. For purposes of this Agreement, "Trademark Licenses" means trademark licenses granted by Company or any affiliate to third parties that license such third parties to sell products bearing the Marks outside of Jenny Craig Weight Loss Centres and within the United States of America (excluding United States territories and Puerto Rico).

(a)    Trademark Licenses Where Customers Are Traced. For Trademark Licenses where delivery addresses to retail customers are Traced, Company shall pay to Developer an amount equal to any license fee payments received by Company or any affiliate that the licensee attributes to sales to retail customers with delivery addresses within the Development Area. For purposes of this Section 2(D)(2), "Traced" means and refers to Trademark Licenses where sales to retail customers are tracked, accounted for and reported to Company or any affiliate by the licensee by each such retail customer's delivery address.

(b)    Other Trademark Licenses. For Trademark Licenses other than those described in Section 2(D)(2)(a), Company shall pay to Developer an amount equal to: (i) the license fee payments received by Company or any affiliate under such Trademark Licenses; divided by (ii) the total number of Jenny Craig Weight Loss Centres (including Jenny Craig Weight Loss Centres owned by Company or any affiliate) in the United States of America (excluding United States territories and Puerto Rico) at the time of payment by Company pursuant to Section 2(D)(4); and multiplied by (iii) the number of Centres then owned by Developer.

(3)    Limited Sales Areas. For Jenny Craig Sales or Trademark Licenses where sales are limited to specific geographic areas, any payments by Company pursuant to Sections

3

2(D)(1)(b) or 2(D)(2)(b) shall be limited to the geographic areas subject to the applicable program. In such situations, the divisor under Sections 2(D)(1)(b)(ii) or 2(D)(2)(b)(ii) shall be the number of Jenny Craig Weight Loss Centres (including Jenny Craig Weight Loss Centres owned by Company or any affiliate) within the geographic areas subject to the program, and the multiplier under Sections 2(D)(1)(b)(iii) or 2(D)(2)(b)(iii) shall be the number of Centres, if any, owned by Developer within such geographic areas. If Developer owns no Centres within the specific geographic areas subject to the applicable program, Developer will receive no payments.

(4)    Time of Payment. Payments required to be made by Company to Developer under this Section 2 shall be made (a) for Jenny Craig Sales, no later than the end of the next calendar quarter following receipt of the revenue by Company or any affiliate, and (b) for license fee payments under the Trademark Licenses, no later than the end of the next calendar quarter following receipt of the payment by Company or any affiliate and a proper accounting from the licensee.

3.    TERM.

A.    Term. The term of this Agreement (the "Agreement Term") shall commence on the Effective Date and shall expire ten (10) years after the Effective Date, unless earlier terminated as provided in Section 7. If this Agreement is renewed pursuant to Section 3(B)(1), any such renewal term shall be referred to herein as a "Renewal Term."

B.    Renewal Rights and Conditions.

(1)    Developer shall have the right to renew this Agreement and enter into up to one (1) Renewal Area Development Agreement (as defined in Section 3(C)), for an additional ten (10) year term, subject to Developer's timely satisfaction of all of the provisions in Sections 3(B)(1) through 3(B)(4), each of which is a condition precedent to renewal.

(2)    At the time Developer exercises the right to enter into a Renewal Area Development Agreement, and when the applicable Renewal Term starts, Developer shall have fully performed all provisions in this Agreement, shall not be in default of any term or provision of this Agreement, shall be in full compliance with all other agreements with Company or any affiliate of Company, and shall be current on all amounts owed to Company or any affiliate of Company.

(3)    Before signing a Renewal Area Development Agreement, Developer shall sign a general release satisfactory to Company of any and all claims against (i) Company, (ii) all affiliates of Company, (iii) all other persons or entities who could assert against Company or against an affiliate of Company a claim for indemnity or similar claim as a result of a claim being brought against any of them by Developer, and (iv) the respective shareholders, directors, officers, partners and agents of all the foregoing, in both their corporate and individual capacities, whether arising out of or in any way related to this Agreement, or any other agreement between Company or an affiliate of Company and Developer ("General Release").

(4)    Not later than the time of signing the applicable Renewal Area Development Agreement, Developer shall have satisfied or arranged to satisfy Company's then-current qualifications and training requirements for a renewing Jenny Craig area developer.

4

C.    <u>Form of Renewal Area Development Agreement</u> . Upon renewal, Developer shall sign Company's then-current form of Area Development Agreement and any and all ancillary agreements that Company then requires ("Renewal Area Development Agreement"). The terms of the Renewal Area Development Agreement may provide for different or additional fees, or both, and may otherwise materially differ from the provisions in this Agreement, except that the Development Area shall be the same, the duration shall be the applicable period of time provided in Section 3(B)(1), and there shall be no initial development fee.

D.    <u>Exercising Right To Renew</u>. Developer's option to renew this Agreement shall be exercised as follows:

(1)    At least one hundred twenty (120) days, but not more than one hundred eighty days (180) days, before the end of the Agreement Term, Developer shall in writing notify Company of its intent to renew and request from Company a copy of Company's then-current Uniform Franchise Offering Circular or equivalent disclosure document, the Renewal Area Development Agreement and applicable ancillary agreements; and

(2)    No sooner than fifteen (15) days and no later than the expiration of this Agreement, Developer shall sign the Renewal Area Development Agreement and all applicable ancillary agreements that Company then requires Developer to sign and shall deliver these documents to Company with payment of a renewal fee of Five Thousand Dollars ($5,000) ("<u>Renewal Fee</u>").

(3)    Developer's failure to perform fully and timely any acts required in Sections 3(B) through 3(D) shall be deemed an election by Developer not to exercise the right to enter into a Renewal Area Development Agreement.

(4)    Company's delivery of any documents to Developer pursuant to this Section 3(D) shall not constitute a waiver of any of Developer's obligations or of any conditions precedent in Sections 3(B) through 3(D). If Developer has exercised the right to enter into a Renewal Area Development Agreement as provided in this Agreement, and, through and including the date this Agreement expires, Developer has satisfied all obligations and conditions precedent in Sections 3(B) through 3(D), then on (or as of) the date this Agreement expires, Company shall sign the Renewal Area Development Agreement previously signed and returned by Developer pursuant to Section 3(D) and shall provide Developer with a copy of the signed Renewal Area Development Agreement.

4.    <u>DEVELOPMENT AND FRANCHISE FEES</u>.

A.    <u>Development Fee</u>. Upon execution of this Agreement, Developer shall deliver to Company a non-refundable development fee of Twenty Five Thousand Dollars ($25,000) (the "<u>Development Fee</u>"). The Development Fee is, in its entirety, fully earned by Company when paid and is not refundable.

B.    <u>Initial Franchise Fee</u>. For each Centre that Developer plans to open, Developer shall enter into Company's then-current form of Franchise Agreement. Developer acknowledges that on execution of each Franchise Agreement, Developer shall be required to pay an initial

franchise fee and that the initial franchise fee may change. As of the date of this Agreement, the initial franchise fee is Twenty-Five Thousand Dollars ($25,000).

5.     SELECTION OF CENTRE LOCATIONS.

Developer shall comply with Company's requirements for placing Centres at locations as set forth in Company's then-current form of Franchise Agreement, as revised by Company from time to time, at the time each Centre is proposed by Developer for placement.

6.     DEVELOPMENT OBLIGATIONS.

A.     Operating Restrictions.  Developer's rights under this Agreement shall be subject, at all times, to the condition that the number of Centres owned and operated by Developer in the Development Area pursuant to Franchise Agreements is maintained at no less than the number for the applicable time period specified in Exhibit 1 (the "Minimum Development Quota").

B.     Failure To Satisfy Minimum Development Quota.  If at any time Developer does not satisfy the Minimum Development Quota, then Company shall have the right, but no obligation, to exercise Company's termination rights pursuant to Section 7, unless Developer pays to Company a monthly fee of Two Thousand Dollars ($2,000) for each Centre necessary to satisfy the Minimum Development Quota on or before the first day of each month starting with the calendar month after the date when Developer failed to satisfy the Minimum Development Quota and continuing while any such Centre remains unopened.

C.     Closures.  If a Centre is destroyed or damaged so that it cannot continue to operate, then Developer shall repair and restore the Centre to Company's then approved plans and specifications.  Developer shall complete repair and restoration as soon as possible but not later than ninety (90) days after the destruction or damage.  If not repaired, restored and reopened within ninety (90) days, the Centre shall not continue to count toward satisfaction of the Minimum Development Quota.  If a Centre ceases operations for seven (7) or more days for any other reason, it shall not count toward satisfaction of the Minimum Development Quota.

7.     TERMINATION.

A.     Termination by Company With Notice and Opportunity to Cure.  Company may terminate this Agreement for cause, which is a breach by Developer of this Agreement or any other agreement with Company or an affiliate of Company.  Except for any default under Sections (B) and (C), below, and as may be expressly provided elsewhere in this Agreement or by controlling applicable law, Developer shall have fourteen (14) days (seven (7) days in the case of any default in the timely payment of sums due to Company or any of its affiliates) after Company's written notice of default within which to remedy any default under this Agreement, and to provide evidence of such remedy to Company.  If any such default is not cured within that time period or such longer time period as Company may specify in the notice of default, Company may terminate this Agreement.

B.     Termination by Company with Twenty Four Hours' Notice and Opportunity to Cure.  Subject to any controlling applicable law to the contrary, Developer shall be deemed to be in default and Company may, at its option, terminate this Agreement and all rights granted

6

hereunder if Developer violates any law, regulation, order, or Company standard relating to health, sanitation or safety and fails to cure the default within twenty four (24) hours after delivery or attempted delivery of written notice by Company or fails to provide evidence of such remedy to Company.

C.    Termination by Company without Notice or Opportunity to Cure.  Subject to any controlling applicable law to the contrary, Developer shall be deemed to be in material default and Company may, at its option, terminate this Agreement and all rights granted hereunder without affording Developer any opportunity to cure the default, effective immediately upon delivery or attempted delivery to Developer of notice by Company, upon the occurrence of any of the following events:

(1)    Understatement of Fees.  Developer is found to have understated Gross Receipts or Continuing Fees for any of Developer's Centres by five percent (5%) or more for any period of time.

(2)    Violation of Law.  Developer's direct or indirect majority shareholder or, if Developer is an entity other than a corporation, its direct or indirect majority owner, is convicted of any felony or crime of moral turpitude.

(3)    Property Seized.  All or any substantial part of Developer's assets are seized pursuant to levy, execution, distraint or similar process.

(4)    Bankruptcy.  (1) Developer commences any case, proceeding or other action under any bankruptcy, reorganization, insolvency or moratorium law, or any other law for the relief of or relating to debtors, or Developer seeks appointment of a receiver, trustee, custodian, assignee for the benefit of creditors or similar official to take possession, custody or control of all or any substantial part of Developer's assets; (2) an involuntary case, proceeding or other action under any bankruptcy, reorganization, insolvency, moratorium or similar law is commenced against Developer, or a receiver, trustee, custodian, assignee for the benefit of creditors or similar official is appointed to take possession, custody or control of all or any substantial part of Developer's assets, unless such case, proceeding, action or appointment is dismissed, vacated, withdrawn or set aside within sixty (60) days; or (3) Developer fails to pay its debts generally as they become due.

(5)    Location Violation.  Developer operates any Centre or any business from a location that has not been approved in writing by Company, or suffers termination of any Centre lease or other tenancy of the premises where any Centre is located, or otherwise loses or parts with possession of the premises without the prior written consent of Company; provided that, in the case of termination of such lease without fault of Developer, other temporary or involuntary loss of possession of the premises without fault of Developer, or exercise of eminent domain of the premises by any federal, state or local government or other authority, Developer shall have sixty (60) days within which to lease or acquire other premises within the Development Area which are satisfactory to Company.

(6)    Repeated Failure To Comply with Obligations.  Developer fails to comply with one or more of the obligations contained in this Agreement on three (3) or more occasions

7

within any twelve (12) month period, whether or not such failure is corrected after notice is given by Company to Developer.

      (7)    <u>Control by Unapproved Shareholders</u>. There has been an actual or attempted Transfer of any direct or indirect ownership interest greater than a cumulative forty-nine percent (49%) equity interest in Developer other than in accordance with Section 9 of this Agreement.

      (8)    <u>Unapproved Assignment of Transfer</u>. Developer fails to comply with the Transfer requirements of Section 9 of this Agreement.

      (9)    <u>Judgment</u>. Developer allows or permits any judgment to be entered against Company or any of its affiliates arising out of or relating to the operation of Developer's business under this Agreement or any Centre owned by Developer;

      (10)    <u>Abandonment</u>. Developer abandons Developer's business under this Agreement or any Centre owned by Developer as set forth in any effective franchise agreement;

      (11)    <u>Unauthorized Use of Marks/Impairment of Goodwill</u>. Developer materially misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated therewith or Company's rights therein, or takes any action that reflects materially and unfavorably upon the operation and reputation of any Centre owned by Developer, or the "Jenny Craig" system generally. Developer's unauthorized use, disclosure, or duplication of the Confidential Information, excluding independent acts of employees or others if Developer shall have exercised its best efforts to prevent such disclosures or use;

      (12)    <u>Misrepresentations</u>. Developer makes any material misrepresentations in connection with the execution of this Agreement or the acquisition of any Centre; or

      (13)    <u>Termination of Any Franchise Agreement</u>. Any Franchise Agreement between Company and Developer is terminated or not renewed according to its terms.

8.    <u>EFFECT OF TERMINATION</u>.

    Commencing on expiration or termination of this Agreement, Developer shall have no right to develop additional Centres in the Development Area and shall lose the Development Area rights granted under Section 2 of this Agreement. At Company's option, upon termination of this Agreement, Company may terminate Developer's right to operate under any existing Franchise Agreement.

9.    <u>TRANSFER AND ASSIGNMENT</u>.

    A.    <u>Transfer and Assignment by Developer</u>.  Neither Developer nor any owner or principal shall pledge, encumber, hypothecate or otherwise grant any third party a security or other interest in this Agreement in any manner whatsoever without the prior written consent of Company, which consent may be withheld or conditioned in Company's discretion.

The rights and duties created by this Agreement are "personal" to Developer and its owners and principals, and Company has entered into this Agreement in reliance on many factors, including the character, skill, aptitude and business and financial capacity of Developer and its owners and principals. Accordingly, neither Developer's nor any owner's or principal's interest in this Agreement nor any rights or obligations hereunder shall be sold, conveyed, assigned, transferred, gifted, mortgaged, shared or divided, voluntarily or involuntarily, by operation of law or otherwise in any manner, including the division of any community property interest in connection with any divorce proceeding (a "Transfer"), without Company's prior written consent, which consent may be withheld or conditioned in Company's discretion. Any such purported Transfer, including any Transfer by a trustee in bankruptcy, without Company's prior written consent, shall be null and void and a material default of this Agreement.

B.    <u>Company's Approval of Transfer</u>.  Any Transfer or encumbrance of fifty percent (50%) or more of the outstanding and issued stock, membership interests, partnership rights or other ownership interest of Developer by one or more Transfers, by operation of law, or any other event(s) or transaction(s) or which, directly or indirectly, changes management control of Developer shall be valid and effective only with Company's prior written consent and only after compliance with this Section 9.  Developer acknowledges and agrees that there are many objective and subjective factors that comprise the process by which Company selects a suitable Developer; therefore, Company may impose any reasonable condition to its consent to any such Transfer, including without limitation, the satisfaction of some or all of the following conditions:

(1)    The Transfer of Developer's rights under this Agreement shall be accompanied by a Transfer of all Franchise Agreements with Company and rights to all Centres owned by Developer to the same transferee;

(2)    Developer and the proposed transferee must complete, execute and comply with all requirements of Company's then-current transfer documents and any other materials described in the Manuals, including, without limitation, Company's then-current form of area development agreement, which may differ from the terms of this Agreement, with a term equal to the term remaining under this Agreement;

(3) The proposed transferee must be a person or business entity that meets Company's then-current standards, specifications, and qualifications for new area developers;

(4) The proposed Transfer shall be for commercially reasonable terms; the sales price of the interest to be conveyed must not be so high, or the terms of the sale so onerous that, in the reasonable judgment of Company, the transferee will be unlikely to properly operate, maintain, and promote the area business and meet transferee's financial and other obligations to Company, third party suppliers and creditors.  This provision shall not create any liability whatsoever to either Developer or any purported assignee on the part of Company in the event that Company approves the Transfer or disapproves the Transfer;

(5) As of the effective date of the proposed Transfer, all obligations of Developer hereunder and under all other agreements between Developer and Company and any affiliate of Company shall be fully satisfied;

9

(6) Any transferee must complete training to Company's satisfaction and pay any then-current training fee;

(7) At or prior to the Transfer, Developer's Centres shall be upgraded, remodeled and refurbished, both exterior and interior, to comply with Company's then-current standards and specifications including, without limitation, upgrades to the Centres' computer and technology equipment and systems;

(8) Developer shall enter into a General Release; and

(9) Payment by Developer of a transfer fee equal to Five Thousand Dollars ($5,000.00).

C.    Right of First Refusal.

(1)    If Developer desires to make any Transfer for value, Developer shall, at least thirty (30) days prior to the closing for any such proposed Transfer, notify Company in writing. This notice must set forth the name of the proposed purchaser, all terms and conditions of the proposed Transfer, and must be accompanied by all fully completed then-current transfer documents required by Company, including a fully executed purchase and sale agreement (the "Notice"). The effectiveness of any such purchase and sale agreement must be contingent upon Company's waiver of its right of first refusal as described herein and upon Company's consent to the transaction.

(2)    Company shall have a right of first refusal to accept for itself or its nominee the terms of any proposed Transfer of the kind described in Sections 9(A) and 9(B) that is offered or proposed by Developer or offered by a bona fide third party and proposed to be accepted by Developer, whether voluntarily or by operation of law (the "Right of First Refusal").

(3)    If Company exercises the Right of First Refusal, then in addition: (i) Company shall have the right to substitute cash for any form of payment proposed in the offer; (ii) Company shall have the right to purchase all property that is part of the proposed transaction or to elect to separate this Agreement from other property, subject to making a reasonable allocation of the price to such property; (iii) Company's creditworthiness shall be deemed to be at least as good as that of any proposed purchaser; (iv) Company shall have at least sixty (60) days after notifying Developer of its election to exercise the Right of First Refusal to close the transaction; and (v) Company shall be entitled to receive written representations and warranties from Developer that Developer owns clear title to all assets being sold, assigned or transferred, free of all liens, claims and encumbrances and that there are no liabilities of Developer that have not been disclosed to Company in writing in connection with the Transfer.

(4)    Company shall exercise the Right of First Refusal as follows: Within thirty (30) days after Developer delivers the Notice and all additional information requested by Company, Company shall, in writing, consent or withhold consent to the proposed sale, assignment or transfer or, in accordance with this Section 9, accept for itself or its nominee the proposed sale, assignment or transfer on the terms specified in the Notice.

(5)     If Company exercises the Right of First Refusal, then Developer shall take all action necessary to cause any other agreements designated by Company and relating to the business set forth in this Agreement to be assigned to Company.

(6)     If Company elects not to exercise the Right of First Refusal and consents to the proposed Transfer, then Developer shall be authorized to complete the proposed transaction with the proposed transferee on the terms set forth in the Notice. Any change to any material term of the transaction shall constitute a new proposal that shall again require compliance by Developer with the procedures in this Section 9.

(7)     If the proposed sale, assignment or transfer is not completed for any reason within one hundred twenty (120) days after Company elects not to exercise the Right of First Refusal with respect to such transaction, a new Right of First Refusal shall commence as to any subsequent proposed Transfer by Developer.

(8)     An election by Company not to exercise the Right of First Refusal and consent to the proposed transaction shall not affect Company's Right of First Refusal for any other proposed transaction. Company's decision not to exercise the Right of First Refusal shall not constitute consent to the proposed transaction. Developer and any proposed transferee shall be required to comply with all provisions relating to Transfer in this Section 9.

D.     Death or Incapacity of Developer or Controlling Owner or Shareholder.

(1)     In the event of the death or incapacity of Developer (which is not a business entity) or any of its controlling or managing owners or principals (if Developer is a business entity), Company shall, upon the written request of the heirs or representatives, allow the heirs or representatives a period of six (6) months from date of death or incapacity to:

(a)     demonstrate that such heirs or representatives meet Company's standards and specifications for new area developers and execute and agree to the terms of the Company's then-current form of area developer agreement (except that the term of such agreement shall be the remaining term hereof and no Development Fee shall be payable); or

(b)     Transfer or assign this agreement to a third party acceptable to Company who meets Company's standards and specifications for new area developers, subject to the provisions for Transfers set forth in Section 9(B) and Company's Right of First Refusal set forth in Section 9(C).

E.     Assignment by Company.  Company shall have the right at any time to assign or Transfer this Agreement, and any rights or obligations in this Agreement, in whole or in part, in any manner and for any purpose to any person or entity, including but not limited to, any affiliate, subsidiary or any other entity.

10.     INDEMNITY BY DEVELOPER.

A.     Developer shall defend, indemnify and hold harmless Company and its affiliated corporations and other entities, and their respective shareholders, directors, officers, co-workers, employees, agents, and any other representatives (collectively, "Indemnitees") from all

11

judgments, settlements, penalties, losses, costs and expenses, including reasonable attorneys' fees incurred in connection with any action, arbitration, suit or other proceeding, regardless of whether reduced to judgment, or any settlement arising from any such proceeding, by reason of any claimed act or omission by Developer, its directors, officers, co-workers, employees, agents and any other representatives. Each Indemnitee is an express and intended third party beneficiary of this Section 10.

B.      If any action, suit or proceeding shall be commenced against Company or any other Indemnitee arising out of the activities of Developer or any claim or demand is asserted for which Company or any other Indemnitee proposes to demand indemnification under this Section 11, Company shall promptly notify Developer. Company and each other Indemnitee shall reasonable cooperate with Developer in the defense, compromise or settlement of the claim, action, suit or proceeding. Neither party will compromise or settle any such claim, action, suit or proceeding, without the prior written consent of the other, provided that if Developer proposes a monetary settlement, acceptance of which would release Company and all other Indemnitees from all liability and claims that were or could have been asserted in the action and Company withholds consent to such settlement, then the indemnification liability of Developer shall be limited to the total sum representing the amount of the proposed compromise or settlement and the amount of costs and expenses (including reasonable attorneys' fees) incurred by Developer up to the time such approval is withheld.

11.     ARBITRATION/DISPUTE RESOLUTION.

A.      Arbitration.

(1)     Except for controversies, disputes or claims set forth in Section 11(B) below, for which Company elects to proceed to court, every claim or dispute arising out of or relating to the negotiation, performance or non-performance of this Agreement including, without limitation, any alleged torts, and any claims regarding the validity, scope, and enforceability of this Section shall be determined by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), or as otherwise agreed by the parties. The place of arbitration shall be in San Diego, California.

(2)     The parties shall first attempt to resolve any claim or dispute through good faith, informal negotiations, including but not limited to, non-binding mediation. In the event that the matter is not thereby resolved within thirty days, either party may demand arbitration by written notice to the other party and to the AAA in San Diego, California.

(3)     The parties shall mutually agree on one arbitrator. If the parties cannot so agree, the single arbitrator shall be selected by the AAA.

(4)     The arbitrator shall, within thirty (30) days after the matter has finally been submitted to him or her, render a written decision making specific findings of fact and setting forth the reasons for the decision which shall be consistent with the terms of this Agreement. The arbitrator shall not have any power to alter, modify or change any of the terms of this Agreement or to grant any remedy which is inconsistent with or prohibited by the terms of this Agreement or not available in a court of law. The arbitrator shall have power to award only

12

direct actual damages and shall have no power or authority to award punitive, exemplary, consequential or incidental damages or statutory multiples of damages such as statutory treble damages. The parties intend that this agreement to arbitrate be valid, binding, enforceable and irrevocable. The terms of this Section shall survive the termination or expiration of this Agreement. Judgment on any award of the arbitrator shall be binding and may be entered in any court having jurisdiction thereof.

   B.    Company Actions. Notwithstanding the provisions of Section 12(A), Company shall have the right to proceed to any court of competent jurisdiction and seek appropriate remedies, including, but not limited to, damages, repossession, foreclosure, specific performance, and injunctive relief, in the following instances:

       (1)    Conduct or threatened conduct which may cause Company, the System, or the Marks irreparable harm;

       (2)    Developer's infringement, misuse or inappropriate use of the Marks (including but not limited to actions seeking relief under the Trademark Act of 1946, as amended), copyrights, trade dress, trade secrets, or other proprietary or confidential information;

       (3)    Abandonment of a Centre;

       (4)    Any failure to properly "de-identify" upon expiration, termination, or abandonment;

       (5)    Any actions by Company as secured creditor under applicable law under any promissory notes, equipment lease, or other secured obligation; and

       (6)    Any actions by Company under applicable bankruptcy law.

   C.    Consent to Jurisdiction. Any arbitration or litigation relating in any way to this Agreement shall be conducted in San Diego, California. By execution and delivery of this Agreement, Developer hereby irrevocably waives, to the fullest extent permitted by law, any objection that Developer may now or hereafter have to the laying of venue in San Diego, California, and any claim that San Diego, California, is an inconvenient forum. Notwithstanding the foregoing, nothing herein shall limit the right of Company to commence any action of the kind described in Section 11(B), above, in courts other than those that are located in San Diego, California.

12.    MISCELLANEOUS.

   A.    Entire Agreement. This Agreement is the entire agreement between the parties concerning its subject matter and supersedes all other agreements, understandings, negotiations and discussions pertaining to such subject matter.

   B.    Amendment. No amendment of any provision of this Agreement shall be effective unless an instrument stating the amendment has been signed by both parties .

13

C.    _Waiver_.  Waiver by a party of a breach or default of any provision of this Agreement shall not operate or be construed as a waiver of any other breach or default.  No provision of this Agreement may be waived unless an instrument stating the waiver has been signed by the party to be bound thereby.

D.    _Third Parties_.  Except as provided in Section 11, no person or entity other than Developer, Company and affiliates of Company shall be deemed to have acquired any rights by reason of anything contained in this Agreement.

E.    _Interpretation_.  Wherever herein appearing, unless clearly contrary to the context:

(1)    Except as otherwise specifically provided herein, words importing the singular shall be deemed to include the plural and vice versa.

(2)    "_Company_" shall mean Jenny Craig International, Inc., its agents, successors in title and permitted assigns, permitted transferees and those claiming through or under them, respectively.

(3)    "_Developer_" shall mean the entity designated as Developer in the first paragraph of this Agreement, its successors in title and permitted assigns, permitted transferees and those claiming through or under them, respectively.

(4)    The masculine, feminine and neuter gender shall include each other.

(5)    The table of contents and section headings in this Agreement are for convenient reference only and shall not affect the meaning or interpretation of this Agreement.

(6)    The provisions of this Agreement shall be interpreted according to their plain meanings and not strictly for or against either party.

F.    _Notices_.  All notices or other communications in connection with this Agreement shall be in writing, and shall be considered given when personally delivered to the addressee by registered or certified mail, postage prepaid, return receipt requested, or when delivered to the addressee via commercial courier or telecopier directed as follows (or directed to such other address or telecopier with confirmation of receipt as instructed by the recipient in accordance with this Section 13(F)):

Company:        Jenny Craig International, Inc.
                11355 North Torrey Pines Road
                La Jolla, California  92038
                Attention: President
                Telecopier: (858) 812-2734

and

14

Jenny Craig, Inc.
11355 North Torrey Pines Road
La Jolla, California 92038
Attention: General Counsel
Telecopier: (858) 812-2799

Developer:        DMJ, Inc.
6006 Sweetbrier Cove
Memphis, Tennessee 38120
Attention: President
Telecopier: (901) 767-7040

G.    <u>Relation of the Parties</u>.  The parties shall be independent contractors.  Neither Developer nor any personnel of Developer shall be deemed to be an employee or other form of agent of Company.  Nothing in this Agreement shall be construed to create a partnership, joint venture, agency or any fiduciary or special relationship.

H.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts made and to be performed in that State, without giving effect to the conflict of laws rules of that State; provided, however, that if a provision of this Agreement is unenforceable under California law, such provision shall be governed by and construed under the laws of the State in which the Development Area is located.

I.    <u>Legal Fees and Costs</u>.  If without the commencement of arbitration or litigation, Company incurs any legal expenses, costs or attorneys' fees in connection with either the collection of any sums due under this Agreement, or the enforcement of Developer's compliance with this Agreement, or as a result of Developer's breach of this Agreement, Developer shall pay such legal expenses, costs and attorneys' fees.  If either Company or Developer commences arbitration or litigation to enforce compliance with the terms of this Agreement, the prevailing party in such arbitration or litigation and in any appeals from the judgment rendered in such arbitration or litigation shall be entitled to recover the full amount of all of its legal expenses, costs and attorneys' fees incurred in such arbitration or litigation.

J.    <u>Limitation of Liability</u>.  Under no circumstances shall either party be liable for any indirect, incidental, punitive, exemplary, special or consequential damages or statutory multiples of damages (such as statutory treble damages) suffered by the other party or any other person arising out of or related to this Agreement or the performance or non-performance of its obligations hereunder, regardless of whether or not such party has been advised of the possibility of such damages.  Nothing contained herein or elsewhere in this Agreement shall act to limit liability to Company for the indemnification obligations of Developer set forth in Section 10.

K.    <u>Severability</u>.  If any provision of this Agreement is unenforceable, the remainder of this Agreement shall continue in effect.

L.    <u>Interest</u>.  Any amount owed by Developer to Company and not paid when due shall bear interest at two percentage points (2%) above the prime rate published from time to

15



time by Bank of America (or its successor) or at the maximum rate allowed by law, whichever is less.

M.    <u>Further Assurances</u>.  Developer shall sign such other or additional instruments as Company requests to accomplish the purposes of this Agreement.

N.    <u>Time</u>.  Developer's timely performance of each and all of Developer's obligations is of the essence of this Agreement.

DEVELOPER:                                COMPANY:

DMJ, INC. *Delaware*                      JENNY CRAIG INTERNATIONAL, INC.
a ~~Tennessee~~ corporation               a California corporation

By:                                       By:

Jon Fusco                                 Maria Weiss

President                                 Vice President Franchise Development

16

EXHIBIT I

TO THE AREA DEVLOPMENT AGREEMENT
BY AND BETWEEN
JENNY CRAIG INTERNATIONAL, INC. AND
DMJ, INC.

### MINIMUM DEVELOPMENT QUOTA

Developer shall open and continuously operate no fewer than one (1) Centre within the Development Area during the term of this Agreement.

After the initial one Centre is opened and operated as set forth in this Exhibit I and for the remaining term of the Agreement, Developer shall use its best efforts to open additional Centres as may be necessary to develop the Development Area to its maximum economic potential.

### DEVELOPMENT AREA

The Development Area referred to in Section 1(B) of the above-referenced Agreement shall be:

17

500 Jackson, MS

TV HH Rank: 90; Cable HH Rank: 99

**TV Markets**

**DMA Counties and Major Cities & Towns**

| | | | | | |
|---|---|---|---|---|---|
| **Adams**<br>Natchez | **Franklin** | **Issaquena** | **Lincoln**<br>Brookhaven | **Rankin**<br>Jackson<br>Pearl | **Simpson**<br>Magee |
| **Attala**<br>Kosciusko | **Hinds**<br>Jackson<br>Clinton | **Jefferson** | **Madison**<br>Jackson | **Brandon**<br>Richland<br>Flowood | **Smith** |
| **Claiborne** | **Holmes**<br>Durant | **Jefferson Davis** | **Ridgeland**<br>Canton<br>Madison | **Scott** | **Walthall** |
| **Lawrence** | **Leake**<br>Carthage | **Pike**<br>McComb | **Forest**<br>Morton | **Warren**<br>Vicksburg |
| **Copiah**<br>Crystal Springs<br>Hazlehurst | **Humphreys**<br>Belzoni | | | **Sharkey** | **Yazoo**<br>Yazoo City |

SRDS TV & Cable Source    Third Quarter, 1997

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# # 147999    — KD

# February 22, 2008
# 16:35:52

## Civ Fil Non-Pris
USAO #.: 08CV0354
Judge..: JEFFREY T MILLER
Amount.:                    $350.00 CK
Check#.: 211514

## Total-> $350.00

FROM: CIVIL FILING
      JENNY CRAIG, INC. V. DMJ

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**FILED**

FEB 2 2 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

08 CV 0354 JM BLM

## I. (a) PLAINTIFFS
Jenny Craig Franchising, LLC

**DEFENDANTS**
DMJ, Inc.

**(b)** County of Residence of First Listed Plaintiff San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Shelby
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Richard R. Spirra
Paul A. Henreid
Gordon & Rees LLP
101 W. Broadway, Suite 1600; San Diego, CA 92101
(619)696-6700

Attorneys (If Known)
Thomas R. Buckner
Apperson, Crump & Maxwell, PLC
6000 Poplar Avenue, Suite 400; Memphis, MN
(901)756-6300

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 462 Naturalization Application | | |
| | | | ☐ 463 Habeas Corpus – Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332
Brief description of cause:
Breach of Contract/ Injunctive Relief

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $Injunction
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE Arnold Goldin; Chancery Court of TN Chancery Court of Madison, MS
DOCKET NUMBER CH-08-0343-2 2008-159-B

DATE 2-22-08

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # 147999     AMOUNT $350     APPLYING IFP KO 2/26/08     JUDGE ____     MAG. JUDGE ____

**ORIGINAL**

American LegalNet, Inc.
www.FormsWorkflow.com